# EXHIBIT A

## LOAN AND SECURITY AGREEMENT

This **LOAN AND SECURITY AGREEMENT** (this "**Agreement**") dated as of the Effective Date, among: (a) **SILICON VALLEY BANK** ("**Bank**"), (b) the borrower listed on Schedule I hereto ("**Borrower**"), and (c) **JES GLOBAL CAPITAL GP III, LLC**, a Delaware limited liability company ("**General Partner**"), provides the terms on which Bank shall lend to Borrower and Borrower shall repay Bank.  The parties agree as follows:

## 1   LOAN AND TERMS OF PAYMENT

**1.1.1    Revolving Advances**.  Subject to the terms and conditions of this Agreement, Bank shall make Advances not exceeding the Availability Amount during the Availability Period.  Amounts borrowed under the Committed Revolving Line may be repaid as set forth on Schedule I hereto.  Notwithstanding the foregoing, (a) any Discretionary Increase Advance shall be within Bank's sole discretion and (b) after repayment of a Discretionary Increase Advance, such Discretionary Increase Advance may not be reborrowed.

**1.1.2    Letters of Credit Sublimit**.

(a)     As part of the Committed Revolving Line, Bank shall issue or have issued Letters of Credit denominated in Dollars or a Foreign Currency for Borrower's account.  The aggregate Dollar Equivalent amount utilized for the issuance of Letters of Credit shall at all times reduce the amount otherwise available for Advances under the Committed Revolving Line.  The aggregate Dollar Equivalent available to be used for the issuance of Letters of Credit may not exceed (i) the Committed Revolving Line, minus (ii) the sum of all outstanding principal amounts of any Advances and Portfolio Investment Advances, and minus (iii) the Dollar Equivalent of the face amount of any outstanding Letters of Credit (including drawn but unreimbursed Letters of Credit and any Letter of Credit Reserve).

(b)     If, on the Maturity Date (or the effective date of any termination of this Agreement), there are any outstanding Letters of Credit, then on such date Borrower shall provide to Bank cash collateral in an amount equal to (i) 105.0% of the face amount of all such Letters of Credit denominated in Dollars and (ii) 105.0% of the Dollar Equivalent of the face amount of all such Letters of Credit denominated in a Foreign Currency, plus, in each case, all interest, fees, and costs due or to become due in connection therewith (as estimated by Bank in its commercially reasonable judgment), to secure all of the Obligations relating to such Letters of Credit.  All Letters of Credit shall be in form and substance acceptable to Bank and shall be subject to the terms and conditions of Bank's standard Application and Letter of Credit Agreement (the "**Letter of Credit Application**").  Borrower shall execute any further documentation in connection with the Letters of Credit as Bank may reasonably request.  Borrower shall be bound by the regulations and interpretations of the issuer of any Letters of Credit guaranteed by Bank and opened for Borrower's account or by Bank's interpretations of any Letter of Credit issued by Bank for Borrower's account.  Bank shall not be liable for any error, negligence, or mistake, whether of omission or commission, in following Borrower's instructions or those contained in the Letters of Credit or any modifications, amendments, or supplements thereto.

(c)     The obligation of Borrower to immediately reimburse Bank for drawings made under Letters of Credit shall be absolute, unconditional, and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, such Letters of Credit, and the Letter of Credit Application.

(d)     Borrower may request that Bank issue a Letter of Credit payable in a Foreign Currency.  If a demand for payment is made under any such Letter of Credit, Bank shall treat such demand as an Advance to Borrower of the Dollar Equivalent of the amount thereof (plus fees and charges in connection therewith such as wire, cable, SWIFT or similar charges).  To guard against fluctuations in currency exchange rates, upon the issuance of any Letter of Credit payable in a Foreign Currency, Bank shall create a reserve (the "**Letter of Credit Reserve**") under the Committed Revolving Line in an amount equal to ten percent (10.0%) of the face amount of such Letter of Credit.  The amount of the Letter of Credit Reserve may be adjusted by Bank from time to time to account for fluctuations in the exchange rate.  The availability of funds under the Committed Revolving Line shall be reduced by the amount of such Letter of Credit Reserve for as long as such Letter of Credit remains outstanding.

**1.1.3    Portfolio Investment Sublimit**.  Subject to the terms and conditions of this Agreement, Bank shall at the request of Borrower make one (1) or more Portfolio Investment Advances, as set forth on Schedule I hereto.

**1.1.4    Procedures for Borrowing**.  Subject to the prior satisfaction of all other applicable conditions to the making of an Advance set forth in this Agreement, to obtain an Advance (other than Advances under Section 1.1.2), Borrower shall notify Bank (which notice shall be irrevocable) through Bank's online banking platform, by electronic mail or by telephone by 12:00 p.m. Eastern time on the Funding Date of the Advance.  Together with any such electronic notification, Borrower shall deliver to Bank by electronic mail a completed Payment/Advance Form executed by an Authorized Signer or his or her designee.  Bank may rely on any telephone notice given by a person whom Bank believes is an Authorized Signer or designee.  Borrower will indemnify Bank for any loss Bank suffers due to such belief or reliance.  Bank shall credit Advances to the Designated Deposit Account.  Bank may make Advances under this Agreement based on instructions from an Authorized Signer or his or her designee or without instructions if the Advances are necessary to meet Obligations which have become due.

**1.1.5    Rollover.**  On any Business Day occurring at least thirty (30) days but no more than ninety (90) days prior to the Stated Maturity Date, an Authorized Signer of Borrower may submit to Bank, on behalf of Borrower and according to Section 9, a written request substantially in the form of Exhibit D  (a "**Rollover Request**") to extend the Stated Maturity Date to a date one (1) calendar year after the Stated Maturity Date or, if such date is not a Business Day, the immediately preceding Business Day (such date, the "**Extended Stated Maturity Date**").  Submission by Borrower of a Rollover Request shall be deemed to be a restatement of each representation and warranty made by Borrower in Section 4 as of the date of such Rollover Request.  After receipt of a Rollover Request, Bank shall determine, in its sole discretion, whether to consent to such Rollover Request.  If granted by Bank, (a) Bank shall provide Borrower with notice of its consent to a Rollover Request, substantially in the form of Exhibit E, attached hereto (an "**Extension Notice**") according to Section 9, (b) as of the date of such Extension Notice, all references to the Stated Maturity Date in this Agreement shall be deemed to be references to the Extended Stated Maturity Date, (c) if the Extension Notice indicates that any such term is to be amended, as of the date of such Extension Notice, each of the definitions of the terms "Applicable Rate," "Unused Facility Fee," and "Letter of Credit Fee" appearing in Section 12 shall be deleted and replaced in its entirety with the new definition for such term set forth in the Extension Notice and (d), upon its receipt of the Extension Notice, Borrower shall pay the Extension Fee according to Section 1.3, and the terms set forth therein shall be deemed accepted by Borrower if Bank does not receive an objection in writing from Borrower within five (5) Business Days.  If Bank does not provide Borrower with an Extension Notice after receiving a Rollover Request on or prior to the Stated Maturity Date, such Rollover Request shall be deemed to have been denied by Bank, the Stated Maturity Date shall not be extended, and Borrower shall not be permitted to submit any subsequent Rollover Requests.  If Bank consents to Borrower's initial Rollover Request, Borrower may submit no more than one (1) subsequent Rollover Request.

**1.1.6    Discretionary Increase of Committed Revolving Line**.  So long as no Event of Default has occurred and is continuing, on any Business Day occurring at least two (2) Business Days prior to the proposed Funding Date of the applicable Discretionary Increase Advance, an Authorized Signer of Borrower may submit to Bank, on behalf of Borrower and according to Section 9, a written request in the form attached hereto as Exhibit F (a "**Discretionary Commitment Increase and Advance Request**") to increase the amount of the Committed Revolving Line to an aggregate amount as set forth on Schedule I hereto.  Submission by Borrower of a Discretionary Commitment Increase and Advance Request shall be deemed to be a restatement of each representation and warranty made by Borrower in Section 4 as of the date of such Discretionary Commitment Increase and Advance Request. After receipt of a Discretionary Commitment Increase and Advance Request, Bank may request evidence of the power and authority of such Authorized Signer to submit such Discretionary Commitment Increase and Advance Request and, subject to its receipt and satisfaction thereof, shall determine, in its sole discretion, whether to consent to such Discretionary Commitment Increase and Advance Request.  If granted by Bank, (i) Bank shall provide Borrower with notice of its consent to a Discretionary Commitment Increase and Advance Request according to Section 9 and (ii) as of the date of such notice, the Committed Revolving Line shall be increased in an amount equal to the amount specified in such Discretionary Commitment Increase and Advance Request as set forth on Schedule I hereto.  If Bank does not provide Borrower with notice of its consent to a Discretionary Commitment Increase and Advance Request within twenty (20) Business Days after the receipt by Bank thereof, such Discretionary Commitment Increase and Advance Request shall be deemed to have been denied by Bank.

**1.2    Payment of Principal and Interest**.

(a)    Promise to Pay.  Borrower unconditionally promises to pay Bank the outstanding principal amount of all Credit Extensions and accrued and unpaid interest thereon as and when due in accordance with this Agreement.

(b)      <u>Scheduled Principal Payments</u>.  Each Advance shall be due and payable as set forth on Schedule I hereto.

(c)      <u>Overadvance</u>.  At any time that the sum of aggregate outstanding Advances, the Dollar Equivalent amount of all outstanding Letters of Credit (including drawn but unreimbursed Letters of Credit) plus an amount equal to the Letter of Credit Reserve and Portfolio Investment Advances exceeds the Committed Revolving Line, Borrower shall immediately pay to Bank in cash the amount of such excess.

(d)      <u>Termination; Repayment</u>.  The Committed Revolving Line terminates on the Maturity Date. On the Maturity Date the principal amount of all Advances, the unpaid interest thereon, and all other Obligations relating to the Committed Revolving Line shall be immediately due and payable.

(e)      <u>Interest</u>.  Interest is payable as set forth on Schedule I hereto.

(f)      <u>Interest Rate</u>.  Subject to Section 1.2(g), the outstanding principal amount of any Advance or, unless Portfolio Investment Advance Documents indicate otherwise, any Portfolio Investment Advance shall accrue interest as set forth on Schedule I hereto.

(g)      <u>Default Rate</u>.  Immediately upon the occurrence and during the continuance of an Event of Default, overdue and unpaid amounts under the Loan Documents shall bear interest at a rate per annum equal to two percent (2.0%) above the rate that is otherwise applicable thereto unless Bank otherwise elects from time to time in its sole discretion.  Fees and expenses which are required to be paid by Borrower pursuant to the Loan Documents (including, without limitation, Bank Expenses) but are not paid when due shall bear interest until paid at a rate equal to the highest rate applicable to the Obligations.  Payment or acceptance of the increased interest rate provided in this Section 1.2(g) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Bank.

(h)      <u>Time of Payment</u>.  All payments (including prepayments) to be made by Borrower under any Loan Document shall be made in immediately available funds in Dollars, without setoff or counterclaim, before 12:00 p.m. Eastern time on the date when due.  Payments of principal and/or interest received after 12:00 p.m. Eastern time are considered received at the opening of business on the next Business Day.  When a payment is due on a day that is not a Business Day, the payment shall be due the next Business Day, and additional fees or interest, as applicable, shall continue to accrue until paid.

(i)      <u>Computation; 360-Day Year</u>.  Changes to the interest rate of any Credit Extension based on changes to the Prime Rate shall be effective on the effective date of any change to the Prime Rate and to the extent of any such change.  In computing interest, the date of the making of any Credit Extension shall be included and the date of payment shall be excluded; provided that if any Credit Extension is repaid on the same day on which it is made, such day shall be included in computing interest on such Credit Extension.  Interest shall be computed as set forth on Schedule I hereto.

(j)      <u>Debit of Accounts</u>.  Bank may debit any of Borrower's deposit accounts maintained with Bank, including the Designated Deposit Account, for principal and interest payments or any other amounts Borrower owes Bank when due under the Loan Documents.  These debits shall not constitute a set-off.

(k)      <u>Application of Payments</u>.  Unless otherwise specified by Borrower, all payments made on the Obligations shall be credited, to the extent of the amount thereof, in the following manner:

(i)      first, against the amount of interest accrued and unpaid with respect to Advances as of the date of such payment in order of incurrence of such Advances;

(ii)      second, against all principal due and owing with respect to Advances as of the date of such payment in order of incurrence of such Advances;

(iii)      third, against all costs, expenses and other fees (including attorneys' fees) arising under the terms hereof; and

(iv)      fourth, to all other amounts constituting any portion of the Obligations.

1.3    **Fees**.  Borrower shall pay to Bank:

(a)    <u>Commitment Fee</u>.  A fully earned, non-refundable commitment fee as set forth on Schedule I hereto;

(b)    <u>Unused Facility Fee</u>.  An Unused Facility Fee, payable quarterly, in arrears, on a calendar year basis, during the Availability Period.  Borrower shall not be entitled to any credit, rebate or repayment of any Unused Facility Fee previously earned by Bank pursuant to this Section 1.3(b) notwithstanding any termination of this Agreement or the suspension or termination of Bank's obligation to make Credit Extensions hereunder;

(c)    <u>Letter of Credit Fee</u>.  Bank's customary fees and expenses for the issuance or renewal of Letters of Credit, including, without limitation, a Letter of Credit Fee with respect to each Letter of Credit payable upon the issuance, each anniversary of such issuance and any renewal thereof;

(d)    <u>Bank Expenses</u>.  All Bank Expenses incurred through and after the Effective Date, when due;

(e)    <u>Extension Fee</u>.  Within five (5) Business Days of Borrower's receipt of any Extension Notice, an Extension Fee;

(f)    <u>Discretionary Increase Fee</u>. A Discretionary Increase Fee, as set forth on Schedule I hereto.

1.4    **Change in Circumstance**s.

(a)    <u>Increased Costs</u>.  If any Change in Law shall:  (i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or advances, loans or other credit extended or participated in by, Bank, (ii) subject Bank to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitment, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, or (iii) impose on Bank any other condition, cost or expense (other than Taxes) affecting this Agreement or Credit Extensions made by Bank, and the result of any of the foregoing shall be to increase the cost to Bank of making, converting to, continuing or maintaining any Credit Extension (or of maintaining its obligation to make any such Credit Extension), or to reduce the amount of any sum received or receivable by Bank hereunder (whether of principal, interest or any other amount) then, upon written request of Bank, Borrower shall promptly pay to Bank such additional amount or amounts as will compensate Bank for such additional costs incurred or reduction suffered.

(b)    <u>Capital Requirements</u>.  If Bank determines that any Change in Law affecting Bank regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on Bank's capital as a consequence of this Agreement, the Committed Revolving Line of Bank or the Credit Extensions made by Bank to a level below that which Bank could have achieved but for such Change in Law (taking into consideration Bank's policies with respect to capital adequacy and liquidity), then from time to time upon written request of Bank, Borrower shall promptly pay to Bank such additional amount or amounts as will compensate Bank for any such reduction suffered.

(c)    <u>Delay in Requests</u>.  Failure or delay on the part of Bank to demand compensation pursuant to this Section 1.4 shall not constitute a waiver of Bank's right to demand such compensation; provided that Borrower shall not be required to compensate Bank pursuant to subsection (a) for any increased costs incurred or reductions suffered more than 180 days prior to the date that Bank notifies Borrower of the Change in Law giving rise to such increased costs or reductions (except that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period shall be extended to include the period of retroactive effect).

1.5    **Taxes**.

(a)    <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of Borrower) requires the deduction or withholding of any Tax from any such payment by Borrower, then (i) Borrower shall be entitled to make such deduction or withholding, (ii) Borrower shall timely pay the full amount deducted or withheld to the relevant

Governmental Authority in accordance with Applicable Law, and (iii) if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 1.5) Bank receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by Borrower.  Without limiting the provisions of Section 1.5(a), Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)    Tax Indemnification.  Without limiting the provisions of Section 1.5(a) and Section 1.5(b), Borrower shall, and does hereby, indemnify Bank, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 1.5) payable or paid by Bank or required to be withheld or deducted from a payment to Bank and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by Bank shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority pursuant to this Section 1.5, Borrower shall deliver to Bank a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Bank.

(e)    Status of Bank.  If Bank (including any assignee or successor) is entitled to an exemption from or reduction of withholding tax with respect to payments made under any Loan Document, it shall deliver to Borrower, at the time or times reasonably requested by Borrower, such properly completed and executed documentation reasonably requested by Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, Bank, if reasonably requested by Borrower, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Borrower as will enable Borrower to determine whether or not Bank is subject to backup withholding or information reporting requirements.  Without limiting the generality of the foregoing, Bank shall deliver whichever of IRS Form W-9, IRS Form W-8BEN, IRS Form W-8BEN-E, IRS Form W-8ECI or W-8IMY is applicable, as well as any applicable supporting documentation or certifications.  If a payment made to Bank under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if Bank were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), Bank shall deliver to Borrower at the time or times prescribed by Applicable Law and at such time or times reasonably requested by Borrower such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested in writing by Borrower as may be necessary for Borrower to comply with its obligations under FATCA and to determine that Bank has complied with Bank's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 1.5(e), "FATCA" shall include any amendments made to FATCA after the Effective Date. Bank agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower in writing of its legal inability to do so.

(f)    Treatment of Certain Refunds.  If Bank determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 1.5 (including by the payment of additional amounts pursuant to this Section 1.5), it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made under this Section 1.5  with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of Bank and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Borrower, upon the written request of Bank, shall repay to Bank the amount paid over pursuant to this Section 1.5(f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that Bank is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 1.5(f), in no event will Bank be required to pay any amount to Borrower pursuant to this Section 1.5(f) if the payment of which would place Bank in a less favorable net after-Tax position than Bank would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 1.5(f) shall not be construed to require Bank to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to Borrower or any other Person.

## 2    CONDITIONS OF CREDIT EXTENSIONS

**2.1    Conditions Precedent to Initial Credit Extension.**  Bank's obligation to make the initial Credit Extension is subject to the condition precedent that Bank shall have received, in form and substance reasonably satisfactory to Bank:

(a)    Loan Documents executed by Borrower and General Partner;

(b)    Operating Documents of Borrower and General Partner and good standing certificates of Borrower and General Partner certified by the Secretary of State of the State of Delaware and the Secretary of State (or equivalent agency) of each other jurisdiction in which Borrower and/or General Partner is qualified to conduct business, in each case as of a date no earlier than thirty (30) days prior to the Effective Date;

(c)    a certificate executed by a Responsible Officer of General Partner with respect to, for each of Borrower and General Partner, (i) Operating Documents, (ii) incumbency and (iii) resolutions authorizing the execution and delivery of this Agreement, the Loan Documents, and all transactions related thereto;

(d)    the form of Subscription Agreement together with the signature page of each Subscription Agreement setting forth the correct legal name and Capital Commitment of each Partner;

(e)    copies of any Side Letter;

(f)    certified copies, dated within forty-five (45) days of the Effective Date, of searches for financing statements filed in the central filing office of the State of Delaware, accompanied by written evidence (including any UCC termination statements) that the Liens indicated in any such financing statements either constitute Permitted Liens or have been or, in connection with the initial Credit Extension, will be terminated or released;

(g)    filings satisfactory to Bank with respect to the Collateral, together with written evidence satisfactory to Bank that the same have been filed (or submitted for filing) in the appropriate public filing office(s) to perfect and/or protect Bank's first priority security interest in the Collateral;

(h)    an executed Federal Reserve Form U-1 (Regulation U);

(i)    a legal opinion of Borrower's and General Partner's counsel dated as of the Effective Date;

(j)    bank statements in form and substance satisfactory to Bank in its sole discretion evidencing Borrower's receipt of Capital Contributions from the most recent Capital Call made to the Partners;

(k)    a payoff letter, duly executed by, *inter alios*, Borrower and Sumitomo Mitsui Banking Corporation, in form and substance reasonably satisfactory to Bank evidencing that certain Revolving Credit Agreement dated as of December 28, 2018, among, *inter alios*, Borrower, General Partner and Sumitomo Mitsui Banking Corporation, has been, or concurrently on the Effective Date is being, terminated and all outstanding obligations thereunder repaid; and

(l)    payment of the fees and Bank Expenses then due as specified in Section 1.3 hereof.

**2.2    Conditions Precedent to all Credit Extensions.**  Bank's obligation to make each Credit Extension, including the initial Credit Extension, is subject to the following conditions precedent:

(a)    receipt of an executed Payment/Advance Form to the extent required by and in accordance with Section 1.1.4;

(b)    the representations and warranties in this Agreement shall be true, accurate, and complete in all material respects as of the date of any Payment/Advance Form or other request by Borrower for a Credit Extension and as of the Funding Date of each Credit Extension; provided that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; provided further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date, and no Event of Default shall have occurred and be continuing or result from the Credit Extension;

(c)      a Material Adverse Change shall not have occurred and be continuing; and

(d)      if the proposed Credit Extension will be used in connection with one (1) or more Investments, neither Borrower nor General Partner is aware of any Partner (i) who could be excused from participating in such Investment(s) due to any Excuse Provision, or (ii) who is an Excluded Partner, in each case, unless Bank has been notified of the same prior to the proposed Credit Extension and the calculation of the Borrowing Base is adjusted to reflect a corresponding reduction of such Partner's Callable Capital based upon its pro rata share of any such Investment as if such Partner had participated in such Investment.

**2.3      Covenant to Deliver**.  Borrower and General Partner shall each deliver to Bank each item required to be delivered to Bank under this Agreement as a condition precedent to any Credit Extension.  A Credit Extension made prior to the receipt by Bank of any such item shall not constitute a waiver by Bank of Borrower's and/or General Partner's obligation to deliver such item, and the making of any Credit Extension in the absence of a required item shall be in Bank's reasonable discretion.

**3      CREATION OF SECURITY INTEREST**

**3.1      Grant of Security Interest**.  Borrower and General Partner each hereby grants Bank, to secure the payment and performance in full of all of the Obligations, a continuing security interest in, and assigns by way of collateral to Bank, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.  Borrower acknowledges that it previously has entered, or may in the future enter, into Bank Services Agreements with Bank.  Regardless of the terms of any Bank Services Agreement, Borrower and General Partner each agrees that any amounts Borrower owes Bank thereunder shall be deemed to be Obligations hereunder and that it is the intent of Borrower, General Partner and Bank to have all such Obligations secured by the first priority perfected security interest in the Collateral granted herein (subject to Permitted Liens).

**3.2      Authorization to File Financing Statements**.  Borrower and General Partner each authorizes Bank to file financing statements, without notice to Borrower or General Partner, with all jurisdictions deemed necessary or appropriate by Bank to perfect or protect Bank's interest or rights hereunder.

**3.3      Termination**.  If this Agreement is terminated, Bank's Lien in the Collateral shall continue until the Obligations (other than inchoate indemnity obligations, any other obligations which, by their terms, are to survive the termination of this Agreement and any Obligations under Bank Services Agreements that are cash collateralized in accordance with this Agreement) are satisfied in full, and at such time, Bank shall, at Borrower's sole cost and expense, terminate its security interest in the Collateral and all rights therein shall revert to Borrower and/or General Partner.  In the event (a) all Obligations (other than inchoate indemnity obligations, any other obligations which, by their terms, are to survive the termination of this Agreement and any Obligations under Bank Services Agreements that are cash collateralized in accordance with this Agreement), except for Bank Services, are satisfied in full, and (b) this Agreement is terminated, Bank shall terminate the security interest granted herein upon Borrower providing cash collateral acceptable to Bank in its commercially reasonable judgment for Bank Services, if any.  In the event such Bank Services consist of outstanding Letters of Credit, Borrower shall provide to Bank cash collateral in an amount equal to (i) 105.0% of the face amount of all such Letters of Credit denominated in Dollars and (ii) 105.0% of the Dollar Equivalent of the face amount of any such Letters of Credit denominated in a Foreign Currency plus all interest, fees, and costs due or to become due in connection therewith (as estimated by Bank in its commercially reasonable judgment), to secure all of the Obligations relating to such Letters of Credit.

**4      REPRESENTATIONS AND WARRANTIES**

Borrower and General Partner each represents and warrants as follows:

**4.1      Due Organization, Authorization; Power and Authority**.  Borrower and General Partner each is duly existing and in good standing as a Registered Organization in its jurisdiction of formation and is qualified and licensed to do business and is in good standing in any jurisdiction in which the conduct of its business or its ownership of property requires that it be qualified, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.  The execution, delivery and performance by each of Borrower and General Partner of the Loan Documents to which it is a party have been duly authorized, and do not (a) conflict with any of Borrower's or General Partner's organizational documents, (b) contravene, conflict with, constitute a default under or violate any Requirement of Law, (c) contravene, conflict or violate any applicable order, writ, judgment, injunction, decree, determination or award of any Governmental Authority by which Borrower or General Partner or any of its respective

property or assets may be bound or affected, (d) subject to any Perfection Requirement, require any action by, filing, registration, or qualification with, or Governmental Approval from, any Governmental Authority or (e) constitute an event of default under any material agreement by which either Borrower or General Partner is bound to an extent or in a manner which has or is reasonably likely to have a Material Adverse Effect.  Borrower has obtained all necessary consents from its Partners to enter into this Agreement.  Neither Borrower nor General Partner is in default under any agreement to which it is a party or by which it may be bound in which the default could reasonably be expected to have a Material Adverse Effect.

**4.2      Perfection Certificate; Partner Information**.  All information set forth on the Perfection Certificate is accurate and complete (it being understood and agreed that Borrower and/or General Partner may from time to time update certain information in the Perfection Certificate after the Effective Date to the extent permitted by one (1) or more specific provisions in this Agreement).  The signature page to the Subscription Agreement of each Partner delivered to Bank truly, accurately and completely sets forth such Partner's Capital Commitment and correct legal name.  True and complete copies of each Partner's Subscription Agreement and any Side Letter have been provided to Bank.

**4.3      Collateral**.  Borrower and General Partner each has good title to their respective assets, free and clear of any and all Liens except Permitted Liens.  Subject to the Perfection Requirements, Bank's Lien is a first priority perfected security interest in the Collateral (subject to Permitted Liens).

**4.4      Litigation**.  Other than as set forth in the Perfection Certificate or as disclosed to Bank pursuant to Section 5.3(e), there are no actions, investigations or proceedings pending or, to the knowledge of the Responsible Officers, threatened in writing by or against Borrower which could reasonably be expected to result in damages or costs to Borrower of more than, individually or in the aggregate, Five Hundred Thousand Dollars ($500,000) not covered by independent third party insurance as to which liability has been accepted by the carrier providing such insurance.

**4.5      Financial Statements; Financial Condition**.  All consolidated financial statements for Borrower delivered to Bank fairly present in all material respects Borrower's consolidated financial condition and Borrower's consolidated results of operations for the periods covered thereby, subject, in the case of unaudited financial statements, to normal year-end adjustments and the absence of footnote disclosures.  There has not been any material deterioration in Borrower's consolidated financial condition since the date of the most recent financial statements submitted to Bank.

**4.6      Solvency**.  The fair salable value (taken on a going concern basis) of Borrower's assets (including goodwill and uncalled Capital Commitments minus disposition costs) exceeds the fair value of its liabilities; Borrower is not left with unreasonably small capital after the transactions in this Agreement; and Borrower is able to pay its debts (including trade debts) as they mature.

**4.7      ERISA Status**.  Either (a) the underlying assets of Borrower or any other obligor under this Agreement or any other Loan Document do not constitute "plan assets" within the meaning of the Plan Asset Regulation because Borrower or such obligor, as applicable, qualifies as an "operating company" within the meaning of the Plan Asset Regulation or (b) "Benefit Plan Investors" (as defined in Section 3(42) of ERISA) hold less than 25% of each class of equity interests in Borrower or such other obligor, as applicable (calculated in accordance with Section 3(42) of ERISA) and, accordingly, the underlying assets of Borrower and such other obligor do not constitute "plan assets" within the meaning of the Plan Asset Regulation.  The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower, General Partner or any other obligor under this Agreement or any other Loan Document, the enforcement of the Obligations in accordance with the terms of this Agreement and the other Loan Documents, and the borrowing and repayment of amounts under this Agreement, do not constitute a non-exempt prohibited transaction under Section 406(a) of ERISA or Section 4975(c)(1)(A) - (D) of the Internal Revenue Code.  None of Borrower, General Partner or any other obligor under this Agreement or any other Loan Document or any member of a Borrower's, General Partner's or any such obligor's Controlled Group has established, maintains or has any obligation to contribute to any Plan.

**4.8      Other Regulatory Compliance**.  Borrower is not required to be registered as an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended.  Borrower is not engaged as one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors).  Borrower has not violated any laws, ordinances or rules, the violation of which could reasonably be expected to have a Material Adverse Effect.  Borrower has

obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary to avoid a Material Adverse Effect.

      **4.9**     **Investments**.  Borrower does not own any stock, partnership interest or other equity securities except for Permitted Investments.  Borrower holds all of its Investments (including all of its Investments in Portfolio Investments) directly or through a Special Purpose Entity.  No Investment proposed to be made in whole or in part with the proceeds of any Advance is subject to excuse, exclusion or cancellation by or on behalf of any Partner except to the extent disclosed to Bank pursuant to Section 2.2(d).

      **4.10**     **Tax Returns and Payments**.  Borrower has timely filed, or submitted extensions for, all tax returns and reports, and Borrower has timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower, except (a) Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

      **4.11**     **Collateral Assignment of Capital Call Rights**.  (a) Each of Borrower and General Partner has full power and authority to grant a security interest in any of its property, including its right to require Capital Contributions to be made to Borrower by the Partners of Borrower, (b) no contractual obligation exists that would prohibit or otherwise restrict Borrower or General Partner from granting a Lien under this Agreement over the Collateral, and (c) no provision of the Partnership Agreement or any Subscription Agreement or any Side Letter (i) limits or prohibits Borrower or General Partner from granting a Lien hereunder, or otherwise granting such security interests in the Collateral, to Bank or (ii) limits or prohibits Bank from exercising any rights hereunder including, without limitation, any remedies set forth in Sections 8.1 and 8.2 hereof following an Event of Default.

      **4.12**     **Partnership Agreement; Callable Capital**.  Except for amendments permitted under this Agreement, the Partnership Agreement and each Subscription Agreement and Side Letter is in full force and effect in the form presented to Bank as of the Effective Date, each Subscription Agreement is in substantially the same form as the form of Subscription Agreement delivered by Borrower to Bank on or prior to the Effective Date, and the Partnership Agreement and applicable Subscription Agreement constitute binding obligations of each Partner, enforceable according to its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.  There are no provisions in the Partnership Agreement or any Subscription Agreement or Side Letter restricting either Borrower or General Partner from entering into and performing its respective obligations under this Agreement.  No Partner has failed to make any Capital Contributions in accordance with any Capital Calls except for any such failure with respect to which Borrower has given Bank prompt notice.  All Callable Capital is due and owing directly to Borrower or to an Alternative Investment Vehicle that is permitted under Section 6.12.  Except as provided in the Excuse Provisions or otherwise disclosed to Bank pursuant to Section 2.2(d), there are no conditions (a) to each Partner's obligation to make Capital Contributions to Borrower or General Partner on behalf of Borrower or (b) limiting or reducing any Capital Commitments or the obligation of any Partner to make, or the right of Borrower or General Partner on behalf of Borrower (or Bank acting in accordance with this Agreement) to receive, any Capital Contributions.  No Person other than Borrower, General Partner on behalf of Borrower or Bank pursuant to the terms of this Agreement is entitled to receive Capital Contributions or has rights to Callable Capital.  Other than as specified in the Excuse Provisions or otherwise disclosed to Bank pursuant to Section 2.2(d), each Partner is obligated to comply with its respective Capital Commitments and fund Capital Calls in an amount up to the remaining Callable Capital of such Partner without setoff, counterclaim or defense and such Callable Capital may be applied to repay or otherwise satisfy the Obligations (including any Obligations that remain outstanding following another Partner's failure to fund Capital Calls when due regardless of any grace period or notice requirement set forth in the Partnership Agreement).

      **4.13**     **Investment Period**.  No fact, event or circumstance has occurred and is continuing that would cause, or has caused, the Investment Period to expire, be terminated, or be suspended prior to the Maturity Date.  Other than as set forth in the Excuse Provisions or otherwise disclosed to Bank pursuant to Section 2.2(d), no Partner has the right under the Partnership Agreement to refuse to fund its portion of a Capital Call made for the purpose of the repayment of an Advance based upon the occurrence of the expiration, termination or suspension of the Investment Period prior to the repayment of such Advance.  Except as provided in the Excuse Provisions or otherwise disclosed to Bank pursuant to Section 2.2(d), each Investment made by Borrower or any Alternative Investment Vehicle using the proceeds of any Advance will be of the kind and nature such that the Partners are unconditionally obligated by the Partnership Agreement to fund a Capital Call for the purpose of repaying such Advance regardless of whether such

Capital Call is made before or after expiration or termination of the Investment Period or during a suspension of the Investment Period.

**4.14    Full Disclosure**.  No written factual representation, warranty or other statement (other than general economic or industry data) of Borrower in any certificate, or written statement given to Bank, as of the date such representation, warranty, or other statement was made, taken together with all such written certificates and written statements given to Bank, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not misleading in any material respect in light of the circumstances under which they were made (it being recognized by Bank that the projections and forecasts provided by Borrower in good faith and based upon reasonable assumptions are not viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ from the projected or forecasted results).

**4.15    Sanctions**.  Neither Borrower nor General Partner is: (a) in violation of any Sanctions; or (b) a Sanctioned Person.  Neither Borrower nor General Partner or any of their respective subsidiaries, directors, officers, employees, agents or Affiliates (i) conducts any business or engages in any transaction or dealing with any Sanctioned Person, including making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person; (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to any Sanctions; (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Sanctions; or (iv) otherwise engages in any transaction that could cause Bank to violate any Sanctions.  To the knowledge of Borrower and General Partner, no Partner is a Sanctioned Person.

## 5    AFFIRMATIVE COVENANTS

Borrower and General Partner shall each do all of the following:

**5.1    Use of Proceeds**.  Cause the proceeds of the Credit Extensions to be used solely (a) as working capital, (b) to fund Borrower's general business purposes or (c) to make Permitted Investments, all in accordance with the Partnership Agreement, and not for personal, family, household or agricultural purposes or to repay outstanding principal indebtedness in connection with any other Credit Extension.

**5.2    Government Compliance**.  (a) Maintain its legal existence and good standing in its jurisdiction of formation and maintain qualification in each jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect and (b) comply with all laws, ordinances and regulations to which it is subject, noncompliance with which could reasonably be expected to have a Material Adverse Effect.

**5.3    Financial Statements, Reports and Certificates**.  Deliver to Bank:

(a)    Quarterly Financial Statements.  As soon as available, but no later than ninety (90) days after the last day of each fiscal quarter of Borrower (other than the last fiscal quarter of each fiscal year of Borrower), a company prepared consolidated balance sheet and income statement covering Borrower's consolidated operations for such quarter, certified by a Responsible Officer and in a form reasonably acceptable to Bank, together with valuation schedules for Portfolio Investments and any reports delivered during such fiscal quarter to Partners according to the terms of the Partnership Agreement;

(b)    Quarterly Compliance Certificate.  Within ninety (90) days after the last day of each fiscal quarter of Borrower (other than the last fiscal quarter of each fiscal year of Borrower) and together with the statements set forth in Section 5.3(a), a completed Compliance Certificate signed by a Responsible Officer;

(c)    Annual Audited Financial Statements.  As soon as available, but no later than one hundred twenty (120) days after the last day of each fiscal year of Borrower, audited consolidated financial statements of Borrower, prepared in accordance with GAAP, consistently applied, together with an unqualified opinion (except for a qualification pertaining to the occurrence of the Stated Maturity Date or the Extended Stated Maturity Date within 12 months of such audit) on the financial statements from an independent certified public accounting firm acceptable to Bank in its reasonable discretion and together with valuation schedules for Portfolio Investments and any reports delivered to Partners according to the terms of the Partnership Agreement with respect to such fiscal year not otherwise delivered to Bank pursuant to Section 5.3(a);

(d)      Fiscal Year End Compliance Certificate.  Within one hundred twenty (120) days after the last day of each fiscal year of Borrower and together with the statements set forth in Section 5.3(c), a completed Compliance Certificate signed by a Responsible Officer;

(e)      Legal Action Notice.  A prompt report of any legal actions, investigations or proceedings pending or threatened in writing against Borrower that could reasonably be expected to result in damages or costs to Borrower of, individually or in the aggregate, One Million Dollars ($1,000,000) or more;

(f)      Investment Period Notice.  A prompt notice of the expiration, termination or suspension of the Investment Period;

(g)      Partner Transfer Notice.  A prompt notice of (i) any requested transfer of any Partner's interest in Borrower, and (ii) the identity of any Person that requests to acquire an interest in Borrower after the Effective Date;

(h)      Capital Call Notice.  A prompt notice to Bank of each Capital Call, including the date and amount of such Capital Call and the amount of Callable Capital after giving effect to such Capital Call, via e-mail at the address specified in Section 9;

(i)      Partner Default Notice.  A prompt notice of (i) any failure to receive any Capital Contributions when due in accordance with a Capital Call (without regard to any grace period or notice requirement set forth in the Partnership Agreement or otherwise), and (ii) the identity of any Partner that fails to make its Capital Contribution when due in connection with a Capital Call;

(j)      Partner Excuse Notice.  A prompt notice of any Partner's claim or exercise of any excuse, exclusion or cancellation right, including any Excuse Provision, with respect to any Capital Call or Permitted Investment;

(k)      Partner Exclusion Notice.  A prompt notice that any Partner has become an Excluded Partner (without regard to any applicable cure period, notice or other requirement);

(l)      Alternative Investment Vehicle Formation Notice.  A prompt notice of the formation of any Alternative Investment Vehicle;

(m)      Beneficial Ownership Information.  Prompt written notice of any changes to the beneficial ownership information set forth in the Perfection Certificate.  Borrower understands and acknowledges that Bank relies on such true, accurate and up-to-date beneficial ownership information to meet Bank's regulatory obligations to obtain, verify and record information about the beneficial owners of its legal entity customers; and

(n)      Other Information.  Other information reasonably requested by Bank.

**5.4      Taxes**.  Cause all material tax returns and reports of Borrower to be timely filed (unless subject to a valid extension) and timely pay all material foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower, except for deferred payment of any taxes contested pursuant to the terms of Section 4.10 hereof, and shall deliver to Bank, promptly upon request, appropriate certificates attesting to such payments.

**5.5      Accounts**.  Maintain with Bank all accounts into which Capital Contributions are or may be deposited.

**5.6      Partnership Agreement**.  Use commercially reasonable efforts to enforce any terms of the Partnership Agreement or any Side Letter to the extent necessary to permit Borrower to comply with this Agreement.

**5.7      New Partners or Amended Partner Documents**.  Within five (5) Business Days of execution thereof, deliver to Bank copies of (a) the Subscription Agreement and any related Side Letter of any new Partner, (b) written evidence of an increase in the Capital Commitment of any Partner or (c) any amendments to any Partner's Side Letter, including but not limited to any documents related to an Partner's election to opt into the provisions of any other Partner's Side Letter pursuant to a "most favored nation" clause.

**5.8    Further Assurances**.  Execute any further instruments and take such further action as Bank reasonably deems necessary to perfect, protect, ensure the priority of or continue Bank's Lien on the Collateral or to effect the purposes of this Agreement.

**5.9    Sanctions**.  (a) Not engage in any of the activities described in Section 4.15 in the future; (b) not become a Sanctioned Person; (c) ensure that the proceeds of the Obligations are not used to violate any Sanctions; and (d) deliver to Bank any certification or other evidence requested from time to time by Bank in its sole reasonable discretion, confirming each such Person's compliance with this Section.  In addition, have implemented, and will consistently apply while this Agreement is in effect, procedures to ensure that the representations and warranties in Section 4.15 remain true and correct while this Agreement is in effect.

## 6    NEGATIVE COVENANTS

Borrower shall not do any of the following and General Partner shall not permit Borrower to do any of the following or do any of the following expressly applicable to it:

**6.1    Dispositions**.  Convey, sell, lease, transfer, assign or otherwise dispose of (including, without limitation, pursuant to a Division) all or any part of Borrower's business or property, or permit any Special Purpose Entity to do any of the foregoing, other than (i) Permitted Investments and (ii) payments permitted under Section 6.7.

**6.2    Changes in Business, Control**.  (a) Engage in any business other than the businesses currently engaged in by Borrower or reasonably related thereto; (b) liquidate or dissolve; (c) permit, allow or suffer to occur a Change of Control; or (d) without at least thirty (30) days prior written notice to Bank, (i) add any new Borrower or General Partner offices or business locations, (ii) change the jurisdiction of organization of either Borrower or General Partner, (iii) change the organizational structure or type of either Borrower or General Partner, (iv) change the legal name of either Borrower or General Partner, or (v) change any organizational number (if any) assigned by the jurisdiction of organization of either Borrower or General Partner.

**6.3    Mergers**.  Merge or consolidate with any other Person (including, without limitation, pursuant to a Division) or permit any Special Purpose Entity to do so.

**6.4    Indebtedness**.  Create, incur, assume, or be liable for any Indebtedness, other than Permitted Indebtedness, or permit any Special Purpose Entity to do so.

**6.5    Encumbrance**.  Create, incur, allow, or suffer to exist any Lien on any of its property or assign or convey any right to receive income, except for Permitted Liens, or permit any Special Purpose Entity to do so or permit any Collateral not to be subject to the first priority security interest granted herein except for Permitted Liens.

**6.6    Investments**.  Directly or indirectly make any Investment, other than Permitted Investments or permit any Special Purpose Entity to do so.

**6.7    Distributions**.  Make any distribution, except for distributions to the Partners as permitted by the Partnership Agreement and paying fees and expenses in the ordinary course of business in accordance with the Partnership Agreement, provided no such distribution or payment of fees and expenses may be made if an Event of Default has occurred and is continuing or would exist after giving effect thereto, or permit any Special Purpose Entity to do so (other than distributions or payments to Borrower).

**6.8    Operating Documents**.  Except as otherwise provided in Section 6.13, alter, amend, modify, terminate or change any provision of its Operating Documents, any Subscription Agreement or any Side Letter or enter into any new Side Letter with an existing Partner, if the result of such amendment (a) is to reduce in any material manner the rights of Borrower or any Alternative Investment Vehicle to the Callable Capital (including any material reduction in the amount thereof or any material change in the time or manner in which the Callable Capital is or may be payable) or of Bank under this Agreement, (b) limits the obligations of any Partner to fund Capital Calls or releases any Partner from such obligation (including, without limitation, to repay the Obligations) or (c) otherwise adversely affects the rights or remedies of Bank under this Agreement in any material respect (each, a "**Material Amendment**").

**6.9    Transactions with Affiliates**.  Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower, except for transactions that are in the ordinary course of Borrower's

DocuSign Envelope ID: 626EEC4B-5882-40E1-889E-8A7C857380B7

business that are (a) upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person or (b) expressly authorized by the Partnership Agreement.

**6.10    ERISA**.  Neither Borrower nor any other obligor under this Agreement or any other Loan Document shall fail to satisfy an exception under the Plan Asset Regulation which failure causes the assets of such Borrower or obligor, as applicable to be deemed "plan assets" (within the meaning of the Plan Asset Regulation).  None of Borrower, General Partner or any other obligor under this Agreement or any other Loan Document shall take any action, or omit to take any action, which would give rise to a non-exempt prohibited transaction under Section 4975(c)(1)(A) - (D) of the Internal Revenue Code or Section 406(a) of ERISA that would subject Bank to any tax, penalty, damages or any other claim or relief under the Internal Revenue Code or ERISA with respect to transactions contemplated by this Agreement and the other Loan Documents.  None of Borrower, General Partner, any other obligor under this Agreement or any other Loan Document or any member of Borrower's, General Partner's or such obligor's Controlled Group shall establish, maintain or have any obligation to contribute to any Plan.

**6.11    Compliance**.  (a) Become an "investment company" or a company controlled by an "investment company", under the Investment Company Act of 1940, as amended, (b) undertake as one of its important activities extending credit to purchase or carry margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System), or use the proceeds of any Credit Extension for that purpose, or (c) violate any other law or regulation, if such violation could reasonably be expected to result in a Material Adverse Effect.

**6.12    Alternative Investment Vehicles**.  Cause or permit any Alternative Investment Vehicle to exist other than an Alternative Investment Vehicle that has joined this Agreement as a co-borrower or guarantor pursuant to Loan Documents acceptable to Bank. In connection therewith, Borrower or General Partner shall provide Bank with authority documents acceptable to Bank, including, without limitation, an authority/enforceability opinion from such Alternative Investment Vehicle's counsel and a certificate from the Secretary of State or registrar of such Alternative Investment Vehicle's jurisdiction of formation certifying that such Alternative Investment Vehicle is validly existing and is in good standing in such jurisdiction.  Under no circumstance shall all or any portion of a Partner's Capital Commitment be transferred to an Alternative Investment Vehicle without Bank's prior written consent.

**6.13    Transfer by, or Admission of, Partners; Bank Side Letter Review.**

(a)    Admission of Partners.  Neither Borrower nor General Partner shall admit any Person as a Subsequent Partner unless such Person is not a Sanctioned Person. Subsequent Partners shall be Excluded Partners upon admission (unless such Subsequent Partner is an existing Limited Partner prior to a transfer).  Following compliance with the requirements set forth in this Section 6.13 and Bank's receipt of such information required by Section 5.7, Bank will review the same and Bank shall notify Borrower in writing within thirty (30) Business Days of receipt of the information required by Section 5.7 if such Subsequent Partner will continue to be an Excluded Partner or may be considered a Limited Partner for purposes of determining Callable Capital.  Thereafter Capital Contribution Proceeds that Borrower has a right to obtain from such Limited Partner shall be included as Callable Capital subject to Bank's receipt of a current Compliance Certificate.

(b)    Transfer of Partnership Interest.  Borrower shall promptly, but in any event within five (5) Business Days of a transfer, provide Bank with notice of any Partner's transfer of its partnership interest in Borrower. Upon notice from Bank of its determination that the applicable Subsequent Partner is an Excluded Partner or a Limited Partner for purposes of determining Callable Capital in accordance with Section 6.13, Borrower and General Partner shall calculate whether, taking into account the Capital Commitments of such Partner as if such transfer had occurred, the transfer would cause the aggregate outstanding Advances, the Dollar Equivalent amount of all outstanding Letters of Credit (including drawn but unreimbursed Letters of Credit) plus an amount equal to the Letter of Credit Reserve and Portfolio Investment Advances to exceed the Borrowing Base, and shall pay any resulting overadvance to Bank pursuant to Section 1.2(c) prior to permitting such transfer.

(c)    Side Letters.  Neither Borrower nor General Partner shall enter into any new Side Letter or amend any existing Side Letter (including in connection with a Limited Partner's election to pursue rights pursuant to a "most favored nation" clause) (each, a **"Proposed Side Letter"**) which could result in a Material Amendment without at least five (5) Business Days' prior written notice to Bank.  If Bank determines, in its sole discretion, such Proposed Side Letter could result in a Material Amendment, upon the execution of the Proposed Side Letter, such Limited Partner together with any other Limited Partner that may elect such Material Amendment shall be deemed to be an Excluded Partner and such Material Amendment shall not result in an Event of Default under Section 6.8.  If

after giving effect to the preceding sentence a Limited Partner is deemed an Excluded Partner and the aggregate outstanding Advances, the Dollar Equivalent amount of all outstanding Letters of Credit (including drawn but unreimbursed Letters of Credit) plus an amount equal to the Letter of Credit Reserve and Portfolio Investment Advances exceeds the Borrowing Base, Borrower shall pay any resulting overadvance to Bank pursuant to Section 1.2(c).  Notwithstanding the foregoing, if Borrower or General Partner enters into a Proposed Side Letter without providing prior written notice to Bank, Borrower and General Partner shall be deemed to have represented and warranted that such Proposed Side Letter could not result in a Material Amendment.

## 7   EVENTS OF DEFAULT

Any one of the following shall constitute an event of default (an "**Event of Default**") under this Agreement:

**7.1    Payment Default**.  Borrower fails to (a) make any payment of principal or interest on any Credit Extension on its due date, or (b) pay any other Obligations within three (3) Business Days after such Obligations are due and payable (which three (3) Business Day cure period shall not apply to payments due on the Maturity Date). During the cure period, the failure to make or pay any payment specified under clause (b) hereunder is not an Event of Default (but no Credit Extension will be made during the cure period);

**7.2    Covenant Default**.

(a) Borrower or General Partner fails or neglects to perform any obligation in Sections 1.2(c), 5.3, 5.4, 5.5, 5.6, 5.7, 5.9 or 6; or

(b) Borrower or General Partner fails or neglects to perform, keep, or observe any other term, provision, condition, covenant or agreement contained in this Agreement or any Loan Documents, and as to any default (other than those specified in this Section 7) under such other term, provision, condition, covenant or agreement that can be cured, has failed to cure the default within ten (10) days after the occurrence thereof; provided that if the default cannot by its nature be cured within the 10-day period or cannot after diligent attempts by Borrower be cured within such 10-day period, and such default is likely to be cured within a reasonable time, then Borrower or General Partner shall have an additional period (which shall not in any case exceed thirty (30) days) to attempt to cure such default, and within such reasonable time period the failure to cure the default shall not be deemed an Event of Default (but no Credit Extensions shall be made during such cure period);

**7.3    Material Adverse Change**.  A Material Adverse Change occurs;

**7.4    Insolvency**.  (a) Borrower or General Partner is unable to pay its debts (including trade debts) as they become due or otherwise becomes insolvent or Borrower or General Partner fails to be solvent as described under Section 4.6 hereof; (b) Borrower or General Partner begins an Insolvency Proceeding; or (c) an Insolvency Proceeding is begun against Borrower or General Partner and not dismissed or stayed within 45 days (but no Credit Extensions shall be made while any of the conditions described in clause (a) exist or until any Insolvency Proceeding is dismissed);

**7.5    Other Agreements**.  There is, under any agreement to which Borrower is a party with a third party or parties, (a) any default resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount individually or in the aggregate in excess of One Hundred Thousand Dollars ($100,000); or (b) any default by Borrower or General Partner, the result of which could reasonably be expected to have a Material Adverse Effect;

**7.6    Judgments**.  One or more final judgments, orders, or decrees for the payment of money in an amount, individually or in the aggregate, of at least One Hundred Thousand Dollars ($100,000) (not covered by independent third-party insurance as to which liability has been accepted by such insurance carrier) shall be rendered against Borrower and the same are not, within ten (10) days after the entry thereof, discharged or execution thereof stayed or bonded pending appeal, or such judgments are not discharged prior to the expiration of any such stay (provided that no Credit Extensions will be made prior to the discharge, stay, or bonding of such judgment, order, or decree);

**7.7    Partnership Agreement**.  If any event occurs which results in the termination of: (a) Borrower's status as a limited partnership, or (b) the Partnership Agreement;

     **7.8**    **Capital Call Funding**.  If (a) greater than or equal to five percent (5.0%) of any Capital Call issued by Borrower or General Partner is not funded within ten (10) Business Days of when due under the terms of such Capital Call (without regard to any grace period or notice requirement set forth in the Partnership Agreement or otherwise), or (b) General Partner or any Affiliate of Borrower or General Partner fails to fund any portion of a Capital Contribution due from such General Partner or Affiliate on or before the date such Capital Contribution is due (regardless of any grace period or notice requirement set forth in the Partnership Agreement or otherwise);

     **7.9**    **Cross-Default**.  A default or an event of default occurs under any loan arrangement between (a) Bank and (b) General Partner, Borrower, and/or any Affiliate of Borrower contemplated under the Partnership Agreement (other than a loan to a Portfolio Investment that is not subject to Portfolio Investment Advance Documents); or

     **7.10**    **Misrepresentations**.  Borrower, General Partner or any Person acting for Borrower makes any representation, warranty, or other statement now or later in this Agreement, any Loan Document or in any writing delivered to Bank or to induce Bank to enter this Agreement or any Loan Document, and such representation, warranty, or other statement is incorrect in any material respect when made.

## 8    BANK'S RIGHTS AND REMEDIES

     **8.1**    **Rights and Remedies**.  If an Event of Default shall have occurred and be continuing, then Bank may: (a) suspend the Committed Revolving Line; (b) terminate the Committed Revolving Line and declare the occurrence of the Maturity Date; (c) declare the principal of, and all interest then accrued on, the Obligations to be forthwith due and payable, whereupon the same shall forthwith become due and payable without presentment, demand, protest, notice of default, notice of acceleration, or of intention to accelerate or other notice of any kind (other than notice of such declaration) all of which Borrower and General Partner hereby expressly waive, anything contained herein or in any other Loan Document to the contrary notwithstanding; (d) exercise any right, privilege, or power set forth in Section 5 or this Section 8.1 or in the other Loan Documents; (e) suspend the obligation of Bank to make Credit Extensions; (f) demand that Borrower (i) deposit cash with Bank in an amount equal to (A) 105.0% of the aggregate face amount of any Letters of Credit denominated in Dollars remaining undrawn and (B) 105.0% of the Dollar Equivalent of the aggregate face amount of any Letters of Credit denominated in a Foreign Currency remaining undrawn (plus, in each case, all interest, fees, and costs due or to become due in connection therewith (as estimated by Bank in its commercially reasonable judgment)), to secure all of the Obligations relating to such Letters of Credit, as collateral security for the repayment of any future drawings under such Letters of Credit, and Borrower shall forthwith deposit and pay such amounts, and (ii) pay in advance all letter of credit fees scheduled to be paid or payable over the remaining term of any Letters of Credit; (g) terminate any FX Contracts (it being understood and agreed that (i) Bank is not obligated to deliver the currency which Borrower has contracted to receive under any FX Contract, and Bank may cover its exposure for any FX Contracts by purchasing or selling currency in the interbank market as Bank deems appropriate; (ii) Borrower shall be liable for all losses, damages, costs, margin obligations and expenses incurred by Bank arising from Borrower's failure to satisfy its obligations under any FX Contract or the execution of any FX Contract; and (iii) Bank shall not be liable to Borrower for any gain in value of a FX Contract that Bank may obtain in covering Borrower's breach); (h) make any payments and do any acts it considers necessary or reasonable to protect the Collateral and/or its security interest in the Collateral, including seizing any personal property of Borrower, General Partner or any of their respective Affiliates in which any Borrower's Books are recorded, stored or maintained and entering any premises in which Borrower, General Partner or any of their respective Affiliates has a possessory interest in which any Borrower's Books are stored, without charge, in order to exercise any of Bank's rights or remedies hereunder or under any other Loan Document, and to demand and receive possession of Borrower's Books; (i) apply to the Obligations any (i) balances and deposits of Borrower it holds, or (ii) any amount held by Bank owing to or for the credit or the account of Borrower; (j) place a "hold" on any account maintained with Bank and/or deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any control agreement or similar agreements providing control of any Collateral; and (k) without notice of default or demand, pursue and enforce any of Bank's rights and remedies under the Loan Documents, or otherwise provided under or pursuant to any Applicable Law or agreement; provided that if any Event of Default specified in Section 7.4 shall occur, the principal of, and all interest on, the Obligations shall thereupon become due and payable concurrently therewith, without any further action by Bank, and without presentment, demand, protest, notice of default, notice of acceleration, or of intention to accelerate or other notice of any kind, all of which Borrower and General Partner hereby expressly waive.

     **8.2**    **Power of Attorney; Capital Calls**.

(a)     Each of Borrower and General Partner hereby irrevocably appoints Bank as its true and lawful attorney-in-fact, regardless of whether an Event of Default has occurred, until all Obligations (other than inchoate indemnity obligations, any other obligations which, by their terms, are to survive the termination of this Agreement and any Obligations under Bank Services Agreements that are cash collateralized in accordance with this Agreement) have been satisfied in full, Bank is under no further obligation to make Credit Extensions and the Loan Documents have been terminated, in its own name or in the name of Borrower or General Partner, as applicable, to sign Borrower's or General Partner's name on any documents necessary to perfect or continue the perfection of Bank's security interest in the Collateral.

(b)     Notwithstanding anything to the contrary set forth in any of the Loan Documents, and without limiting the foregoing, (i) during the continuance of an Event of Default, Borrower and General Partner shall be authorized to issue Capital Calls only in accordance with this Section 8.2(b) or with the consent of Bank in its sole discretion, and (ii) upon the occurrence and during the continuance of an Event of Default (other than an Event of Default pursuant to Sections 7.1(a), 7.4, 7.7, or 7.8(b) or an Event of Default resulting from the occurrence of a Change of Control pursuant to clause (a) of the definition thereof), prior to Bank exercising its right to issue Capital Calls to the Partners, Bank shall give to Borrower five (5) Business Days' prior written notice (the "**Initial Notice Period**") of its intention to exercise such remedies and, if, at any time prior to the expiration of such Initial Notice Period, Borrower or General Partner shall issue a Capital Call to the Partners sufficient to repay the Obligations in full, then Bank shall not exercise such remedies prior to the first (1st) Business Day following the Initial Payment Date (as defined below); provided that: (i) Borrower shall have provided Bank a copy of each Capital Call Notice issued during such Initial Notice Period; (ii) such Capital Call must require the Partners to fund their requested capital contribution within ten (10) Business Days after the date of such Capital Call (such 10th Business Day being the "**Initial Payment Date**"); and (iii) the Capital Contributions are deposited directly into a deposit account subject to Bank's first priority perfected Lien; provided further that nothing herein to the contrary shall prohibit Bank from exercising any remedies it may have with respect to any Event of Default pursuant to Sections 7.1(a), 7.4, 7.7, or 7.8(b), an Event of Default resulting from the occurrence of a Change of Control pursuant to clause (a) of the definition thereof), or any remedies with respect to the account subject to Bank's first priority perfected Lien.  Each of Borrower and General Partner acknowledges and agrees that Bank will be irreparably harmed should Borrower or General Partner fail to take any such action, including, without limitation, the failure to make a Capital Call or deliver the proceeds of such Capital Call to Bank as set forth above.  Each of Borrower and General Partner further acknowledges and agrees that Bank has the right, and it is appropriate for Bank, to seek injunctive relief to compel Borrower or General Partner to take any such action, including, without limitation, making a Capital Call or delivering Capital Contribution Proceeds to Bank, in a court of competent jurisdiction as set forth in Section 10.  Each of Borrower and General Partner hereby waives its right to oppose Bank's request for such injunctive relief.

(c)     In addition to and without limiting the foregoing, each of Borrower and General Partner irrevocably appoints Bank as its true and lawful attorney-in-fact, exercisable upon the occurrence and during the continuance of an Event of Default, to (i) pay, contest or settle any Lien, charge, encumbrance, security interest, and adverse claim in or to the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same, (ii) make or request Capital Calls in an amount sufficient to satisfy all Obligations and enforce the obligation of any Partners to make Capital Contributions, (iii) notify any or all Partners to make all payments due or to become due in connection with Capital Calls directly to a deposit account subject to Bank's first priority perfected Lien, (iv) exercise and enforce every right, power, remedy, authority, option and privilege and take all steps, actions, suits or proceedings necessary to make Capital Calls and to receive Capital Contribution Proceeds and any other rights to call for additional Capital Contributions as contemplated by the Partnership Agreement, any Subscription Agreement or any Side Letter, including, without limitation, the right to make Capital Calls, (v) enforce the payment thereof and the related terms of the Partnership Agreement, any Subscription Agreement or any Side Letter and all rights in respect of Capital Calls against each Partner thereunder, (vi) make allowances or adjustments related to the funding of Capital Calls, (vii) compromise any claims related to the Collateral or the failure of any Partner to fund Capital Calls, (viii) endorse Borrower's and/or General Partner's name on any checks or other forms of payment or security, and (ix) take such further action as is necessary or reasonably desirable to obtain the full benefit of this Section 8.2(c).  Bank shall not incur any liability in connection with or arising from the exercise of such power of attorney and shall have no obligation to exercise any of the foregoing rights and remedies.  Notwithstanding the foregoing, Bank shall not be responsible in any way for any depreciation in the value of the Collateral nor have any duty or responsibility whatsoever to take any steps to preserve any rights of Borrower or General Partner in the Collateral under the Partnership Agreement, any Subscription Agreement or Side Letter.  Bank's foregoing appointment as Borrower's and General Partner's attorney in fact, and all of Bank's rights and powers, coupled with an interest, are irrevocable until such time as all Obligations have been satisfied in full, Bank is under no further obligation to make Credit Extensions and the Loan Documents have been terminated.  The exercise by

DocuSign Envelope ID: 626EEC4B-5882-40E1-889E-8A7C857380B7

Bank of any of the rights granted hereunder shall not release Borrower or General Partner from any duties or obligations under the Partnership Agreement or any Side Letter, and Bank shall not have any obligations or duties of Borrower or General Partner under the Partnership Agreement or any Side Letter.

8.3     **Application of Payments and Proceeds Upon Default**.  If an Event of Default has occurred and is continuing, Bank may apply any funds in its possession, whether from Borrower account balances, payments, proceeds realized as the result of any disposition of the Collateral, or otherwise, to the Obligations in such order as Bank shall determine in its sole discretion.  Any surplus shall be paid to Borrower or other Persons legally entitled thereto; Borrower shall remain liable to Bank for any deficiency.  If Bank, in its commercially reasonable judgment, directly or indirectly enters into a deferred payment or other credit transaction with any purchaser at any sale of Collateral, Bank shall have the option, exercisable at any time, of either reducing the Obligations by the principal amount of the purchase price or deferring the reduction of the Obligations until the actual receipt by Bank of cash therefor.

8.4     **No Waiver; Remedies Cumulative**.  Bank's failure, at any time or times, to require strict performance by Borrower of any provision of this Agreement or any other Loan Document shall not waive, affect, or diminish any right of Bank thereafter to demand strict performance and compliance herewith or therewith.  No waiver hereunder shall be effective unless signed by the party granting the waiver and then is only effective for the specific instance and purpose for which it is given.  Bank's rights and remedies under this Agreement and the other Loan Documents are cumulative.  Bank has all rights and remedies provided under the Code, by law, or in equity.  Bank's exercise of one right or remedy is not an election and shall not preclude Bank from exercising any other remedy under this Agreement or other remedy available at law or in equity, and Bank's waiver of any Event of Default is not a continuing waiver.  Bank's delay in exercising any remedy is not a waiver, election, or acquiescence.

8.5     **Waivers**.  Borrower and General Partner each waives demand, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees held by Bank on which Borrower is liable.  General Partner waives any right to require Bank to (a) proceed against Borrower, any other guarantor or any other person; (b) proceed against or exhaust any security held from Borrower; (c) marshal any assets of Borrower; or (d) pursue any other remedy in Bank's power whatsoever.  Bank may, at its election, exercise or decline or fail to exercise any right or remedy it may have against Borrower or any security held by Bank, including, without limitation, the right to foreclose upon any such security by judicial or nonjudicial sale, without affecting or impairing in any way the liability of General Partner hereunder.  General Partner waives any defense arising by reason of any disability or other defense of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower.  General Partner waives any setoff, defense or counterclaim that Borrower may have against Bank.  General Partner waives any defense arising out of the absence, impairment or loss of any right of reimbursement or subrogation or any other rights against Borrower.  General Partner shall have no right of subrogation or reimbursement, contribution or other rights against Borrower, and General Partner waives any right to enforce any remedy that Bank now has or may hereafter have against Borrower.  General Partner waives all rights to participate in any security now or hereafter held by Bank.  General Partner waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Agreement and of the existence, creation, or incurring of new or additional Indebtedness.  General Partner assumes the responsibility for being and keeping itself informed of the financial condition of Borrower and of all other circumstances bearing upon the risk of nonpayment of any Indebtedness or nonperformance of any obligation of Borrower, warrants to Bank that it will keep so informed, and agrees that absent a request for particular information by General Partner, Bank shall have no duty to advise General Partner of information known to Bank regarding such condition or any such circumstances.

9       **NOTICES**

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address or email address indicated below; provided that, for clause (b), if such notice, consent, request, approval, demand or other communication is not sent during the normal business hours of the recipient, it shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.  Bank or Borrower may change

its mailing or electronic mail address by giving the other party written notice thereof in accordance with the terms of this Section 9.

| | |
|---|---|
| If to Borrower or General Partner | JES Global Capital III, L.P.<br>4095 State Road 7, L-306<br>Wellington, Florida 33449<br>Attn: Elliot Smerling<br>Email:  esmerling@jesglocap.com |

with a copy to (which shall
not constitute notice):    Akerman LLP
                           520 Madison Avenue, 20th Floor
                           New York, NY 10022
                           Attention: Robert J. Stein
                           Telephone:  (212) 880-3890
                           Fax:  (212) 880-8965
                           Email: robert.stein@akerman.com

If to Bank:                Silicon Valley Bank
                           53 State Street, 28th Floor
                           Boston, Massachusetts 02109
                           Attn: Lauren Gates
                           Email: lfraher@svb.com
                           Capital Call Notice Email: eastpecs@svb.com
                                                GroupGlobalFundBankingNESE@svb.com

with a copy to (which shall
not constitute notice):    Cadwalader, Wickersham & Taft LLP
                           227 West Trade Street, Suite 2400
                           Charlotte, North Carolina 28202
                           Attn:  Tim Hicks
                           Email: tim.hicks@cwt.com

## 10      CHOICE OF LAW, VENUE AND JURY TRIAL WAIVER

New York law governs the Loan Documents without regard to principles of conflicts of law (other than Section 5-1401 and Section 5-1402 of the New York General Obligations Law).  Borrower, General Partner and Bank each submit to the exclusive jurisdiction of the State and Federal courts in the Borough of Manhattan in New York City; provided that nothing in this Agreement shall be deemed to operate to preclude Bank from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations or to enforce a judgment or other court order in favor of Bank.  Each of Borrower and General Partner submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each of Borrower and General Partner waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or *forum non conveniens* and consents to the granting of such legal or equitable relief as is deemed appropriate by such court.  Each of Borrower and General Partner waives personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to Borrower or General Partner, as applicable, at the address set forth in Section 9 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of Borrower's or General Partner's, applicable, actual receipt thereof or three (3) days after deposit in the U.S. mails, proper postage prepaid.

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER, GENERAL PARTNER AND BANK EACH WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.  EACH PARTY HERETO HAS REVIEWED THIS WAIVER WITH ITS COUNSEL**.

This Section 10 shall survive the termination of this Agreement.

11      **GENERAL PROVISIONS**

**11.1    Successors and Assigns**.

(a)      This Agreement binds and is for the benefit of the successors and permitted assigns of each party hereto.  Neither Borrower nor General Partner may assign its rights under this Agreement or delegate its obligations hereunder without Bank's prior written consent.  Bank may, without the consent but with notice to Borrower or General Partner, sell, transfer, assign, negotiate, or grant participation in all or any part of, or any interest in, Bank's obligations, rights, and benefits under this Agreement and the other Loan Documents.

(b)      To the extent Bank sells a participation, it shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register at one of its U.S. offices on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); provided that Bank shall not have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and Bank shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

**11.2    Indemnification**.  Each of Borrower and General Partner shall indemnify, defend and hold Bank and its directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing Bank (each, an "**Indemnified Person**") harmless against:  (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by the Loan Documents; and (b) all losses or expenses (including Bank Expenses) in any way suffered, incurred, or paid by such Indemnified Person as a result of, in connection with, or arising out of the transactions contemplated by the Loan Documents except for obligations, demands, claims, and liabilities and/or losses directly caused by such Indemnified Person's gross negligence or willful misconduct.  To the fullest extent permitted by Applicable Law, Borrower shall not assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Advance or Letter of Credit or the use of the proceeds thereof.  No Indemnified Person referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.  This Section 11.2 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, liabilities and related expenses arising from any non-Tax claim.

**11.3    Time of Essence**.  Time is of the essence for the performance of all Obligations in this Agreement.

**11.4    Severability of Provisions**.  Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

**11.5    Amendments in Writing; Waiver; Integration**.  No purported amendment or modification of any Loan Document, or waiver, discharge or termination of any obligation under any Loan Document, shall be enforceable or admissible unless, and only to the extent, expressly set forth in a writing signed by the party against which enforcement or admission is sought.  Without limiting the generality of the foregoing, no oral promise or statement, nor any action, inaction, delay, failure to require performance or course of conduct shall operate as, or evidence, an amendment, supplement or waiver or have any other effect on any Loan Document.  Any waiver granted shall be limited to the specific circumstance expressly described in it and shall not apply to any subsequent or other circumstance, whether similar or dissimilar, or give rise to, or evidence, any obligation or commitment to grant any further waiver.  The Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements.  All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of the Loan Documents merge into the Loan Documents.

**11.6    Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together,

constitute one Agreement.  Delivery of an executed signature page of this Agreement by electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof.

**11.7      Survival**.  All covenants, representations and warranties made in this Agreement continue in full force until this Agreement has terminated pursuant to its terms and all Obligations (other than inchoate indemnity obligations, any other obligations which, by their terms, are to survive the termination of this Agreement and any Obligations under Bank Services Agreements that are cash collateralized in accordance with this Agreement) have been paid in full and satisfied.  Without limiting the foregoing, except as otherwise provided in Section 3.3, the grant of security interest by Borrower and General Partner in Section 3.1 shall survive until the termination of all Bank Services Agreements.  The obligations of Borrower and General Partner in Section 11.2 to indemnify Bank shall survive until the statute of limitations with respect to such claim or cause of action shall have run.

**11.8      Confidentiality**.  Bank agrees to maintain the confidentiality of Information (as defined below), except that Information may be disclosed (a) to Bank's subsidiaries or Affiliates (such subsidiaries and Affiliates, together with Bank, collectively, "**Bank Entities**"); (b) to prospective transferees or purchasers of any interest in the Credit Extensions (provided that any prospective transferee or purchaser shall have entered into an agreement containing provisions substantially the same as those in this Section); (c) as required by law, regulation, subpoena, or other order; (d) to Bank's regulators or as otherwise required in connection with Bank's examination or audit; (e) as Bank considers appropriate in exercising remedies under the Loan Documents; and (f) to (x) third-party service providers and/or creditors of Bank or (y) any actual or prospective party (or such party's subsidiaries or Affiliates) to any swap, derivative, lending arrangement or other transaction under which payments are to be made by reference to Borrower and its obligations, this Agreement or payments hereunder, so long as, in the case of clauses (x) and (y), such Person has executed a confidentiality agreement with Bank with terms no less restrictive than those contained herein.  The term "**Information**" means all information received from Borrower or General Partner regarding Borrower, its Investments or Borrower's or General Partner's respective business other than information that is either: (i) in the public domain or in Bank's possession when disclosed to Bank, or becomes part of the public domain (other than as a result of its disclosure by Bank in violation of this Agreement) after disclosure to Bank; or (ii) disclosed to Bank by a third party, if Bank does not know that the third party is prohibited from disclosing the information.

**11.9      Right of Set Off**.  Borrower grants to Bank, a right of set off for all Obligations to Bank, whether now existing or hereafter arising upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Bank or any entity under the control of Bank (including a Bank subsidiary) or in transit to any of them; provided that such right of set off may be exercised by Bank only upon the occurrence and during the continuance of an Event of Default.  At any time after the occurrence and during the continuance of an Event of Default, without demand or notice, Bank may set off the same or any part thereof and apply the same to any liability or obligation of Borrower even though unmatured and regardless of the adequacy of any other collateral securing the Obligations.  ANY AND ALL RIGHTS TO REQUIRE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF BORROWER ARE KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

**11.10      Electronic Execution of Documents**.  The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any Applicable Law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**11.11      Captions and Section References**.  The headings used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.  Unless indicated otherwise, section references herein are to sections of this Agreement.

**11.12      Construction of Agreement**.  The parties hereto mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Agreement.  In cases of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

**11.13      Relationship**.  The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement.  The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

    **11.14**   **Third Parties**.  Nothing in this Agreement, whether express or implied, is intended to: (a) confer any benefits, rights or remedies under or by reason of this Agreement on any persons other than the express parties to it and their respective permitted successors and assigns; (b) relieve or discharge the obligation or liability of any person not an express party to this Agreement; or (c) give any person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

    **11.15**   **Anti-Terrorism Law**.  Bank hereby notifies Borrower and General Partner that, pursuant to the requirements of Anti-Terrorism Law, Bank may be required to obtain, verify and record information that identifies Borrower and General Partner, which information may include the name and address of Borrower and General Partner and other information that will allow Bank to identify Borrower and General Partner in accordance with Anti-Terrorism Law.  Borrower and General Partner hereby agree to take any action necessary to enable Bank to comply with the requirements of Anti-Terrorism Law.

    **11.16**   **Judgment Currency**.  If for the purposes of obtaining judgment in any court it is necessary to convert a sum due from Borrower hereunder in the currency expressed to be payable herein (the "**Specified Currency**") into another currency, the parties hereto agree, to the fullest extent that they may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures Bank could purchase the Specified Currency with such other currency at Bank's applicable office on the Business Day preceding that on which final judgment is given.  The obligation of Borrower in respect of any sum due to Bank hereunder shall, notwithstanding any judgment in a currency other than the Specified Currency, be discharged only to the extent that on the Business Day following receipt by Bank of any sum adjudged to be so due in such other currency, Bank may in accordance with normal banking procedures purchase the Specified Currency with such other currency.  If the amount of the Specified Currency so purchased is less than the sum originally due to Bank in the Specified Currency, Borrower shall, to the fullest extent that it may effectively do so, as a separate obligation and notwithstanding any such judgment, indemnify Bank against such loss, and if the amount of the Specified Currency so purchased exceeds the total of the sum originally due to Bank in the Specified Currency, Bank agrees to return the amount of any excess to Borrower (or to any other Person who may be entitled thereto under Applicable Law).

    **12**     **DEFINITIONS**

    **12.1**   **Accounting Terms and Other Definitions**.  Accounting terms not defined in this Agreement shall be construed following GAAP.  Calculations and determinations must be made following GAAP.  Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in this Section 12.  All other terms contained in this Agreement, unless otherwise indicated, shall have the meaning provided by the Code to the extent such terms are defined therein.  As used in the Loan Documents, the word "shall" is mandatory, the word "may" is permissive, the word "or" is not exclusive, the words "includes" and "including" are not limiting, the singular includes the plural, and numbers denoting amounts that are set off in brackets are negative.  The term "continuing" in the context of an Event of Default means that the Event of Default has not been remedied (if capable of being remedied) or waived.  As used in this Agreement, the following capitalized terms have the following meanings:

    "**Advance**" or "**Advances**" is a cash advance (or advances) under the Committed Revolving Line, and includes, without limitation, Discretionary Increase Advances.

    "**Affiliate**" is, with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, including, without limitation, any parallel fund, any related fund contemplated under the Partnership Agreement, the management company of a Person (or such other Person responsible for its management), and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

    "**Agreement**" is defined in the preamble hereof.

    "**Alternative Investment Vehicle**" is any Person other than Borrower or General Partner that has the right to enforce any Capital Commitment or to otherwise call, demand or receive any Callable Capital or Capital Contribution Proceeds .

    "**Anti-Terrorism Law**" is any law relating to terrorism or money-laundering, including Executive Order No. 13224 and the USA Patriot Act.

DocuSign Envelope ID: 626EEC4B-5882-40E1-889E-8A7C857380B7

"**Applicable Law**" is all applicable provisions of constitutions, laws, statutes, ordinances, rules, treaties, regulations, permits, licenses, approvals, interpretations and orders of courts or Governmental Authorities and all orders and decrees of all courts and arbitrators.

"**Applicable Rate**" is set forth on Schedule I hereto.

"**Authorized Signer**" is any individual listed in Borrower's borrowing resolutions who is authorized to execute the Loan Documents, including any Payment/Advance Form or other Advance request, on behalf of Borrower or General Partner.

"**Availability Amount**" is (a) the Committed Revolving Line, minus (b) the Dollar Equivalent amount of all outstanding Letters of Credit (including drawn but unreimbursed Letters of Credit) plus an amount equal to the Letter of Credit Reserve, and minus (c) the outstanding principal balance of any Advances and Portfolio Investment Advances.

"**Availability Period**" is set forth on Schedule I hereto.

"**Bank**" is defined in the preamble hereof.

"**Bank Entities**" is defined in Section 11.8.

"**Bank Expenses**" are all audit fees, costs and reasonable and documented out-of-pocket expenses (including reasonable and documented attorneys' fees and expenses) for preparing, amending, negotiating, administering, defending and enforcing the Loan Documents (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings) or otherwise incurred with respect to Borrower.

"**Bank Services**" are any products, credit services and/or financial accommodations previously, now, or hereafter provided to Borrower or any of its subsidiaries by Bank or any Bank Affiliate, including, without limitation, any letters of credit, cash management services (including, without limitation, merchant services, direct deposit of payroll, business credit cards, and check cashing services), interest rate swap arrangements, and foreign exchange services as any such products or services may be identified in Bank's various agreements related thereto (each, a "**Bank Services Agreement**").

"**Bank Services Agreement**" is defined in the definition entitled "Bank Services" appearing alphabetically in this Section 12.1.

"**Borrower**" is set forth on Schedule I hereto.

"**Borrower's Books**" are all Borrower's and General Partner's books and records including ledgers, federal, state and local tax returns, records regarding Borrower's assets or liabilities, the Collateral, business operations or financial condition, and all computer programs or storage or any equipment containing such information.

"**Borrowing Base**" is the lesser of (a)(i) fifty percent (50%) of Callable Capital of the Partners minus (ii) all Indebtedness of Borrower (other than (1) the outstanding principal balance of any Advances and (2) the Dollar Equivalent amount of all outstanding Letters of Credit (including drawn but unreimbursed Letters of Credit) but including Contingent Obligations) plus (iii) an amount equal to the Letter of Credit Reserve and (b) thirty percent (30%) of the aggregate Capital Commitments; provided that the percentage set forth in clause (a)(i) of this definition shall increase to sixty-seven percent (67%) if the Borrowing Base Increase Condition is satisfied.

"**Borrowing Base Increase Condition**" is each of the following conditions shall have occurred: (a) Bank shall have received evidence in form and substance satisfactory to Bank in its sole discretion that Borrower has called and received Capital Contribution Proceeds in an amount greater than or equal to fifty percent (50%) of the aggregate Capital Commitments of the Partners (excluding the Capital Commitments of any Excluded Partner) and (b) the NAV Condition is satisfied.  For all purposes under this Agreement and any other Loan Document, the Borrowing Base Increase Condition will cease to be in effect at any time either of the foregoing conditions is no longer satisfied at the determination of Bank.

"**Business Day**" is a day other than a Saturday, Sunday or other day on which commercial banks in the State of California are authorized or required by law to close.

"**Callable Capital**" is the remaining amount of Capital Contribution Proceeds that Borrower has a right to obtain from the Partners, without condition, upon the making of Capital Calls in accordance with the Partnership Agreement, including Recallable Capital but excluding capital attributable to Excluded Partners and excluding capital attributable to any Partner that has claimed or exercised an excuse, exclusion or cancellation right pursuant to an Excuse Provision.

"**Capital Call**" is a request by Borrower or General Partner to the Partners under the Partnership Agreement for a Capital Contribution.

"**Capital Commitments**" are the aggregate cash committed by the Partners to contribute to the capital of Borrower under the Partnership Agreement.

"**Capital Contribution**" is a capital contribution which has been or may be made by the Partners to Borrower pursuant to a Capital Call.

"**Capital Contribution Condition**" is the receipt by Borrower or General Partner of all Capital Contribution Proceeds from the first Capital Call made pursuant to and in accordance with the Partnership Agreement, in an amount greater than or equal to One Hundred Million Dollars ($100,000,000) of Capital Commitments, on the date such Capital Contribution Proceeds are due under the Partnership Agreement (regardless of any grace period or notice requirement set forth therein).

"**Capital Contribution Proceeds**" are the cash proceeds of Capital Contributions.

"**Cash Equivalents**" are (a) marketable direct obligations issued or unconditionally guaranteed by the United States or any agency or any State thereof having maturities of not more than one (1) year from the date of acquisition; (b) commercial paper maturing no more than one (1) year after its creation and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc.; and (c) Bank's certificates of deposit issued maturing no more than one (1) year after issue.

"**Change in Law**" is the occurrence, after the Effective Date, of:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in Applicable Law or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" is (a) any circumstance in which General Partner ceases to be the general partner of Borrower or General Partner ceases to manage the operations of Borrower, (b) any change in management that (i) causes the Investment Period to be terminated, reduced or suspended or (ii) permits any Partner to suspend or terminate the Investment Period or dissolve Borrower under the Partnership Agreement or otherwise, (c) any transfer or withdrawal by Limited Partners that, together with all other transfers and/or withdrawals by Limited Partners during the Availability Period, is more than five percent (5.0%) of the aggregate Capital Commitments; provided that any transfer by a Limited Partner to a Subsequent Partner which has not been designated as an Excluded Partner pursuant to Section 6.13 shall be excluded for purposes of this clause (c), (d) any transfer by any Partner of all or a portion of its interest in Borrower to a Sanctioned Person or which would result in a material violation of any Applicable Law, or (e) Elliot Smerling, for any reason, fails to be a "Managing Principal" (as that term is defined in the Partnership Agreement) of Borrower.

"**Code**" is the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of New York; provided that, to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Bank's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction

solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"**Collateral**" is the property described on Exhibit A.

"**Committed Revolving Line**" is the commitment to make an Advance or Advances in an amount not to exceed the Permanent Committed Revolving Line Amount; provided that Borrower may request an Advance or Advances that would cause the aggregate principal amount of outstanding Advances to exceed the Permanent Committed Revolving Line Amount but not to exceed the Maximum Increased Committed Revolving Line Amount (each such Advance, a "**Discretionary Increase Advance**") in accordance with Section 1.1.6.

"**Compliance Certificate**" is that certain certificate in the form attached hereto as Exhibit C.

"**Connection Income Taxes**" is Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Contingent Obligation**" is, for any Person, any direct or indirect liability of that Person for (a) any direct or indirect guaranty by such Person of any indebtedness, capital contribution agreement, keepwell, lease, dividend, letter of credit or other obligation of another Person, including Portfolio Guaranties, (b) any other obligation endorsed, co-made, discounted or sold with recourse by that Person, or for which that Person is directly or indirectly liable; (c) any obligations for undrawn letters of credit for the account of that Person; and (d) all obligations from any interest rate, currency or commodity swap agreement, interest rate cap or collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; but "Contingent Obligation" does not include endorsements in the ordinary course of business.  The amount of a Contingent Obligation is the stated or determined amount of the primary obligation for which the Contingent Obligation is made or, if not determinable, the maximum reasonably anticipated liability for it determined by the Person in good faith; but the amount may not exceed the maximum of the obligations under any guarantee or other support arrangement.

"**Controlled Group**" is a corporation, trade or business that is, along with Borrower, a member of a controlled group of corporations or a controlled group of trades or businesses, as described in Section 414 of the Internal Revenue Code or Section 4001 of ERISA.

"**Credit Extension**" is any Advance, Letter of Credit, Portfolio Investment Advance, or any other extension of credit by Bank for Borrower's or a Portfolio Investment's benefit.

"**Defaulting Partner**" is any Partner who repudiates or fails to comply in all respects with any portion of a Capital Call made by General Partner within five (5) Business Days of the making thereof, unless (a) such failure has been cured, or (b) Bank elects in writing, in its sole discretion, to waive any such non-compliance.

"**Designated Deposit Account**" is the deposit account established by Borrower for purposes of receiving Advances.

"**Discretionary Commitment Increase and Advance Request**" is defined in Section 1.1.6.

"**Discretionary Increase Advance**" is defined in the definition of Committed Revolving Line.

"**Discretionary Increase Fee**" is a fee equal to twenty basis points (0.20%) per annum of the principal amount of Advances outstanding in excess of the Permanent Committed Revolving Line Amount, as determined by Bank, and calculated on the basis of actual days elapsed in a year consisting of 360 days.  Such amount of Advances in excess of the Permanent Committed Revolving Line Amount shall be multiplied on a daily basis by the Discretionary Increase Fee percentage specified above, with the sum of such amounts incurred during each day of the applicable calendar quarter being due and payable on the first Payment Date following such calendar quarter.

"**Division**" is, in reference to any Person which is an entity, the division of such Person into two (2) or more separate Persons, with the dividing Person either continuing or terminating its existence as part of such division, including, without limitation, as contemplated under Section 18-217 of the Delaware Limited Liability Company Act for limited liability companies formed under Delaware law, Section 17-220 of the Delaware Revised Uniform Limited

Partnership Act for limited partnerships formed under Delaware law, or any analogous action taken pursuant to any other Applicable Law with respect to any corporation, limited liability company, partnership or other entity.

"**Dollars**," "**dollars**" or use of the sign "**$**" is only lawful money of the United States and not any other currency, regardless of whether that currency uses the "$" sign to denote its currency or may be readily converted into lawful money of the United States.

"**Dollar Equivalent**" is, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in a Foreign Currency, the equivalent amount therefor in Dollars as determined by Bank at such time on the basis of the then-prevailing rate of exchange in San Francisco, California, for sales of the Foreign Currency for transfer to the country issuing such Foreign Currency.

"**Effective Date**" is set forth on Schedule I hereto.

"**ERISA**" is the Employee Retirement Income Security Act of 1974, as amended, and its regulations.

"**Event of Default**" is defined in Section 7.

"**Excluded Partner**" is (a) any Partner designated as an "Excluded Partner" by Bank on the Effective Date, (b) any Partner that is a Defaulting Partner, (c) any Partner that has transferred, assigned (including by pledge, charge or other encumbrance) or withdrawn all or any portion (to the extent so transferred, assigned or withdrawn) of its limited partnership interest in Borrower or given written notice to Borrower or General Partner of its desire to do so, (d) any Subsequent Partner (unless such Subsequent Partner is an existing Limited Partner prior to a transfer) until such time as Bank has provided written notice to Borrower that such Subsequent Partner is not an Excluded Partner, (e) any Partner that amends its Side Letter in any way (including pursuant to a "most favored nation" clause) that would result in a Material Amendment, as determined by Bank in its sole discretion, (f) any Partner that repudiates, challenges, or declares unenforceable its obligation to make Capital Contributions as required by any Operating Document, its Subscription Agreement, or any Side Letter, (g) any Partner with respect to which any bankruptcy, reorganization or insolvency petition is made, or that becomes the subject of any Insolvency Proceeding, or (h) any Partner that is or becomes a Sanctioned Person.

"**Excluded Taxes**" is any of the following Taxes imposed on or with respect to Bank or required to be withheld or deducted from a payment to Bank, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of Bank being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of Bank with respect to an applicable interest in a Credit Extension or the Committed Revolving Line pursuant to a law in effect on the date on which (i) Bank acquires such interest in the Credit Extensions or Committed Revolving Line or (ii) Bank changes its lending office, except in each case to the extent that, pursuant to Section 1.5, amounts with respect to such Taxes were payable either to Bank's assignor immediately before Bank became a party hereto or to Bank immediately before it changed its lending office, (c) Taxes attributable to Bank's failure to comply with Section 1.5(e), and (d) any withholding Taxes imposed under FATCA.

"**Excuse Provisions**" are the provisions of the Partnership Agreement and the Side Letters (other than customary excuse and exclusion provisions related to ERISA, bank holding company status or that Partner participation would result in a violation of Applicable Law), which could give rise to an excuse by any Partner, an exclusion by General Partner, or a withdrawal as a matter of right (i.e., not in General Partner's discretion) and listed on Schedule II.

"**Extended Stated Maturity Date**" is defined in Section 1.1.5.

"**Extension Fee**" is a fee equal to twenty basis points (0.20%) of the Committed Revolving Line as of each date on which Borrower receives an Extension Notice.

"**Extension Notice**" is defined in Section 1.1.5.

"**FATCA**" is Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with),

DocuSign Envelope ID: 626EEC4B-5882-40E1-889E-8A7C857380B7

any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing the foregoing.

"**Foreign Currency**" is the lawful money of a country other than the United States.

"**Funding Date**" is any date on which a Credit Extension is made to or for the account of Borrower, which shall be a Business Day.

"**FX Contract**" is any foreign exchange contract by and between Borrower and Bank under which Borrower commits to purchase from or sell to Bank a specific amount of Foreign Currency at a set price or on a specified date.

"**GAAP**" is generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other Person as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

"**General Partner**" is defined in the preamble hereof.

"**Governmental Approval**" is any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"**Governmental Authority**" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Indebtedness**" is (a) indebtedness for borrowed money or the deferred price of property or services, such as reimbursement and other obligations for surety bonds and letters of credit, (b) obligations evidenced by notes, bonds, debentures or similar instruments, (c) capital lease obligations, and (d) Contingent Obligations.

"**Indemnified Person**" is defined in Section 11.2.

"**Indemnified Taxes**" is (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in clause (a) of this definition, Other Taxes.

"**Information**" is defined in Section 11.8.

"**Initial Notice Period**" is defined in Section 8.2(b).

"**Initial Payment Date**" is defined in Section 8.2(b).

"**Insolvency Proceeding**" is any proceeding by or against any Person under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors (other than Bank), or proceedings seeking reorganization, arrangement, receivership or other relief.

"**Internal Revenue Code**" is the U.S. Internal Revenue Code of 1986, and the rules and regulations promulgated thereunder, each as amended or modified from time to time.

"**Investment**" is any beneficial ownership interest in any Person (including stock, partnership interest or other securities), and any loan, advance or capital contribution to any Person.

"**Investment Period**" is the "Investment Period" (as that term is defined in the Partnership Agreement), which is the period during which Capital Commitments may be subject to a Capital Call for general purposes,

including paying the Obligations (without meeting any special conditions, including the use of any Loan or the timing of any Advance).

"**Letter of Credit**" is a standby or commercial letter of credit issued by Bank upon request of Borrower based upon an application, guarantee, indemnity or similar agreement on the part of Bank as set forth in Section 1.1.2.

"**Letter of Credit Application**" is defined in Section 1.1.2(b).

"**Letter of Credit Fee**" is a fee equal to three percent (3%) per annum of the Dollar Equivalent of the face amount of each Letter of Credit issued according to Section 1.1.2.

"**Letter of Credit Reserve**" is defined in Section 1.1.2(d).

"**Lien**" is a claim, mortgage, deed of trust, levy, attachment charge, pledge, hypothecation, security interest or other encumbrance of any kind, whether voluntarily incurred or arising by operation of law or otherwise against any property.

"**Limited Partners**" are the limited partners set forth in the Partnership Agreement.

"**Loan Documents**" are, collectively, this Agreement, the Perfection Certificate, any Bank Services Agreement, any note, or notes or guaranties executed by Borrower, and any other present or future agreement between Borrower and/or for the benefit of Bank in connection with this Agreement or Bank Services, all as amended, restated, or otherwise modified in accordance with the terms thereof.

"**Material Adverse Change**" is any one or more of (a) a material adverse change in the perfection or priority of Bank's Lien in the Collateral or in the value of the Collateral; (b) a material adverse change in the business, operations, or condition (financial or otherwise) of Borrower; and (c) a material adverse change in the prospect of repayment of any portion of the Obligations; provided that any Material Adverse Change relating solely to a Portfolio Investment shall not be considered a "Material Adverse Change" hereunder if such Portfolio Investment is not subject to Portfolio Investment Advance Documents or has otherwise satisfied the requirements of a Portfolio Investment Cure.

"**Material Adverse Effect**" is a material adverse effect on the business or operations of Borrower.

"**Material Amendment**" is defined in Section 6.8.

"**Maturity Date**" is the earliest of (a) the Stated Maturity Date, (b) the date upon which Bank declares the Obligations due and payable after the occurrence of an Event of Default, and (c) 45 days prior to the earlier of (i) the termination of the Partnership Agreement, and (ii) the termination of the Investment Period.

"**Maximum Increased Committed Revolving Line Amount**" is set forth on Schedule I hereto.

"**NAV Condition**" is that the aggregate fair value (as determined in accordance with GAAP) of all outstanding unrealized Investments of Borrower (excluding cash and cash equivalents) is greater than or equal to one hundred percent (100%) of the total cost basis in such Investments (as reflected in Borrower's most recent annual or quarterly financial statements required to be delivered hereunder pursuant to Section 5.3).

"**Obligations**" are Borrower's obligations to pay when due any debts, principal, interest, Bank Expenses, and other amounts Borrower owes Bank now or later, whether under this Agreement, the other Loan Documents, or otherwise, including, without limitation, all obligations relating to letters of credit (including reimbursement obligations for drawn and undrawn letters of credit), cash management services, and foreign exchange contracts, if any, and including interest accruing after Insolvency Proceedings begin and debts, liabilities, or obligations of Borrower assigned to Bank, and to perform Borrower's duties under the Loan Documents.

"**OFAC**" is the Office of Foreign Assets Control of the United States Department of the Treasury and any successor thereto.

"**Operating Documents**" are, for any Person, such Person's formation documents, as certified with the Secretary of State of such Person's state of formation on a date that is no earlier than thirty (30) days prior to the

Effective Date, and, (a) if such Person is a corporation, its bylaws in current form, (b) if such Person is a limited liability company, its limited liability company agreement (or similar agreement), and (c) if such Person is a partnership or limited partnership, its partnership agreement, limited partnership agreement (including, without limitation, the Partnership Agreement), or similar agreement, each of the foregoing with all current amendments or modifications thereto.

"**Other Connection Taxes**" is, with respect to Bank, Taxes imposed as a result of a present or former connection between Bank and the jurisdiction imposing such Tax (other than connections arising from Bank having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Credit Extension or Loan Document).

"**Other Taxes**" is all present or future stamp, court, documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Participant Register**" is defined in Section 11.1(b).

"**Partners**" are the Limited Partners and General Partner.

"**Partnership Agreement**" is that certain Limited Partnership Agreement of Borrower dated as of November 25, 2018, by and among the Partners, as amended, restated or otherwise modified from time to time in accordance with the terms and provisions of this Agreement.

"**Payment/Advance Form**" is that certain form attached hereto as <u>Exhibit B</u>.

"**Payment Date**" is set forth on Schedule I hereto.

"**Perfection Certificate**" is each Perfection Certificate delivered by each of Borrower and General Partner in connection with this Agreement.

"**Perfection Requirement**" is the filing of a financing statement or entry in a public register in any jurisdiction necessary to perfect Bank's first priority security interest created by this Agreement or any other Loan Document.

"**Permanent Committed Revolving Line Amount**" is set forth on Schedule I hereto.

"**Permitted Indebtedness**" is:

(a)        Borrower's Indebtedness to Bank under this Agreement and the other Loan Documents;

(b)        Indebtedness existing on the Effective Date and shown on the Perfection Certificate;

(c)        Indebtedness secured by Liens permitted under clauses (a) and (c) of the definition of "Permitted Liens" hereunder;

(d)        Portfolio Obligations; and

(e)        extensions, refinancings, modifications, amendments and restatements of any items of Permitted Indebtedness (a) through (d) of this definition, provided that the principal amount thereof is not increased or the terms thereof are not modified to impose more burdensome terms upon Borrower.

"**Permitted Investments**" are:

(a)        Investments existing on the Effective Date and shown on the Perfection Certificate; and

(b)        (i) Investments consisting of Cash Equivalents, and (ii) any Investments permitted pursuant to the Partnership Agreement.

"**Permitted Liens**" are:

(a)     Liens existing on the Effective Date that are shown on the Perfection Certificate or arising under this Agreement and the other Loan Documents;

(b)     Liens for taxes, fees, assessments or other government charges or levies, either (i) not due and payable or (ii) being contested in good faith and for which Borrower maintains adequate reserves on its Books, provided that no notice of any such Lien has been filed or recorded under the Internal Revenue Code of 1986, as amended, and the Treasury Regulations adopted thereunder; and

(c)     Liens incurred in the extension, renewal or refinancing of the indebtedness secured by Liens described in clause (a) of this definition, but any extension, renewal or replacement Lien must be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness may not increase.

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"**Plan**" is any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), including any single-employer plan or multiemployer plan (as such terms are defined in Section 4001(a)(15) and in Section 4001(a)(3) of ERISA, respectively), that is subject to Title IV of ERISA or Section 412 of the Internal Revenue Code.

"**Plan Asset Regulation**" is the U.S. Department of Labor regulation located at 29 C.F.R. Section 2510.3-101, as modified in application by Section 3(42) of ERISA.

"**Portfolio Guaranty**" is any guaranty by Borrower of the Indebtedness of one (1) or more Investments.

"**Portfolio Investment**" is a Person or Persons (excluding Special Purpose Entities) in which Borrower or a Special Purpose Entity holds an Investment directly in its own name.

"**Portfolio Investment Advance**" is set forth on Schedule I hereto.

"**Portfolio Investment Advance Documents**" is set forth on Schedule I hereto.

"**Portfolio Investment Cure**" is, solely with respect to any Material Adverse Change arising solely as a result of a breach or default with respect to a Portfolio Investment that is subject to Portfolio Investment Advance Documents, Borrower and General Partner shall have a fifteen (15) Business Day period (without duplication of any time periods set forth in this Agreement) to make a Capital Call and direct the proceeds therefrom to repay all Obligations arising under such Portfolio Investment Advance Documents in full within such 15 Business Day period.

"**Portfolio Obligations**" is the aggregate amount of Borrower's (a) actual obligations and (b) Contingent Obligations pursuant to Portfolio Guarantees.

"**Prime Rate**" is set forth on Schedule I hereto.

"**Recallable Capital**" is, for any Partner, at any time, any amounts distributed to such Partner that are added back to such Partner's uncalled Capital Commitment and subject to recall as a Capital Contribution pursuant to the Partnership Agreement without any condition, limitation, expiration, sunset or termination of any kind, so long as such amounts have been identified as "Recallable Capital" with respect to such Partner in a Compliance Certificate delivered under Section 5.3(b) or 5.3(d) or a certificate of General Partner delivered to Bank; provided that the failure of General Partner to provide such certified information shall result in the exclusion of such amount from "Recallable Capital" until such information is received or unless Bank otherwise agree to include such amount.

"**Registered Organization**" is any "registered organization" as defined in the Code with such additions to such term as may hereafter be made.

"**Requirement of Law**" is as to any Person any material law (statutory or common), treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**" is the "Managing Principal" (as that term is defined in the Partnership Agreement) or any Principal (as that term is defined in the Partnership Agreement) of General Partner.

"**Rollover Request**" is defined in Section 1.1.5.

"**Sanctioned Person**" is a Person that: (a) is listed on any Sanctions list maintained by OFAC or any similar Sanctions list maintained by any other Governmental Authority having jurisdiction over Borrower or General Partner; (b) is located, organized, or resident in any country, territory, or region that is the subject or target of Sanctions; or (c) is fifty percent (50.0%) or more owned or controlled by one (1) or more Persons described in clauses (a) and (b) of this definition.

"**Sanctions**" is the economic sanctions laws, regulations, embargoes or restrictive measures administered, enacted or enforced by the United States government and any of its agencies, including, without limitation, OFAC and the U.S. State Department, or any other Governmental Authority having jurisdiction over Borrower or General Partner.

"**Side Letter**" is any agreement entered into between any Partner and either Borrower or General Partner that modifies or amends any term of the Partnership Agreement or the Subscription Agreement or affects any Partner's Capital Commitment.

"**Special Purpose Entity**" is a corporation, partnership, limited liability company or other entity, including, without limitation, any subsidiary, special purpose vehicle, or alternative investment vehicle, in each case that holds Portfolio Investments of or on behalf of, or which are otherwise beneficially owned directly or indirectly by, or controlled by, Borrower.

"**Specified Currency**" is defined in Section 11.16.

"**Stated Maturity Date**" is set forth on Schedule I hereto.

"**Subscription Agreement**" is, with respect to each Partner, any agreement evidencing the Capital Commitment of such Partner.

"**Subsequent Partner**" is a Partner who becomes a Partner after the Effective Date, whether due to a transfer by an existing Partner or otherwise.

"**Taxes**" is all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Unused Facility Fee**" is a fee equal to twenty basis points (0.20%) per annum of the average unused portion of the Permanent Committed Revolving Line Amount, as determined by Bank. The unused portion of the Permanent Committed Revolving Line Amount, for purposes of this definition, shall equal the difference between (x) the Permanent Committed Revolving Line Amount (as it may be reduced from time to time) and (y) the average for the period of the daily closing balance of Advances outstanding plus the sum of the aggregate Dollar Equivalent amount of outstanding Letters of Credit (including drawn but unreimbursed Letters of Credit and any Letter of Credit Reserve).

"**USA Patriot Act**" is the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (Public Law 107-56, signed into law on October 26, 2001), as amended from time to time.

*[Signature page follows.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

BORROWER:

**JES GLOBAL CAPITAL III, L.P.**, a Delaware limited partnership

By:    JES Global Capital GP III, LLC, a Delaware limited liability company, its general partner

By:    *Elliot Smerling* _____
Name:    543C65BD164E4D6...
Title:    Management Committee Representative

GENERAL PARTNER:

**JES GLOBAL CAPITAL GP III, LLC**, a Delaware limited liability company

By:    *Elliot Smerling* _____
Name:    543C65BD164E4D6...
Title:    Management Committee Representative

BANK:

**SILICON VALLEY BANK**

By:

Name:

Title:   Vice President

**SCHEDULE I**
**LSA PROVISIONS**

| LSA Section | LSA Provision |
|---|---|
| 1.1.1 – Revolving Advances | Amounts borrowed under the Committed Revolving Line may be repaid and, during the Availability Period, reborrowed, subject to the applicable terms and conditions precedent herein. |
| 1.1.3 – Portfolio Investment Sublimit | Subject to the terms and conditions of this Agreement, Bank shall at the request of Borrower make one (1) or more Credit Extensions to or for the account of one (1) or more Portfolio Investments (each, a "**Portfolio Investment Advance**") in an aggregate amount not to exceed the amount of the Permanent Committed Revolving Line.  Borrower shall request each such Portfolio Investment Advance at least five (5) Business Days before the proposed date thereof.  Each Portfolio Investment Advance shall be made pursuant to loan documents and supported by a Portfolio Guaranty in favor of Bank, all in form and substance acceptable to Bank ("**Portfolio Investment Advance Documents**").  The amount of any such Portfolio Investment Advance shall be treated as an Advance in determining availability under the Committed Revolving Line.   As a condition precedent to each Portfolio Investment Advance, Borrower shall have provided Bank with evidence that it has contributed equity into such Portfolio Investment in an amount equal to at least 100% of the principal amount of the requested Portfolio Investment Advance. |
| 1.1.6 – Discretionary Increase of Committed Revolving Line ("**Maximum Increased Committed Revolving Line**") | Borrower may increase the amount of the Committed Revolving Line to an aggregate amount not to exceed the lesser of (a) One Hundred Fifty Million Dollars ($150,000,000) and (b) the Borrowing Base (the "**Maximum Increased Committed Revolving Line Amount**"). |
| 1.1.6 – Discretionary Increase of Committed Revolving Line (Temporary Increase) | It being understood and agreed that (x) the Committed Revolving Line may be further increased by the amount specified in any subsequent Discretionary Commitment Increase and Advance Request consented to by Bank and reduced by the amount equivalent to any Advance repaid by Borrower, (y) the Committed Revolving Line will be restored to the Permanent Committed Revolving Line Amount at any time Borrower has repaid all outstanding Advances in excess of the Permanent Committed Revolving Line Amount, and (z) after repayment of a Discretionary Increase Advance, such Discretionary Increase Advance may not be reborrowed. |
| 1.2(b) – Scheduled Principal Payments | Prior to satisfaction of the Capital Contribution Condition, each Advance (other than a Portfolio Investment Advance) shall be due and payable on the earlier of: (i) one hundred eighty (180) days after the date such Advance is made and (ii) the Maturity Date.<br><br>After the Capital Contribution Condition is satisfied, each Advance (other than a Portfolio Investment Advance) shall be due and payable on the earlier of: (i) three hundred sixty-four (364) days after the date such Advance is made and (ii) the Maturity Date.<br><br>Each Portfolio Company Advance shall be due and payable on the earlier of: (i) twelve (12) months after the date such Portfolio Investment Advance is made; provided that the time period in this clause (i) may be extended to date not later than twenty-four months after the date such Portfolio Investment Advance is made as set forth in the applicable Portfolio Investment Advance Documents and (ii) the Maturity Date. |
| 1.2(e) – Interest | Interest is payable in arrears monthly on each Payment Date and on the Maturity Date. |

| 1.2(f) – Interest Rate | The outstanding principal amount of any Advance or, unless Portfolio Investment Advance Documents indicate otherwise, any Portfolio Investment Advance shall accrue interest at a floating rate per annum equal to the Applicable Rate, which interest shall be payable in accordance with Section 1.2(e). |
|---|---|
| 1.2(i) – Computation; 360-Day Year | Interest shall be computed on the basis of a 360-day year for the actual number of days elapsed. |
| 1.3(a) – Commitment Fee | A fully earned, non-refundable commitment fee equal to twenty basis points (0.20%) of the amount set forth in clause (a) of the definition of Permanent Committed Revolving Line Amount on the Effective Date. |
| 1.3(f) – Discretionary Increase Fee | A Discretionary Increase Fee, payable quarterly, in arrears, on a calendar year basis, during the Availability Period. |
| 12.1 – "Applicable Rate" | "**Applicable Rate**" is the greater of (i) the Prime Rate minus seventy-five basis points (0.75%), and (ii) three hundred twenty-five basis points (3.25%); provided that, in the event such rate of interest is less than zero percent (0.0%) per annum, such rate shall be deemed to be zero percent (0.0%) per annum for purposes of this Agreement. |
| 12.1 – "Availability Period" | "**Availability Period**" is the period commencing on the Effective Date and ending on the Maturity Date. |
| 12.1 – "Borrower" | "**Borrower**" is JES Global Capital III, L.P., a Delaware limited partnership. |
| 12.1 – "Effective Date" | "**Effective Date**" is February 3, 2021. |
| 12.1 – "Payment Date" | "**Payment Date**" is the first (1st) calendar day of each month. |
| 12.1 – "Permanent Committed Revolving Line Amount" | "**Permanent Committed Revolving Line Amount**" is the lesser of (a) Ninety-Five Million Dollars ($95,000,000) and (b) the Borrowing Base. |
| 12.1 – "Prime Rate" | "**Prime Rate**" is the rate of interest per annum from time to time published in the money rates section of The Wall Street Journal or any successor publication thereto as the "prime rate" then in effect; provided that if such rate of interest, as set forth from time to time in the money rates section of The Wall Street Journal, becomes unavailable for any reason as determined by Bank, the "Prime Rate" shall mean the rate of interest per annum announced by Bank as its prime rate in effect at its principal office in the State of California (such Bank announced Prime Rate not being intended to be the lowest rate of interest charged by Bank in connection with extensions of credit to debtors); provided that, in the event such rate of interest is less than zero percent (0.0%) per annum, such rate shall be deemed to be zero percent (0.0%) per annum for purposes of this Agreement. |
| 12.1 – "Stated Maturity Date" | "**Stated Maturity Date**" is February 3, 2022. |

**SCHEDULE II**
**EXCUSE PROVISIONS**

Section 4.4 of the Partnership Agreement.

**EXHIBIT A**
**COLLATERAL DESCRIPTION**

The Collateral consists of all of the respective right, title and interest of each of Borrower and General Partner in and to the following personal property:

1.      All Capital Commitments, Capital Contributions, Capital Contribution Proceeds, Capital Calls, and all other proceeds and rights to payment from the Partners, whether as a result of Capital Calls, or otherwise, and all general intangibles related thereto;

2.      All rights to (a) make Capital Calls and request Capital Contributions from any Partner, (b) exercise and enforce every right, power, remedy, authority, option and privilege and take all steps, actions, suits or proceedings necessary to make Capital Calls and to receive Capital Contribution Proceeds and any other rights to call for additional Capital Contributions with respect to the Capital Commitments as contemplated by the Partnership Agreement and/or any Subscription Agreement or Side Letter executed by any Partner in connection therewith, including, without limitation, the right to make Capital Calls, and (c) enforce the payment thereof and the related terms of the Partnership Agreement and/or any Subscription Agreement or Side Letter executed by any Partner in connection therewith and all rights in respect of Capital Calls against each Partner thereunder;

3.      All deposit accounts into which Capital Contributions are, have been or may be made;

4.      All Borrower's Books and/or General Partner's books relating to the foregoing; and

5.      All claims, rights and interests in any of the above and all proceeds of the foregoing and all general intangibles related thereto.

**EXHIBIT B**
**LOAN PAYMENT/ADVANCE REQUEST FORM**
**DEADLINE FOR SAME DAY PROCESSING IS NOON EASTERN TIME**

Date: _____

JES Global Capital III, L.P.

---

**LOAN PAYMENT:**

From Account #_____    To Account #_____
                 (Deposit Account #)                                    (Loan Account #)
Principal $_____    and/or Interest $_____

Authorized Signature:_____    Phone Number: _____
Print Name/Title: _____

---

**LOAN ADVANCE:**

From Account #_____    To Account #_____
                 (Loan Account #)                                    (Deposit Account #)

Amount of Advance $_____

Date of last capital call: _____    Amount of last capital call: $_____

As of the date of this Payment Advance Form:

1.  Amount of capital called $_____
2.  Remaining Capital Contribution Proceeds Borrower may obtain from Partners $_____
3.  Aggregate amount of distributions to Partners since Effective Date: $_____ and date(s) of such distributions:
4.  Recallable Capital: $_____
5.  Callable Capital attributable to Excluded Partners: $_____
6.  Callable Capital subject to Excuse Provisions: $_____
7.  Callable Capital that is not attributable to Excluded Partners or subject to Excuse Provisions (No. 2 minus No. 5 and No. 6): $_____
8.  Percentage of Callable Capital Specified in Borrowing Base:  [50%][1] [67%][2] of Line 7: $_____
9.  Indebtedness other than Credit Extensions made pursuant to the Loan and Security Agreement (including guaranties and other Contingent Obligations): $_____
10. Borrowing Base (Lesser of (i) No. 8 minus No. 9 and (ii) No. 10): $_____
11. 30% of aggregate Capital Commitments: $_____
11. Committed Revolving Line: $_____
12. Outstanding Credit Extensions made pursuant to the Loan and Security Agreement (including Advances, Portfolio Investment Advances and Letters of Credit): $_____
13. Availability Amount (Lesser of No. 11 and No. 12, minus No. 13): $_____
14. Callable Capital after giving effect to requested Advance: $_____

Use of proceeds:  _____

All Borrower's representations and warranties in the Loan and Security Agreement are true, accurate and complete in all material respects on the date of the request for an advance; provided that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; provided further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date:

---

[1] Applicable prior to satisfaction of the Borrowing Base Increase Condition.
[2] Applicable upon satisfaction of the Borrowing Base Increase Condition.

1

Authorized Signature:_____          Phone Number: _____

Print Name/Title: _____

**EXHIBIT C**
**COMPLIANCE CERTIFICATE**

TO: SILICON VALLEY BANK                                Date: _____
FROM:  JES GLOBAL CAPITAL III, L.P.

      The undersigned authorized officer of JES Global Capital III, L.P., a Delaware limited partnership ("**Borrower**") certifies that under the terms and conditions of the Loan and Security Agreement among Borrower, General Partner and Bank (as amended, the "**Agreement**"): (1) Borrower is in complete compliance for the period ending _____ with all required covenants except as noted below; (2) there are no Events of Default; and (3) all representations and warranties in the Agreement are true and correct in all material respects on this date except as noted below; provided that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date.

      Attached are the required documents supporting the certification. The undersigned certifies that these are prepared in accordance with GAAP consistently applied from one period to the next except as explained in an accompanying letter or footnotes.  The undersigned acknowledges that no borrowings may be requested at any time or date of determination that Borrower is not in compliance with any of the terms of the Agreement, and that compliance is determined not just at the date this certificate is delivered.  Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Agreement.

**Please indicate compliance status by circling Yes/No under "Complies" column.**

| Reporting Covenant | Required | Complies |
|---|---|---|
| Quarterly financial statements with Compliance Certificate, valuation schedules and LP Reports | Quarterly within 90 days | Yes   No |
| Annual financial statements (CPA Audited) with Compliance Certificate, valuation schedules and LP Reports | FYE within 120 days | Yes   No |

**Please complete the section below.**

*As of the date of this Compliance Certificate:*

1. Amount of capital called $_____
2. Remaining Capital Contribution Proceeds Borrower may obtain from Partners $_____
3. Aggregate amount of distributions to Partners since Effective Date: $_____ and date(s) of such distributions:_____
4. Recallable Capital: $_____
5. Callable Capital attributable to Excluded Partners: $_____
6. Callable Capital subject to Excuse Provisions: $_____
7. Callable Capital not attributable to Excluded Partners or subject to Excuse Provisions (No. 2 minus No. 5 and No. 6): $_____

| | |
|---|---|
| 8. | Percentage of Callable Capital Specified in Borrowing Base: [50%][3] [67%][4] of Line 7: $_____ |
| 9. | Indebtedness other than Credit Extensions (including guaranties and other Contingent Obligations): $_____ |
| 10. | 30% of aggregate Capital Commitments: $_____ |
| 11. | Borrowing Base (Lesser of (i) No. 8 minus No. 9 and (ii) No. 10): $_____ |
| 12. | Committed Revolving Line: $_____ |
| 13. | Outstanding Credit Extensions (including Advances, Portfolio Investment Advances and Letters of Credit): $_____ |
| 14. | Availability Amount (Lesser of No. 11 and No. 12 minus No. 13): $_____. If a negative number, Borrower shall immediately pay Bank the amount of that overadvance. |

Transfers of Partner's Capital Commitments? Yes/No

If Yes, which Partner, Amount of Capital Commitment, Name of New Partner: _____.

Portfolio Guarantees:

Portfolio Investment                Lender          Maximum Amount of Guaranty

_____
_____
_____

Any other Contingent Obligations (other than Portfolio Guarantees listed above):

_____
_____
_____

The date of the most recent Capital Call was _____, and the amount of such Capital Call was $_____.

Has Borrower failed to receive any Capital Contributions when due in accordance with a Capital Call?

Yes/No

If Yes, please provide the name of the Partner, the date and the amount of such Capital Call.

Has any Partner claimed or exercised any excuse, exclusion or cancellation right with respect to any Capital Call or Permitted Investment, whether pursuant to an Excuse Provision or otherwise?

Yes/No

Has any Partner become an Excluded Partner?

---

[3] Applicable prior to satisfaction of the Borrowing Base Increase Condition.
[4] Applicable upon satisfaction of the Borrowing Base Increase Condition.

Yes/No

Has any Alternative Investment Vehicle been formed?

Yes/No

Is Borrower in compliance with all limitations with respect to Indebtedness set forth in the Partnership Agreement?

Yes/No

Were greater than or equal to five percent (5.0%) of Capital Contributions with respect to any Capital Call not funded within ten (10) Business Days of the date when due (regardless of any grace period or notice requirement set forth in the Partnership Agreement or otherwise)?

Yes/No

If Yes, please provide date/amount of Capital Call and the names of each Partner that did not fund such Capital Call as required above:

_____

_____

Were all Capital Contributions from General Partner and any Affiliate of Borrower or General Partner funded when due (regardless of any grace period or notice requirement set forth in the Partnership Agreement or otherwise)?

Yes/No

If No, please provide name of General Partner/Affiliate that failed to fund Capital Contributions as required above and due date and amount of Capital Contribution not funded as required above:

_____

_____

The following Special Purpose Entities were created:

_____

_____

The following are the exceptions with respect to the certifications above:  (If no exceptions exist, state "No exceptions to note.")

_____

| **JES GLOBAL CAPITAL III, L.P.** | **BANK USE ONLY** |
|---|---|
| By:  JES Global Capital GP III, LLC, its general partner | Received by:_____ <br> AUTHORIZED SIGNER <br> Date:_____ |
| By: _____ <br> Name: <br> Title: | Verified:_____ <br> AUTHORIZED SIGNER <br> Date:_____ <br> Compliance Status:         Yes    No |

**EXHIBIT D**
**FORM OF ROLLOVER REQUEST**

TO: SILICON VALLEY BANK                     Date: _____

FROM:  JES GLOBAL CAPITAL III, L.P.

Re:  Rollover Request

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement dated as of February 3, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), by and among (a) JES GLOBAL CAPITAL III, L.P., a Delaware limited partnership ("**Borrower**"), (b) JES GLOBAL CAPITAL GP III, LLC, a Delaware limited liability company, and (c) SILICON VALLEY BANK ("**Bank**").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

Pursuant to Section 1.1.5 of the Loan Agreement, Borrower hereby requests that Bank extend the Stated Maturity Date to a date one (1) calendar year after the Stated Maturity Date or, if such date is not a Business Day, the immediately preceding Business Day.

In connection herewith, the undersigned Authorized Signer of Borrower hereby represents, warrants, and certifies to Bank that:

1.  On and as of the date hereof, all representations and warranties in the Loan Agreement are true, accurate, and complete in all material respects and will be true and correct in all material respects immediately after giving effect to the request herein; provided that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; provided further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date;

2.  No Event of Default has occurred and is continuing on and as of the date hereof or will exist on the date after giving effect to the request herein becomes effective;

3.  After any request herein becomes effective, the sum of aggregate outstanding Advances, the Dollar Equivalent amount of all outstanding Letters of Credit (including drawn but unreimbursed Letters of Credit) plus an amount equal to the Letter of Credit Reserve and Portfolio Investment Advances will not exceed the Committed Revolving Line; and

4.  As of the date hereof, no event has occurred since the date of the most recent financial statements of Borrower delivered to Bank which could reasonably be expected to have a Material Adverse Effect.

In the event that, between the date hereof and the date any request herein becomes effective, any event should occur which could reasonably be expected to have a Material Adverse Effect, Borrower shall promptly notify Bank.

Authorized Signature:_____      Phone Number: _____
Print Name/Title: _____

1

**EXHIBIT E**
**FORM OF EXTENSION NOTICE**


Date:  [_____]


JES Global Capital III, L.P.
4095 State Road 7, L-306
Wellington, Florida 33449

Re: Notice of Consent to Rollover Request dated [INSERT DATE OF ROLLOVER REQUEST]

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement dated as of February 3, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), by and among (a) JES GLOBAL CAPITAL III, L.P., a Delaware limited partnership ("**Borrower**"), (b) JES GLOBAL CAPITAL GP III, LLC, a Delaware limited liability company, and (c) SILICON VALLEY BANK ("**Bank**").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

We have received your Rollover Request, dated as of the date set forth above.  We hereby notify you that:

1. [We hereby consent to such Rollover Request effective as of the date hereof.][We hereby consent to such Rollover Request, effective as of the date on which we receive a fee in the amount of $[_____], which fee shall be deemed to be fully earned and non-refundable.]

2. The definition of the term "Applicable Rate" appearing in Section 12 of the Loan Agreement:

    ☐    shall remain as set forth therein without amendment or revision.

    ☐    shall be deleted and replaced in its entirety with the following new definition:

        [●]

3. The definition of the term "Unused Facility Fee" appearing in Section 12 of the Loan Agreement:

    ☐    shall remain as set forth therein without amendment or revision.

    ☐    shall be deleted and replaced in its entirety with the following new definition:

        [●]

4. The definition of the term "Letter of Credit Fee" appearing in Section 12 of the Loan Agreement:

    ☐    shall remain as set forth therein without amendment or revision.

    ☐    shall be deleted and replaced in its entirety with the following new definition:

        [●]

Other than as provided herein, the terms of the Loan Agreement shall remain in full force and effect.  This Extension Notice shall be deemed to be a Loan Document and will be construed and interpreted in accordance with the laws governing the terms of the Loan Agreement.  The terms set forth herein shall be deemed accepted by Borrower if Bank does not receive an objection in writing from Borrower within five (5) Business Days.

1

Thank you,

SILICON VALLEY BANK

By: _____
Name:
Title:

**EXHIBIT F**
**DISCRETIONARY COMMITMENT INCREASE AND ADVANCE REQUEST FORM**

Date:

TO:    SILICON VALLEY BANK
3003 Tasman Drive
Santa Clara, CA  95054
Attention:  Corporate Services Department
Email: lfraher@svb.com

RE:    Loan and Security Agreement dated as of February 3, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), by and among (a) JES GLOBAL CAPITAL III, L.P., a Delaware limited partnership ("**Borrower**"), (b) JES GLOBAL CAPITAL GP III, LLC, a Delaware limited liability company ("**General Partner**"), and (c) SILICON VALLEY BANK ("**Bank**").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

Ladies and Gentlemen:

The undersigned refers to the Loan Agreement, the terms defined therein and used herein as so defined, and hereby makes this Discretionary Commitment Increase and Advance Request.

1.    This Discretionary Commitment Increase and Advance Request is made by Borrower to request (a) an increase of the Committed Revolving Line in the amount of $_____ and (b) a corresponding Discretionary Increase Advance in an amount equal to that specified in clause (a), as provided in the completed Payment/Advance Form dated as of the date hereof and attached hereto as Annex 1.

2.    The proposed Funding Date of the Discretionary Increase Advance is _____.

The undersigned hereby represents and certifies that the following statements are true, accurate and complete as of the date hereof:

1.    The amount of Callable Capital as of the date hereof is $_____.

2.    Either (a) the list of Partners and the Capital Commitment of each Partner submitted to Bank and dated _____ remains true, accurate and complete as of the date hereof or (b) a true, accurate and complete list of Partners and the Capital Commitment of each Partner as of the date hereof, together with evidence of the Capital Commitment of each Partner not previously delivered to Bank, is provided on Annex 2 attached hereto.

3.    Attached hereto as Annex 3 is evidence that Borrower or General Partner has received one hundred percent (100%) of the Capital Contribution Proceeds from the most recent Capital Call, dated _____, in the amount of $_____, on the date such Capital Contribution Proceeds were due under the Partnership Agreement (regardless of any grace period or notice requirement set forth therein).

4.    All representations and warranties of Borrower and General Partner contained in the Loan Agreement are true, accurate and complete in all material respects as of the date hereof; provided that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; provided further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date.

5.    No default or Event of Default has occurred and is continuing or would result from the proposed Discretionary Increase Advance.

| Authorized Signature: _____ | Phone Number: _____ |
|---|---|
| Print Name/Title: _____ | |