UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE SMERLING LITIGATION,

21 Civ. 2552 (JPC)

**DECLARATION OF CHRISTOPHER ANDREW JARVINEN IN SUPPORT OF
UNOPPOSED MOTION TO SELL RESIDENTIAL REAL PROPERTY LOCATED AT
11353 MANATEE TERRACE, LAKE WORTH, FLORIDA AND RELATED RELIEF**

CHRISTOPHER ANDREW JARVINEN, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     Through my professional association, Christopher A. Jarvinen, P.A., I am a member of the law firm of Berger Singerman LLP, counsel to James S. Feltman who is the receiver (the "Receiver") appointed pursuant to that certain *Order Appointing Receiver*, dated May 14, 2021 (Case No. 1:21-cv-05766-JPC, ECF No. 28) (the "Receivership Order") and that certain *Order Granting Joint Motion to (I) Consolidate SVB Action and Citizens Bank Action Into a Single Action, (II) Appoint James Feltman as Receiver in Consolidated Action, and (III) Grant Unopposed Receivership Expansion Motion*, dated July 19, 2021 (Case No. 1:21-cv-02552-JPC, ECF No. 98) (the "Receivership Consolidation/Expansion Order" and together with the Receivership Order, collectively, the "Orders").  I respectfully submit this Declaration in support of the unopposed motion (the "Unopposed Motion") of the Receiver requesting the Court to enter an order, substantially in the form attached hereto as **Exhibit "1"**: (a) authorizing the Receiver to sell to Michael J. Spinner and Danika R. Spinner ("Spinner" or the "Real Property Purchaser") residential real property located at 11353 Manatee Terrace, Lake Worth, Florida 33449 (the "Real

Property") for a purchase price of $3,625,000.00, per the terms of the *"AS IS" Residential Contract for Sale and Purchase* (w/addendum) attached hereto as **Exhibit "2"** (the "Real Property Contract"); (b) modifying the sale procedures set forth in 28 U.S.C. § 2001 with respect to the sale of the Real Property; and (c) related relief.

2.      The Receiver is proceeding by motion, rather than filing an initial pre-motion letter, because of the time sensitivity of the relief sought and given that: (i) Citizens Bank, N.A. ("Citizens Bank") and Silicon Valley Bank ("SVB") which are the plaintiffs in this consolidated action (the "Consolidated Action")[1] support the relief requested in the Unopposed Motion; (ii) defendant JES Global Capital GP III, LLC has failed to appear in either the SVB Action (defined herein) or the Consolidated Action; and (iii) defendants JES Global Capital II, L.P. and JES Global Capital GP II, LLC have failed to appear in the Citizens Bank Action (defined herein) or the Consolidated Action.

### Background:  The SVB Action and the Citizens Bank Action

3.      SVB instituted the SVB Action in March 2021, alleging in its Complaint that Mr. Smerling ("Defendant Smerling") and JES Global Capital GP III, LLC (together, the "New York Defendants") had misappropriated nearly $95 million from SVB (of which approximately $80 million remains outstanding) through fraud and deceit.  (*See* Consolidated Action, ECF No. 1.)

---

[1]      The Receivership Consolidation/Expansion Order, among other things, consolidated the following two separate actions into this Consolidated Action: (i) *Citizens Bank, N.A.* v. *JES Global Capital II, L.P., JES Global Capital GP II, LLC and Elliot S. Smerling*, original case no. 21 Civ. 80815 (S.D. Fla.) initially filed in the District Court for the Southern District of Florida (the "Florida Court") and transferred to this Court by order of the Florida Court dated July 2, 2021 (post-transfer S.D.N.Y. case no. 1:21-cv-05766-JPC, ECF No. 66 (the "Citizens Bank Action")); and (ii) *Silicon Valley Bank* v. *JES Global Capital GP III, LLC; and Elliot S. Smerling*, case no 1:21-cv-02552-JPC (S.D.N.Y) (the "SVB Action") filed in this Court.  As the case number for the SVB Action and the Consolidated Action are the same, this Declaration refers to the "Consolidated Action" when referencing docket numbers for filings related to either the SVB Action or the Consolidated Action.

4.      SVB thereafter obtained in the SVB Action orders of prejudgment attachment and preliminary injunctions with respect to assets of the New York Defendants.  (*See* Consolidated Action, ECF Nos. 19, 26, 31, 37, 67, and 80.)

5.      Following SVB's filing of its Complaint in the SVB Action, Citizens Bank initiated the Citizens Bank Action in the Florida Court and filed a similar complaint on May 5, 2021, against Defendant Smerling, JES Global Capital II, L.P., and JES Global Capital GP II, LLC (collectively, the "Florida Defendants"), seeking to recover approximately $54 million that Citizens Bank alleged the Florida Defendants improperly misappropriated from that bank.  (*See* Citizens Bank Action, ECF No. 1.)

6.      SVB in the SVB Action and Citizens Bank in the Citizens Bank Action obtained final judgments on consent against Defendant Smerling in the amounts of approximately $80 million and $56 million, respectively.  (*See* Consolidated Action, ECF No. 83; Citizens Bank Action, ECF No. 61.)

7.      Citizens Bank in the Citizens Bank Action also obtained a default judgment against the other Florida Defendants given their failure to appear in that action.  (*See* Citizens Bank Action, ECF No. 58.)  Similarly, SVB in the SVB Action obtained a default Judgment against JES Global Capital GP III, LLC given its failure to appear in that action.  (*See* Consolidated Action, ECF No. 150.)

**The Receiver and the Receivership**

8.      On May 14, 2021, the Florida Court entered the Receivership Order appointing Mr. Feltman as the Receiver for the estates of the Florida Defendants.  (*See* Citizens Bank Action, ECF No. 28.)  Mr. Feltman and his retained professionals have since been researching, locating and collecting assets associated with Defendant Smerling and various entities affiliated with him. (*See*

Declaration of James Feltman with Respect to Original Inventory, Citizens Bank Action, ECF No. 65.)

9.      On July 19, 2021, this Court entered the Receivership Consolidation/Expansion Order: (i) appointing Mr. Feltman as the Receiver in the Consolidated Action, including as the receiver for the estates of the New York Defendants pursuant to the Receivership Order which was adopted as an order of this Court in the Consolidated Action, as modified by the Receivership Consolidation/Expansion Order; (ii) expanding the receivership to all of the assets that each of the 61 entities (collectively, the "Additional Entities") listed on Exhibit "A" of the Receivership Consolidation/Expansion Order owns, possesses, has a beneficial interest in, or controls directly or indirectly, as "Receivership Property" under the Receivership Order (collectively, the "Smerling Assets"); and (iii) appointing Mr. Feltman as the Receiver over the Smerling Assets.   (*See* Consolidated Action, ECF No. 98.)

## **The Receiver Has Complied with 28 U.S.C. § 754**

10.      On July 22, 2021 (i.e., three days after this Court entered the Receivership Consolidation/Expansion Order), the Receiver properly commenced a 28 U.S.C. § 754 proceeding in the United States District Court for the Southern District of Florida.  *See* Florida Court, Case No. 9:21-mc-81274-AMC (the "28 U.S.C. § 754 Proceeding").

11.      In compliance with the requirements of 28 U.S.C. § 754, the Receiver initiated the 28 U.S.C. § 754 Proceeding by filing the following documents: (i) the Receivership Order; (ii) the Receivership Consolidation/Expansion Order; (iii) the complaint filed by SVB in the SVB Action; and (iv) the complaint filed by Citizens Bank in the Citizens Bank Action.  *See* Docket for 28 U.S.C. § 754 Proceeding at ECF No. 1.

12.     The Real Property is located in the geographic area covered by the United States District Court for the Southern District of Florida.

**Broad Authority Has Been Granted to the Receiver**

13.     Pursuant to the Receivership Order, the Receiver has been granted broad and extensive authority including the authority:

- to take complete custody, control, and possession of any and all Receivership Property (*See* Receivership Order, ¶ 5(b));

- To manage, control, operate, and maintain the Receivership Property and hold in his possession, custody, and control all Receivership Property, pending further Order of this Court (*See* Receivership Order, ¶ 5(c));

- To use Receivership Property for the benefit of the Receivership Estate (*See* Receivership Order, ¶ 5(d));

- To take any action in relation to any Receivership Property which, prior to the entry of this Order, could have been taken by the Defendant Smerling (*See* Receivership Order, ¶ 5(e));

- To take such other action as may be approved by this Court (*See* Receivership Order, ¶ 5(k)); and

- To deposit all cash proceeds of Receivership Property, into the account being held by the Receiver (*See* Receivership Order, ¶ 19).

**Prior Sale Motions Approved by the Court**

14.     On August 20, 2021, the Receiver filed a motion requesting, among other relief, authorization to sell 11 vehicles and to modify the sale procedures set forth in 28 U.S.C. §§ 2001 and 2004 with respect to the proposed sale (the "11 Vehicles Sale Motion").  (*See* Consolidated Action, ECF Nos. 101-104.)  On August 30, 2021, the Court entered an order granting the relief requested in the 11 Vehicles Sale Motion (the "11 Vehicles Sale Order").  (*See* Consolidated

11274949-1

Action, ECF No. 106.)[2]

15.     On September 29, 2021, the Receiver filed a motion requesting, among other relief, authorization to sell three vacant parcels of land and to modify the sale procedures set forth in 28 U.S.C. § 2001 with respect to the proposed sale (the "Vacant Parcels Sale Motion").   (*See* Consolidated Action, ECF Nos. 115-118.)   On October 14, 2021, the Court entered an order granting the relief requested in the Vacant Parcels Sale Motion (the "Vacant Parcels Sale Order"). (*See* Consolidated Action, ECF No. 120).

16.     On October 15, 2021, the Receiver filed a motion requesting, among other relief, authorization to sell a 1970 Chevrolet Chevelle and to modify the sale procedures set forth in 28 U.S.C. §§ 2001 and 2004 with respect to the proposed sale (the "Chevelle Sale Motion").   (*See* Consolidated Action, ECF Nos. 122-125.)   On October 18, 2021, the Court entered an order granting the relief requested in the Chevelle Sale Motion (the "Chevelle Sale Order").   (*See* Consolidated Action, ECF Nos. 126.)

17.     On January 24, 2022, the Receiver filed a motion requesting, among other relief, authorization to sell residential real property located at 3049 Hartridge Terrace (Wellington, Florida) and two watches, as well as to approve prospectively certain future sales of Receivership Property, and to modify the sale procedures set forth in 28 U.S.C. §§ 2001 and 2004 with respect to such sales (the "Residential Real Property/Watches/Future Sales Motion") (*See* Consolidated Action, ECF Nos. 151-154.)   On January 25, 2022, the Court entered an order granting the relief requested in the Residential Real Property/Watches/Future Sales Motion (the "Residential Real Property/Watches/Future Sales Order").   (*See* Consolidated Action, ECF No. 155).

---

[2]     As additional background, I commend the Court and parties-in-interest to the prior declarations that I have filed in this matter (*See* Consolidated Action, ECF Nos. 95, 102, 109, 116, 123, 132, 152, 164 and 169), each of which I incorporate herein by reference.

11274949-1

18. On March 3, 2022, the Receiver filed a motion requesting, among other relief, authorization to sell a vacant parcel of land and to modify the sale procedures set forth in 28 U.S.C. § 2001 with respect to the proposed sale (the "Vacant Parcel Sale Motion", and together with the 11 Vehicles Sale Motion, the Vacant Parcels Sale Motion, the Chevelle Sale Motion and the Residential Real Property/Watches/Future Sales Motion, collectively, the "Prior Sale Motions"). (*See* Consolidated Action, ECF Nos. 168-171.)  On March 7, 2022, the Court entered an order granting the relief requested in the Vacant Parcel Sale Motion (the "Vacant Parcel Sale Order", and together with the 11 Vehicles Sale Order, the Vacant Parcels Sale Order, the Chevelle Sale Order and the Residential Real Property/Watches/Future Sales Order, collectively, the "Prior Sale Orders").  (*See* Consolidated Action, ECF No. 175.)

**The Real Property Subject to Sale**

19. During June 2021, the Receiver took possession of the Real Property (*See* Declaration of James Feltman with Respect to Original Inventory, Citizens Bank Action, ECF No. 65 at ECF p. 5 out of 8 pages.)

20. The Real Property is owned by Canes Fourteen, LLC.  Per the Receivership Consolidation/Expansion Order, the Real Property represents Receivership Property governed by the Orders.  *See* Receivership Consolidation/Expansion Order at Exh. A, ECF p. 12 out of 22 pages.

21. The Receivership Estate is currently incurring home owner association fees, on the Real Property totaling approximately $209.00 per month.  In addition, the Real Property has been assessed 2021 real estate taxes totaling $24,376.00.  During 2020, the amount of the real estate taxes paid on the Real Property totaled $22,629.00.

22.     In the SVB Action, SVB obtained orders of prejudgment attachment relating to the Real Property (*See, e.g.,* Consolidated Action, ECF Nos. 26, 37 67, 80).

23.     Based upon the Receiver's investigation, the Receiver is not aware of the existence of any mortgage on the Real Property.

**The Marketing of the Real Property for Sale**

24.     During October, 2021, the Receiver began communicating with Coldwell Banker Realty with respect to marketing the Real Property, including requesting and receiving from Coldwell Banker Realty multiple analyses setting forth suggested listing prices for the Real Property.

25.     After numerous communications with Coldwell Banker Realty between October, 2021 and February, 2022, as well as negotiating the terms of the listing agreement for the Real Property, on February 9, 2022, the Receiver officially retained Coldwell Banker Realty to market the Real Property.  Annette Amiraian Maggio of Coldwell Banker Realty is the listing agent.

26.     Based upon the Receiver's investigation, Ms. Maggio had no connection to any of the parties involved in the receivership or the Real Property Purchaser prior to Coldwell Banker Realty being retained to market the Real Property.

27.     After Coldwell Banker Realty provided a detailed market analysis for the purpose of recommending to the Receiver the listing price for the Real Property, and after the Receiver decided to list the Real Property at a listing price higher than initially recommended by Coldwell Banker Realty, the Real Property was originally listed for sale on February 16, 2022 with a listing price of $3.75 million.

28.     Among other marketing approaches, Coldwell Banker Realty listed the Real Property on the "multiple listing service" (the "MLS").  The MLS number for the Real Property is

RX-10777436.  The Real Property has been shown for a month and half to dozens of potential purchasers.

**Spinner's Offer to Purchase the Real Property**

29.     Pursuant to communications and negotiations with Spinner between March 11-29, 2022, including multiple offers and counter-offers, the Receiver has accepted, subject to this Court's approval, the offer by Spinner to purchase the Real Property for an purchase price totaling $3,625,000.00.

30.     Based upon the Receiver's investigation, Spinner has no connection to any of the parties involved in the receivership.

31.     The Receiver has requested and reviewed a document reflecting proof of funds by Spinner in an amount sufficient to fund the offer, including the $250,000.00 deposit and the additional cash balance totaling $475,000.00 which will be due at the closing.

32.     On March 31, 2022, Spinner forwarded to the Receiver proof of the $50,000.00 initial deposit with the escrow agent as required under the Real Property Contract.  On April 11, 2022, Spinner forwarded to the Receiver proof of the $200,000.00 additional deposit with the escrow agent as required by the Real Property Contract.

**The Court Should Approve the Proposed Sale of the Real Property**

33.     A receiver possesses broad discretion to sell receivership property under the highly deferential "business judgment" standard.  *See, e.g., Lawsky* v. *Condor Capital Corp.*, No. 14 CIV. 2863 (CM), 2015 WL 4470332, at *6 (S.D.N.Y. July 21, 2015).  As Judge McMahon stated in *Lawsky*,

> When analyzing a proposed sale of property by a receiver, courts apply the highly deferential "business judgment" standard.  *See, e.g., Golden Pacific Bancorp v. Fed. Deposit Ins. Corp.*, No. 95 Civ. 9281(NRB), 2002 WL 31875395, at *9 (S.D.N.Y. Dec. 26, 2002), *aff'd by* 375 F.3d 196 (2d Cir.

2004).  This standard is identical to the test courts use to analyze whether other fiduciaries, such as bankruptcy trustees, acted in accordance with their fiduciary duties.  *See, e.g., In re Bakalis*, 220 B.R. 525, 531-32 (Bankr. E.D.N.Y. 1998) (challenges to a bankruptcy trustee's discretion when selling estate property are judged under the highly deferential business judgment test).  Here, the task of this Court is not to decide whether it agrees with the Receiver's decision but, rather, whether the Receiver exercised his discretion in a reasonable manner, in good faith, and for sound business reasons.  *See Bank of N.Y. Mellon v. Ret. Bd. of Policemen's Annuity & Benefit Fund of the City of Chi. (In re Bank of N.Y. Mellon)*, 127 A.D.3d 120, 125-26 (1st Dept. 2015) (a fiduciary comports with his fiduciary duty if he exercises his discretionary power "reasonably and in good faith"); *Corbin v. Fed. Reserve Bank of N.Y.*, 475 F.Supp. 1060, 1071 (S.D.N.Y. 1979) (receiver does not breach fiduciary duty if he exercises "reasonable business judgment").

*Id.*

34.     First, the Court should approve the sale of the Real Property to the Real Property Purchaser.  The Receiver has exercised reasonable business judgment by accepting the Real Property Purchaser's offer of a purchase price for the Real Property totaling $3,625,000.00, subject to the approval of this Court.  As an initial comment, the proposed sale of the Real Property to the Real Property Purchaser for a purchase price of $3,625,000.00 will result, after payment of the real estate commissions and other estimated closing costs, in proceeds to the Receivership Estate in the approximate amount of $3,262,500.00.  Not only is this amount a substantial, guaranteed payment that the Receiver has negotiated, it also obviates the continuing costs of maintaining, insuring and paying real estate taxes on the Real Property.  Second, the offer accepted by the Receiver from the Real Property Purchaser is within a mere 3.4% of the original $3,750,000.00 listing price (which itself represents a higher the listing price initially suggested by Coldwell Banker Realty) and has resulted from the Real Property being officially marketed publicly for more than one-and-a-half months by Coldwell Banker Realty, including being listed on the MLS, and the property being shown to dozens of prospective purchasers.  Third, the proposed sale of the Real Property is

10

structured as traditional, good faith, arms-length, market-based sales of real property resulting

from vigorous independent negotiations between the Real Property Purchaser and the Receiver.

Accordingly, the Receiver respectfully requests that this Court approve the proposed sale of the

Real Property to the Real Property Purchaser because such sale will maximize the value of the

Receivership Estate.

35.     Thus, the Receiver now seeks entry of an order in substantially the form of the

proposed order attached hereto as **Exhibit "1"** which authorizes the sale of the Real Property to

the Real Property Purchaser.

36.     This specific relief requested in the Unopposed Motion is supported by SVB and

Citizens Bank.  (*See* ¶ 45.)

**The Receiver Requests Modification of the Sale Procedures Set Forth in 28 U.S.C. §
2001 With Respect to the Sale of the Real Property**

37.     28 U.S.C. § 2001 provides for special procedures pertaining to the sale of real

property.  Subsection (b) pertains to the sale of such property at private sale and states:

> After a hearing, of which notice to all interested parties shall be
> given by publication or otherwise as the court directs, the court may
> order the sale of such realty or interest or any part thereof at private
> sale for cash or other consideration and upon such terms and
> conditions as the court approves, if it finds that the best interests of
> the estate will be conserved thereby. Before confirmation of any
> private sale, the court shall appoint three disinterested persons to
> appraise such property or different groups of three appraisers each
> to appraise properties of different classes or situated in different
> localities. No private sale shall be confirmed at a price less than two-
> thirds of the appraised value. Before confirmation of any private
> sale, the terms thereof shall be published in such newspaper or
> newspapers of general circulation as the court directs at least ten
> days before confirmation. The private sale shall not be confirmed if
> a bona fide offer is made, under conditions prescribed by the court,
> which guarantees at least a 10 per centum increase over the price
> offered in the private sale.

*See* 28 U.S.C. § 2001(b).

11

38.     A district court possesses broad equitable powers and wide discretion to determine relief in an equity receivership, including the power to order the sale of receivership property.  *See, e.g., SEC* v. *Elliott,* 953 F.2d 1560, 1566 (11th Cir. 1992) (the district court has broad powers and wide discretion to determine relief in an equity receivership); *SEC* v. *Byers*, 637 F.Supp.2d 166, 184 (S.D.N.Y. 2009) ("a district court has extremely broad discretion in supervising an equity receivership and in determining appropriate procedures to be used in its administration") (quoting *FDIC* v. *Bernstein*, 786 F.Supp. 170, 177 (E.D.N.Y. 1992)); *see also* Prior Sale Orders.[3]  This broad discretion includes setting the terms and conditions for a sale under 28 U.S.C. § 2001.  *See United States* v. *Branch Coal Corp*., 390 F.2d 7, 10 (3d Cir. 1968), *cert. den. by Sun Protection Co. of Am.* v. *U.S.*, 391 U.S. 966 (1968) ("appellate courts will not disturb the exercise of a district court's discretion in setting the terms and conditions for a judicial sale and the confirmation thereof"); *United States* v. *Nipper*, 11-460 WJ/LFG, 2015 WL 4664921, at *1 (D. N.M. July 2, 2015) ("Under 28 U.S.C. § 2001(a), the [c]ourt may set the terms and conditions of a sale of real property that is sold under any decree or order of the [c]ourt.  The [c]ourt has broad discretion in setting the terms and conditions of sale under 28 U.S.C. § 2001").

39.     Thus, a district court may dispense with or modify the requirements of 28 U.S.C. § 2001 with respect to the sale of real or personal property.  *See, e.g., Keybank National Ass'n* v. *Monolith Solar Assocs.*, 1:19-CV-1562, 2021 WL 925768, at *1 (N.D.N.Y. Mar. 11, 2021) (granting receiver's request to dispense with requirements of 28 U.S.C. § 2001 and approving letter of intent for the sale of certain solar photovoltaic generation facilities which included the transfer

---

[3]     For example, "[a] court of equity, under proper circumstances, has the power to order a receiver to sell property free and clear of all encumbrances." *Miners' Bank of Wilkes-Barre* v. *Acker*, 66 F.2d 850, 853 (3d Cir. 1933); *see also* Prior Sale Orders.  Generally, when a court-appointed receiver is involved, the receiver, as agent for the court, should conduct the sale of the receivership property.  *See Blakely Airport Joint Venture II* v. *Federal Sav. and Loan Ins. Corp.*, 678 F. Supp. 154, 156 (N.D. Tex. 1988).  Thus, this Court is authorized to approve the Receiver's proposed sales of the Real Property to the Real Property Purchaser.  *See, e.g.,* Prior Sale Orders.

of title to real property); *SEC* v. *Equitybuild, Inc.*, No. 18 CV 5587, 2019 WL 1953117, at \*2-4 (N.D. Ill. May 2, 2019) (approving receiver's sale process for real property through a sale process developed by receiver which did not follow the statutory requirements of 28 U.S.C. § 2001); *Pennant Mgmt., Inc.* v. *First Farmers Financial, LLC*, Case No. 14-cv-7581, 2015 WL 5180678, at \*7 (N.D. Ill. Sept. 4, 2015) (granting receiver's request to waive strict compliance with 28 U.S.C. § 2001 and to sell five hotel properties under different procedures where no party objected to the procedures, properties were advertised on a website, and "following the archaic procedures in [28 U.S.C. §§ 2001 and 2002] would have hampered the sales"); *Nipper*, 2015 WL 4664921, at \*2 (granting request in a receivership action to dispense with requirements of 28 U.S.C. § 2001 to permit the I.R.S. to sell a parcel of receivership real property through one of its units that specializes in selling real property where receiver was unable to sell the real property); *SEC* v. *Billion Coupons, Inc*., Civil Nos. 09-00068 JMS-LEK, 09-00069 JMS-LEK, 2009 WL 2143531, at \*3 (D. Hawai'i July 13, 2009) (approving receiver's request to modify the requirements of 28 U.S.C. § 2001 to create a procedure authorizing the receiver to sell real property where a real estate agent is retained by the receiver to sell the real property and such real estate agent lists the real property in the appropriate multiple listing service); *cf. SEC* v. *Platinum Mgmt. (NY) LLC*, 16-cv-6848 (BMC), 2018 WL 9801132 at \*4 (E.D.N.Y.) (approving a sale of receivership assets that did not comply with 28 U.S.C. § 2001 where the process developed by receiver "has ensured the result that § 2001 demands – a sale of the property interest in an amount that adequately reflects its value" and where the court found that "requiring the [r]eceiver to follow § 2001 at this point would be a waste of [r]eceivership assets and would likely result in the exact same outcome").

40.     As an initial comment, the Receiver submits that the proposed sale of the Real Property to the Real Property Purchaser does not even represent a "private" sale but is more akin

to a "public" sale, and therefore, such sales do not even trigger 28 U.S.C. § 2001.  For example, District Judge Cogan of the U.S. District Court for the Eastern District of New York in *Platinum Mgmt.* held that the sale in that case of the receiver's equity interests in a company that had the right to extract gold in Brazil was more akin to a public sale, and therefore, did not trigger § 2001(b) in part because "the Second Circuit has held that 'the docketing of [a] decision [gives] effective notice to the public".  2018 WL 9801132 at *3 (citations omitted).  Since the receiver in *Platinum Mgmt*. conducted the sale publicly by putting the public on notice of the sale at least twice, including through the retention of Houlihan Lokey to assist in the sale, and the separate filing of the sale motion which alerted the public to the proposed sale and the court process which approved the sale, Judge Cogan concluded that no requirement existed to consult § 2001(b).  *See id.*

41.    Similar to the public notice holdings in *Platinum Mgmt.*, the Receiver has put the public on notice at least twice of the sale of the Real Property to the Real Property Purchaser.  The Real Property subject to this Motion has been advertised by Coldwell Banker Realty publicly, including being listed for over one-and-a-half months on the "multiple listing service" which are collectively the common, nationwide computerized, website databases permitting thousands of real estate agents from more than 800 real estate brokerages to sell one another's properties that are listed for sale.  *See, e.g., Regional Multiple Listing Serv. of Minn.* v. *Am. Home Realty Network, Inc.*, Civil No. 12-965 (JRT/FLN), 2012 WL 4470286, at *1 n.1 (D. Minn. Sept. 27, 2012); *see also* "Multiple Listing Service (MLS): What Is It", https://www.nar.realtor/nar-doj-settlement/multiple-listing-service-mls-what-is-it (last visited on Sept. 22, 2021).  Moreover, the Receiver arranged for the MLS listings created by Coldwell Banker Realty to include a lengthy "terms of sale"/addendum (i.e., a form of which is attached to, and is a part of, the Real Property

Contract).  Such "terms of sale"/addendum states among other things, that the proposed sale is a part of this receivership case and any proposed sale must receive the approval of this Court. Additionally, the Receiver filed and served this Unopposed Motion on the docket of this receivership case.  Given the fact that the entire sales process related to the Real Property has been conducted publicly, the Receiver respectfully submits that the Court need not consult 28 U.S.C. § 2001(b).

42.      Moreover, the facts here with the Real Property are analogous with those in *Billion Coupons* where the district court in that case granted the receiver's request to approve a process authorizing the receiver to sell real property simply where the receiver retained a real estate agent and the real property was advertised publicly through the MLS.  *Billion Coupons*, 2009 WL 2143531, at * 3.  In this matter, the Receiver retained Coldwell Banker Realty over two months ago to market the parcel of Real Property.  In turn, Coldwell Banker Realty has publicly advertised the Real Property, including listing it on the MLS.  Moreover, similar to *Pennant Mgmt.* and *Nipper* cases, (i) Coldwell Banker Realty is a brokerage which specializes in the marketing and selling of real property, (ii) the Real Property has been advertised on a website (here, the MLS), and (iii) no party has objected to the sales of the Real Property proposed by this Motion.  *Pennant Mgmt.*, 2015 WL 5180678, at * 7; *Nipper*, 2015 WL 4664921, at * 2.

43.      Even if 28 U.S.C. § 2001 applies to the sale of the Real Property, ample cause exists for this Court to dispense with or modify the requirements of 28 U.S.C. § 2001 with respect to this transaction.  If the Receiver was required to follow the exact requirements of 28 U.S.C. § 2001 with respect to the sales of the Real Property, the Receivership Estate would be unnecessarily and excessively burdened with the uncertainty and expense of: (i) multiple hearings in which the Receiver would seek approval to sell the Real Property at a private sale; (ii) multiple applications

11274949-1

seeking the appointment of three court-appointed appraisers to appraise the Real Property; (iii) paying for sets of three Court-appointed appraisers separately to appraise the Real Property; (iv) advertising the proposed sale before obtaining Court confirmation; and (v) one or more hearings to obtain confirmation of the sale.  Alternatively, the Receiver would be faced with selling the Real Property pursuant to 28 U.S.C. § 2001(a) at a sale on the courthouse steps, thereby significantly increasing the likelihood that the Real Property would be sold at a distressed liquidation price. Under these circumstances, it is appropriate for the Court to vest the Receiver with the discretion to sell the Real Property to the Real Property Purchaser through the terms proposed by this Motion in order to minimize the expense to the Receivership Estate while protecting the value to be obtained through the sale against the very real possibility that the Receivership Estate would obtain unreasonably low liquidation proceeds from such sale on the courthouse steps.

44.     Accordingly, the Receiver now seeks entry of a proposed order in substantially the form of the proposed order attached hereto as **Exhibit "1"** to modify the sale procedures set forth in 28 U.S.C. § 2001 with respect to the sale of the Real Property to the Real Property Purchaser.

45.     This specific relief requested in the Unopposed Motion is supported by SVB and Citizens Bank.  (*See* ¶ 45.)

**Conclusion**

46.     Counsel for each of Citizens Bank and SVB has reviewed and approved the form of the proposed order attached to the Unopposed Motion as **Exhibit "1"** and has advised undersigned counsel for the Receiver that their respective clients affirmatively support the relief requested in the Unopposed Motion.

11274949-1

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 14, 2022.

Christopher Andrew Jarvinen

# Exhibit 1

11274949-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE SMERLING LITIGATION,

21 Civ. 2552 (JPC)

**[PROPOSED] ORDER GRANTING UNOPPOSED MOTION TO SELL**
**RESIDENTIAL REAL PROPERTY LOCATED AT**
**11353 MANATEE TERRACE, LAKE WORTH, FLORIDA AND RELATED RELIEF**

THIS MATTER is before the Court upon the unopposed motion (the "Unopposed

Motion")[1] of James Feltman, in his capacity as the receiver (the "Receiver") appointed pursuant

to that certain (a) *Order Appointing Receiver*, dated May 14, 2021 (Case No. 1:21-cv-05766-JPC,

ECF No. 28) (the "Receivership Order") and (b) *Order Granting Joint Motion to (I) Consolidate*

*SVB Action and Citizens Bank Action Into a Single Action, (II) Appoint James Feltman as Receiver*

*in Consolidated Action, and (III) Grant Unopposed Receivership Expansion Motion*, dated July

19, 2021 (Case No. 1:21-cv-02552-JPC, ECF No. 98) (the "Receivership Consolidation/Expansion

Order" and together with the Receivership Order, collectively, the "Orders"), seeking the entry of

an order (this "Order"), *inter alia*: (a) authorizing the Receiver to sell to Michael J. Spinner and

Danika R. Spinner  ("Spinner" or the "Real Property Purchaser") residential real property located

at 11353 Manatee Terrace, Lake Worth, Florida 33449 (the "Real Property") for a purchase price

of  $3,625,000.00,  per  the  terms  of  the  *"AS IS" Residential Contract for Sale and Purchase*

(w/addendum) attached to the Declaration as Exhibit "2"; (b) modifying the sale procedures set

---

[1]   Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the
      Unopposed Motion.

forth in 28 U.S.C. § 2001 with respect to the sale of the Real Property; and (c) granting the Receiver such other and further relief as the Court deems just and proper; and

WHEREAS the Court finds, based on the record in this Consolidated Action, including the *Declaration of Christopher Andrew Jarvinen in Support of Unopposed Motion to Sell Residential Real Property Located at 11353 Manatee Terrace, Lake Worth, Florida and Related Relief* (Consolidated Action, ECF No. ___) (the "Declaration"), that it is appropriate to grant the relief requested in the Unopposed Motion; and

WHEREAS the Orders authorize James Feltman, in his capacity as the Receiver, *inter alia*: (i) to take complete custody, control, and possession of any and all Receivership Property; (ii) to manage, control, operate, and maintain the Receivership Property and hold in his possession, custody, and control all Receivership Property, pending further Order of this Court; (iii) to use Receivership Property for the benefit of the Receivership Estate; (iv) to take any action in relation to any Receivership Property which, prior to the entry of this Order, could have been taken by the Defendant Smerling; (v) to take such other action as may be approved by this Court; and (vi) to deposit all cash proceeds of Receivership Property, into the account being held by the Receiver; and

WHEREAS, the Real Property represents Receivership Property; and

WHEREAS, an additional description of the Real Property is attached to this Order as **Exhibit "A"**; and

WHEREAS, the Receiver has complied with 28 U.S.C. § 754; and

WHEREAS, this Court has jurisdiction over the Receivership Property and constitutional authority to enter this Order; and

2

WHEREAS, the authority granted herein is consistent with of Receiver's authority and duties under the Orders, and in furtherance of the Receiver's efforts to maximize the value of the Receivership Property.  The entry of this Order is in the best interests of all parties in interest as its implementation will, among other things, permit the Receiver to sell the Real Property, as well as to obviate additional expenses related to home owner association fees, real estate taxes and insuring the Real Property, thereby producing cash for the Receivership Estate; and

WHEREAS, the terms of the transaction proposed in the Unopposed Motion are fair and reasonable under the circumstances, were negotiated in good faith and at arm's length, reflect the Receiver's exercise of prudent business judgment consistent with his fiduciary duties, and, where applicable, are supported by reasonably equivalent value and fair consideration; and

WHEREAS, the Receiver has shown good cause for the entry of this Order and the Court concludes that entry of this Order is necessary to preserve and maximize the value of the Receivership Property in the best interests of the creditors of the Receivership Estate; and

WHEREAS, the Receiver has provided adequate and sufficient notice of the Unopposed Motion by providing written notice to creditors and interested parties identified on the Receiver's declaration of service filed in conjunction of the Unopposed Motion, and therefore, such notice is appropriate, adequate, and proper under the circumstances involved in this case; and

IT IS ACCORDINGLY HEREBY:

ORDERED that the Unopposed Motion is granted subject to the terms and conditions set forth in this Order, any objections that have not previously been withdrawn are hereby overruled; and it is further

11275271-1

ORDERED that the terms of the Real Property Contract are approved in their entirety and the Receiver is authorized to perform under the Real Property Contract; and it is further

ORDERED that the Receiver is hereby authorized in his sole discretion to sell the Real Property to the Real Property Purchaser pursuant to the terms of the Real Property Contract in exchange for the gross purchase price totaling $3,625,000.00 as described in the Real Property Contract; and it is further

ORDERED that the Court hereby immediately terminates its prior attachment orders (e.g., ECF Nos. 26, 37, 67 and 80) relating to the Real Property; and it is

ORDERED that the Receiver is hereby authorized in his sole discretion to execute such agreements, transfer documents, title documents, organizational documents and organizational consents, and such other documents as the Receiver may determine in his sole discretion are necessary or desirable in connection with the sales of the Real Property; and it is further

ORDERED that the sale procedures set forth in 28 U.S.C. § 2001, to the extent applicable, shall not apply with respect to the sales of the Real Property; and it is further

ORDERED that, within ten (10) days following the entry of this Order, the Receiver shall serve a copy of this Order upon the Florida Defendants and the New York Defendants by service, via Federal Express, electronic mail or any other mechanism reasonably designed to successfully effect service, as follows:

(a)     Upon Mr. Smerling through his counsel who has appeared in the Consolidated Action;

(b)      Upon JES Global Capital GP III, LLC, directed to its registered agent in Delaware and/or the Secretary of State for the State of Delaware in the event that such entity no longer has a registered agent; and

(c)      Upon JES Global Capital II, L.P. and JES Global Capital GP II, LLC, directed to the Secretary of State for the State of Florida as neither entity currently has a registered agent in Florida.

Dated:          _____ ___, 2022
                New York, New York


                                    _____
                                    John P. Cronan, U.S.D.J.

5

**Exhibit "A"**

Legal description for the Real Property

Lot 245, HOMELAND, according to the map or plat thereof, as recorded in Plat Book 33, at Page(s) 111, of the Public Records of Palm Beach County, Florida.

6

# Exhibit 2

11274949-1

"AS IS" Residential Contract
For Sale And Purchase
THIS FORM HAS BEEN APPROVED BY
THE FLORIDA REALTORS AND THE FLORIDA BAR



1*  PARTIES: _Canes Fourteen, LLC, a Florida limited liability company_ ("Seller"),
2*  and ___~~Michael M. Spinner & Danika Spinner~~___ Michael J. Spinner & Danika R. Spinner ("Buyer"),
3   agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property
4   (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale And Purchase
5   and any riders and addenda ("Contract"):
6   1.  PROPERTY DESCRIPTION:
7*      (a) Street address, city, zip: _11363 Manatee Terrace, Lake Worth Florida 33449_
8*      (b) Located in: _Palm Beach_ County, Florida. Property Tax ID #: _00-41-44-38-01-000-2450_
9*      (c) Real Property: The legal description is _____
10      _____
11      _____
12      together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and
13      attached wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or
14      by other terms of this Contract.
15      (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items
16      which are owned by Seller and existing on the Property as of the date of the initial offer are included in the
17      purchase: range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), light fixture(s), drapery rods
18      and draperies, blinds, window treatments, smoke detector(s), garage door opener(s), thermostat(s), doorbell(s),
19      television wall mount(s) and television mounting hardware, security gate and other access devices, mailbox
20      keys, and storm shutters/storm protection items and hardware ("Personal Property").
21*     Other Personal Property items included in this purchase are: _NONE_
22      _____
23      Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
24*     (e) The following items are excluded from the purchase: _____
25      _____

26                          PURCHASE PRICE AND CLOSING

27*  2.  PURCHASE PRICE (U.S. currency):.................................................$ _3,625,000_
28*     (a) Initial deposit to be held in escrow in the amount of (checks subject to Collection) ...........$ _50,000_
29      The initial deposit made payable and delivered to "Escrow Agent" named below
30*     (CHECK ONE): (i) ☐ accompanies offer or (ii) ☒ is to be made within _3_ (if left blank,
31      then 3) days after Effective Date. IF NEITHER BOX IS CHECKED, THEN OPTION (ii)
32      SHALL BE DEEMED SELECTED.
33*     Escrow Agent Name: _Fidelity National Title Insurance; c/o Stacey Tomlinson_
34*     Address: _13800 NW 14 Street, Suite 190, Sunrise, FL 33323_ Phone: _954-308-3008_
35*     Email: _Stacey.Tomlison@fnf.com_ Fax: _954-971-2050_
36*     (b) Additional deposit to be delivered to Escrow Agent within _____ (if left blank, then 10)
37*     days after Effective Date .................................................................$ _200,000_
38      (All deposits paid or agreed to be paid, are collectively referred to as the "Deposit")
39*     (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8........$ _2,900,000_
40*     (d) Other: _____$ _0.00_
41      (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
42*     transfer or other Collected funds (See STANDARD S).........................................$ _475,000_
43   3.  TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:
44      (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before
45*     _March 31st, 2022_, this offer shall be deemed withdrawn and the Deposit, if any, shall be returned to
46      Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the day
47      the counter-offer is delivered.
48      (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or
49      initialed and delivered this offer or final counter-offer ("Effective Date").
50   4.  CLOSING; CLOSING DATE: The closing of this transaction shall occur when all funds required for closing are
51      received by Closing Agent and Collected pursuant to STANDARD S and all closing documents required to be
52      furnished by each party pursuant to this Contract are delivered ("Closing"). Unless modified by other provisions of

Buyer's Initials _____          Page 1 of 12          Seller's Initials _____
FloridaRealtors/FloridaBar-ASIS-6   Rev.10/21 © 2021 Florida Realtors® and The Florida Bar. All rights reserved.
Licensed to Alta Star Software and ID: D1848241866.X6T8.105212
Software and added formatting © 2022 Alta Star Software, all rights reserved. • www.altastar.com • (877) 279-8898

53*  this Contract, the Closing shall occur on __See Section 5 of Addendum__  ("Closing Date"), at the time
54  established by the Closing Agent.

**5. EXTENSION OF CLOSING DATE:**

56  (a) In the event Closing funds from Buyer's lender(s) are not available on Closing Date due to Consumer Financial
57  Protection Bureau Closing Disclosure delivery requirements ("CFPB Requirements"), if Paragraph 8(b) is
58  checked, Loan Approval has been obtained, and lender's underwriting is complete, then Closing Date shall be
59  extended for such period necessary to satisfy CFPB Requirements, provided such period shall not exceed 7
60  days.
61  (b) If an event constituting "Force Majeure" causes services essential for Closing to be unavailable, including the
62  unavailability of utilities or issuance of hazard, wind, flood or homeowners' insurance, Closing Date shall be
63  extended as provided in STANDARD G.

**6. OCCUPANCY AND POSSESSION:**

65  (a) Unless Paragraph 6(b) is checked, Seller shall, at Closing, deliver occupancy and possession of the Property
66  to Buyer free of tenants, occupants and future tenancies. Also, at Closing, Seller shall have removed all
67  personal items and trash from the Property and shall deliver all keys, garage door openers, access devices and
68  codes, as applicable, to Buyer. If occupancy is to be delivered before Closing, Buyer assumes all risks of loss
69  to the Property from date of occupancy, shall be responsible and liable for maintenance from that date, and
70  shall have accepted the Property in its existing condition as of time of taking occupancy, see Rider T PRE-
71  CLOSING OCCUPANCY BY BUYER.
72  (b) ☑ CHECK IF PROPERTY IS SUBJECT TO LEASE(S) OR OCCUPANCY AFTER CLOSING. If Property is
73  subject to a lease(s) or any occupancy agreements (including seasonal and short-term vacation rentals) after
74  Closing or is intended to be rented or occupied by third parties beyond Closing, the facts and terms thereof
75  shall be disclosed in writing by Seller to Buyer and copies of the written lease(s) shall be delivered to Buyer, all
76  within 5 days after Effective Date. If Buyer determines, in Buyer's sole discretion, that the lease(s) or terms of
77  occupancy are not acceptable to Buyer, Buyer may terminate this Contract by delivery of written notice of such
78*  election to Seller within 5 days after receipt of the above items from Seller, and Buyer shall be refunded the
79  Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Estoppel Letter(s)
80  and Seller's affidavit shall be provided pursuant to STANDARD D, except that tenant Estoppel Letters shall not
81  be required on seasonal or short-term vacation rentals. If Property is intended to be occupied by Seller after
82  Closing, see Rider U POST-CLOSING OCCUPANCY BY SELLER.

83*  **7. ASSIGNMENT: (CHECK ONE):** Buyer☐ may assign and thereby be released from any further liability under
84*  this Contract;☒ may assign but not be released from liability under this Contract; or☐ may not assign this Contract.
85  IF NO BOX IS CHECKED, THEN BUYER MAY NOT ASSIGN THIS CONTRACT.

**FINANCING**

87  **8. FINANCING:**
88*  ☒ (a) This is a cash transaction with no financing contingency.
89*  ☑ (b) This Contract is contingent upon, within __25__ (if left blank, then 30) days after Effective Date ("Loan
90*  Approval Period"): (1) Buyer obtaining approval of a ☐ conventional ☐ FHA ☐ VA or ☐ other _____
91*  (describe) mortgage loan for purchase of the Property for a **(CHECK ONE):** ☐ fixed, ☐ adjustable, ☐ fixed or
92*  adjustable rate in the Loan Amount (See Paragraph 2(b)), at an initial interest rate not to exceed _____ % (if left
93*  blank, then prevailing rate based upon Buyer's creditworthiness), and for a term of _____(if left blank, then 30)
94  years ("Financing"); and (2) Buyer's mortgage broker or lender having received an appraisal or alternative valuation
95  of the Property satisfactory to lender, if either is required by lender, which is sufficient to meet the terms required
96  for lender to provide Financing for Buyer and proceed to Closing ("Appraisal").
97*  (i) Buyer shall make application for Financing within _____ (if left blank, then 5) days after Effective Date
98  and use good faith and diligent effort to obtain approval of a loan meeting the Financing and Appraisal terms of
99  Paragraph 8(b)(1) and (2), above, ("Loan Approval") within the Loan Approval Period and, thereafter, to close this
100  Contract. Loan Approval which requires Buyer to sell other real property shall not be considered Loan Approval
101  unless Rider V is attached.
102  Buyer's failure to use good faith and diligent effort to obtain Loan Approval during the Loan Approval Period shall
103  be considered a default under the terms of this Contract. For purposes of this provision, "diligent effort" includes,
104  but is not limited to, timely furnishing all documents and information required by Buyer's mortgage broker and lender
105  and paying for Appraisal and other fees and charges in connection with Buyer's application for Financing.
106  (ii) Buyer shall, upon written request, keep Seller and Broker fully informed about the status of Buyer's
107  mortgage loan application, loan processing, appraisal, and Loan Approval, including any Property related conditions
108  of Loan Approval. Buyer authorizes Buyer's mortgage broker, lender, and Closing Agent to disclose such status

FloridaRealtors/FloridaBar-ASIS-5   Rev.10/21 © 2021 Florida Realtors® and The Florida Bar. All rights reserved.
Licensed to Alta Star Software and ID: D154824156R.K6T8.105212
Software and added formatting © 2022 Alta Star Software, all rights reserved. • www.altastar.com • (877) 279-8898

109 and progress and release preliminary and finally executed closing disclosures and settlement statements, as
110 appropriate and allowed, to Seller and Broker.
111    (iii) If within the Loan Approval Period, Buyer obtains Loan Approval, Buyer shall notify Seller of same in writing
112 prior to expiration of the Loan Approval Period; or, if Buyer is unable to obtain Loan Approval within Loan Approval
113 Period but Buyer is satisfied with Buyer's ability to obtain Loan Approval and proceed to Closing, Buyer shall deliver
114 written notice to Seller confirming same, prior to the expiration of the Loan Approval Period.
115    (iv) If Buyer is unable to obtain Loan Approval within the Loan Approval Period, or cannot timely meet the
116 terms of Loan Approval, all after the exercise of good faith and diligent effort, Buyer may terminate this Contract by
117 delivering written notice of termination to Seller prior to expiration of the Loan Approval Period; whereupon, provided
118 Buyer is not in default under the terms of this Contract, Buyer shall be refunded the Deposit thereby releasing Buyer
119 and Seller from all further obligations under this Contract.
120    (v) If Buyer fails to timely deliver any written notice provided for in Paragraph 8(b)(iii) or (iv), above, to Seller
121 prior to expiration of the Loan Approval Period, then Buyer shall proceed forward with this Contract as though
122 Paragraph 8(a), above, had been checked as of the Effective Date; provided, however, Seller may elect to terminate
123 this Contract by delivering written notice of termination to Buyer within 3 days after expiration of the Loan Approval
124 Period and, provided Buyer is not in default under the terms of this Contract, Buyer shall be refunded the Deposit
125 thereby releasing Buyer and Seller from all further obligations under this Contract.
126    (vi) If Buyer has timely provided either written notice provided for in Paragraph 8b(iii), above, and Buyer
127 thereafter fails to close this Contract, the Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's
128 default or inability to satisfy other contingencies of this Contract; or (2) Property related conditions of the Loan
129 Approval (specifically excluding the Appraisal valuation) have not been met unless such conditions are waived by
130 other provisions of this Contract; in which event(s) the Buyer shall be refunded the Deposit, thereby releasing Buyer
131 and Seller from all further obligations under this Contract.
132* ☐ (c) Assumption of existing mortgage (see Rider D for terms).
133* ☐ (d) Purchase money note and mortgage to Seller (see Rider C for terms).

134 **CLOSING COSTS, FEES AND CHARGES**

135 **9.  CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:**
136   (a)  COSTS TO BE PAID BY SELLER:
137 • Documentary stamp taxes and surtax on deed, if any    • HOA/Condominium Association estoppel fees
138 • Owner's Policy and Charges (if Paragraph 9(c)(i) is checked)    • Recording and other fees needed to cure title
139 • Title search charges (if Paragraph 9(c)(iii) is checked)    • Seller's attorneys' fees
140* • Municipal lien search (if Paragraph 9(c)(i) or (iii) is checked)    • Other:_____
141 • Charges for FIRPTA withholding and reporting
142    If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11,
143    a sum equal to 125% of estimated costs to meet the AS IS Maintenance Requirement shall be escrowed at
144    Closing. If actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall pay
145    such actual costs. Any unused portion of escrowed amount(s) shall be returned to Seller.
146   (b)  COSTS TO BE PAID BY BUYER:
147 • Taxes and recording fees on notes and mortgages    • Loan expenses
148 • Recording fees for deed and financing statements    • Appraisal fees
149 • Owner's Policy and Charges (if Paragraph 9(c)(ii) is checked)    • Buyer's Inspections
150 • Survey (and elevation certification, if required)    • Buyer's attorneys' fees
151 • Lender's title policy and endorsements    • All property related insurance
152 • HOA/Condominium Association application/transfer fees    • Owner's Policy Premium (if Paragraph
153 • Municipal lien search (if Paragraph 9(c)(ii) is checked)      9(c)(iii) is checked)
154* • Other:_____
155*   (c)  TITLE EVIDENCE AND INSURANCE: At least _____ (if left blank, then 15, or if Paragraph 8(a) is checked,
156 then 5) days prior to Closing Date ("Title Evidence Deadline"), a title insurance commitment issued by a Florida
157 licensed title insurer, with legible copies of instruments listed as exceptions attached thereto ("Title
158 Commitment") and, after Closing, an owner's policy of title insurance (see STANDARD A for terms) shall be
159 obtained and delivered to Buyer. If Seller has an owner's policy of title insurance covering the Real Property,
160 Seller shall furnish a copy to Buyer and Closing Agent within 5 days after Effective Date. The owner's title policy
161 premium, title search and closing services (collectively, "Owner's Policy and Charges") shall be paid, as set
162 forth below. The title insurance premium charges for the owner's policy and any lender's policy will be calculated
163 and allocated in accordance with Florida law, but may be reported differently on certain federally mandated
164 closing disclosures and other closing documents. For purposes of this Contract "municipal lien search" means a

search of records necessary for the owner's policy of title insurance to be issued without exception for unrecorded liens imposed pursuant to Chapters 153, 159 or 170, F.S., in favor of any governmental body, authority or agency. (CHECK ONE):

☐ (i) Seller shall designate Closing Agent and pay for Owner's Policy and Charges, and Buyer shall pay the premium for Buyer's lender's policy and charges for closing services related to the lender's policy, endorsements and loan closing, which amounts shall be paid by Buyer to Closing Agent or such other provider(s) as Buyer may select; or

☒ (ii) Buyer shall designate Closing Agent and pay for Owner's Policy and Charges and charges for closing services related to Buyer's lender's policy, endorsements and loan closing; or

☐ (iii) [MIAMI-DADE/BROWARD REGIONAL PROVISION]: Buyer shall designate Closing Agent. Seller shall furnish a copy of a prior owner's policy of title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title evidence, which is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search; and (C) municipal lien search. Buyer shall obtain and pay for post-Closing continuation and premium for Buyer's owner's policy, and if applicable, Buyer's lender's policy. Seller shall not be obligated to pay more than $_____ (if left blank, then $200.00) for abstract continuation or title search ordered or performed by Closing Agent.

(d) **SURVEY:** At least 5 days prior to Closing Date, Buyer may, at Buyer's expense, have the Real Property surveyed and certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.

(e) **HOME WARRANTY:** At Closing, ☐ Buyer ☐ Seller ☒ N/A shall pay for a home warranty plan issued by _____ at a cost not to exceed $_____. A home warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.

(f) **SPECIAL ASSESSMENTS:** At Closing, Seller shall pay: (i) the full amount of liens imposed by a public body ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being imposed on the Property before Closing. Buyer shall pay all other assessments. If special assessments may be paid in installments (CHECK ONE):

☒ (a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after Closing. Installments prepaid or due for the year of Closing shall be prorated.

☐ (b) Seller shall pay, in full, prior to or at the time of Closing, any assessment(s) allowed by the public body to be prepaid. For any assessment(s) which the public body does not allow prepayment, OPTION (a) shall be deemed selected for such assessment(s).

IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.

This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district (CDD) pursuant to Chapter 190, F.S., or special assessment(s) imposed by a special district pursuant to Chapter 189, F.S., which lien(s) or assessment(s) shall be prorated pursuant to STANDARD K.

## DISCLOSURES

**10. DISCLOSURES:**

(a) **RADON GAS:** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

(b) **PERMITS DISCLOSURE:** Except as may have been disclosed by Seller to Buyer in a written disclosure, Seller does not know of any improvements made to the Property which were made without required permits or made pursuant to permits which have not been properly closed or otherwise disposed of pursuant to Section 553.79, F.S. If Seller identifies permits which have not been closed or improvements which were not permitted, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open permits or unpermitted improvements.

(c) **MOLD:** Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or desires additional information regarding mold, Buyer should contact an appropriate professional.

(d) **FLOOD ZONE; ELEVATION CERTIFICATION:** Buyer is advised to verify by elevation certificate which flood zone the Property is in, whether flood insurance is required by Buyer's lender, and what restrictions apply to improving the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area"

221 or "Coastal Barrier Resources Act" designated area or otherwise protected area identified by the U.S. Fish and
222 Wildlife Service under the Coastal Barrier Resources Act and the lowest floor elevation for the building(s) and/or
223 flood insurance rating purposes is below minimum flood elevation or is ineligible for flood insurance coverage
224 through the National Flood Insurance Program or private flood insurance as defined in 42 U.S.C. §4012a, Buyer
225 may terminate this Contract by delivering written notice to Seller within _____ (if left blank, then 20) days after
226 Effective Date, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further
227 obligations under this Contract, failing which Buyer accepts existing elevation of buildings and flood zone
228 designation of Property.

229 (e) **ENERGY BROCHURE:** Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information Brochure
230 required by Section 553.996, F.S.

231 (f) **LEAD-BASED PAINT:** If Property includes pre-1978 residential housing, a lead-based paint disclosure is
232 mandatory.

233 (g) **HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE: BUYER SHOULD NOT EXECUTE THIS**
234 **CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS'**
235 **ASSOCIATION/COMMUNITY DISCLOSURE, IF APPLICABLE.**

236 (h) **PROPERTY TAX DISCLOSURE SUMMARY:** BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT
237 PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO
238 PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY
239 IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER
240 PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE
241 COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

242 (i) **FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"):** Seller shall inform Buyer in writing if
243 Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act ("FIRPTA"). Buyer
244 and Seller shall comply with FIRPTA, which may require Seller to provide additional cash at Closing. If Seller
245 is not a "foreign person", Seller can provide Buyer, at or prior to Closing, a certification of non-foreign status,
246 under penalties of perjury, to inform Buyer and Closing Agent that no withholding is required. See STANDARD
247 V for further information pertaining to FIRPTA. Buyer and Seller are advised to seek legal counsel and tax
248 advice regarding their respective rights, obligations, reporting and withholding requirements pursuant to
249 FIRPTA.

250 (j) **SELLER DISCLOSURE:** Seller knows of no facts materially affecting the value of the Real Property which are
251 not readily observable and which have not been disclosed to Buyer. Except as provided for in the preceding
252 sentence, Seller extends and intends no warranty and makes no representation of any type, either express or
253 implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller
254 has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected
255 building, environmental or safety code violation.

256 **PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS**

257 11. **PROPERTY MAINTENANCE:** Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the
258 Property, including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS
259 IS Maintenance Requirement"). See Paragraph 9(a) for escrow procedures, if applicable.

260 12. **PROPERTY INSPECTION; RIGHT TO CANCEL:**
261 (a) *PROPERTY INSPECTIONS AND RIGHT TO CANCEL: Buyer shall have __15__ (if left blank, then 15)*
262 *days after Effective Date ("Inspection Period") within which to have such inspections of the Property*
263 *performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole*
264 *discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering*
265 *written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely*
266 *terminates this Contract, the Deposit paid shall be returned to Buyer, thereupon, Buyer and Seller shall*
267 *be released of all further obligations under this Contract; however, Buyer shall be responsible for*
268 *prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting*
269 *from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the*
270 *preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to*
271 *terminate granted herein, Buyer accepts the physical condition of the Property and any violation of*
272 *governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to*
273 *Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all*
274 *repairs and improvements required by Buyer's lender.*

(b) **WALK-THROUGH INSPECTION/RE-INSPECTION:** On the day prior to Closing Date, or on Closing Date prior to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS Maintenance Requirement and has met all other contractual obligations.

(c) **SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS:** If Buyer's inspection of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open or needed permits, and shall promptly cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve such permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations, consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to expend, any money.

(d) **ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES:** At Buyer's option and cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties to Buyer.

ESCROW AGENT AND BROKER

13. **ESCROW AGENT:** Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow within the State of Florida and, subject to Collection, disburse them in accordance with terms and conditions of this Contract. Failure of funds to become Collected shall not excuse Buyer's performance. When conflicting demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent may take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties or liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall determine the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve escrow disputes through mediation, arbitration, interpleader or an escrow disbursement order.

In any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder, or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent. Agent shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing or termination of this Contract.

14. **PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify Property condition, square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or public records. **BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL, WRITTEN OR OTHERWISE) OF BROKER.** Buyer and Seller (individually, the "Indemnifying Party") each individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees at all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection with or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of information provided by the Indemnifying Party or from public records; (ii) Indemnifying Party's misstatement(s) or failure to perform contractual obligations; (iii) Broker's performance, at Indemnifying Party's request, of any task beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral, recommendation or retention of any vendor for, or on behalf of, Indemnifying Party; (iv) products or services provided by any such vendor for, or on behalf of, Indemnifying Party; and (v) expenses incurred by any such vendor.

331  Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors and
332  paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not relieve
333  Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14, Broker
334  will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this Contract.

335                                          **DEFAULT AND DISPUTE RESOLUTION**

336  **15. DEFAULT:**
337      (a) **BUYER DEFAULT:** If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract,
338          including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the Deposit
339          for the account of Seller as agreed upon liquidated damages, consideration for execution of this Contract, and
340          in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further obligations under
341          this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity to enforce Seller's
342          rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon default by Buyer, shall
343          be split equally between Listing Broker and Cooperating Broker; provided however, Cooperating Broker's share
344          shall not be greater than the commission amount Listing Broker had agreed to pay to Cooperating Broker.
345      (b) **SELLER DEFAULT:** If for any reason other than failure of Seller to make Seller's title marketable after
346          reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract,
347          Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting
348          from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific
349          performance.
350      This Paragraph 15 shall survive Closing or termination of this Contract.
351  **16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and
352  Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be settled
353  as follows:
354      (a) Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to
355          resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under Paragraph
356          16(b).
357      (b) Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida
358          Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules").
359          The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be
360          sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16
361          may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph
362          16 shall survive Closing or termination of this Contract.
363  **17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted
364  by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in
365  conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to recover
366  from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting the
367  litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

368                                  **STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")**

369  **18. STANDARDS:**
370      **A. TITLE:**
371      (i) **TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS:** Within the time period provided in
372      Paragraph 9(c), the Title Commitment, with legible copies of instruments listed as exceptions attached thereto, shall
373      be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by Seller at
374      or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title insurance
375      in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the Real Property,
376      subject only to the following matters: (a) comprehensive land use plans, zoning, and other land use restrictions,
377      prohibitions and requirements imposed by governmental authority; (b) restrictions and matters appearing on the
378      Plat or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of record without right of
379      entry; (d) unplatted public utility easements of record (located contiguous to real property lines and not more than
380      10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes for year of Closing and
381      subsequent years; and (f) assumed mortgages and purchase money mortgages, if any (if additional items, attach
382      addendum); provided, that, none prevent use of Property for RESIDENTIAL PURPOSES. If there exists at Closing
383      any violation of items identified in (b) - (f) above, then the same shall be deemed a title defect. Marketable title shall
384      be determined according to applicable Title Standards adopted by authority of The Florida Bar and in accordance
385      with law.

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

386  (ii) **TITLE EXAMINATION:** Buyer shall have 5 days after receipt of Title Commitment to examine it and notify Seller
387  in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and it is
388  delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after date of
389  receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period") after
390  receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Buyer fails to so notify Seller, Buyer
391  shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller will deliver
392  written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties will close this
393  Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of Seller's notice). If
394  Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after expiration of Cure Period,
395  deliver written notice to Seller: (a) extending Cure Period for a specified period not to exceed 120 days within which
396  Seller shall continue to use reasonable diligent effort to remove or cure the defects ("Extended Cure Period"); or
397  (b) electing to accept title with existing defects and close this Contract on Closing Date (or if Closing Date has
398  passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's receipt of Seller's notice), or (c)
399  electing to terminate this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all
400  further obligations under this Contract. If after reasonable diligent effort, Seller is unable to timely cure defects, and
401  Buyer does not waive the defects, this Contract shall terminate, and Buyer shall receive a refund of the Deposit,
402  thereby releasing Buyer and Seller from all further obligations under this Contract.
403  **B. SURVEY:** If Survey discloses encroachments on the Real Property or that improvements located thereon
404  encroach on setback lines, easements, or lands of others, or violate any restrictions, covenants, or applicable
405  governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of
406  such matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later
407  than Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and
408  Survey shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a
409  prior survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the
410  preparation of such prior survey, to the extent the affirmations therein are true and correct.
411  ~~**G. INGRESS AND EGRESS:** Seller represents that there is ingress and egress to the Real Property and title to~~
412  ~~the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of access.~~
413  **D. LEASE INFORMATION:** Seller shall, at least 10 days prior to Closing, furnish to Buyer estoppel letters from
414  tenant(s)/occupant(s) specifying nature and duration of occupancy, rental rates, advanced rent and security
415  deposits paid by tenant(s) or occupant(s)("Estoppel Letter(s)"). If Seller is unable to obtain such Estoppel Letter(s)
416  the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit
417  and Buyer may thereafter contact tenant(s) or occupant(s) to confirm such information. If Estoppel Letter(s) or
418  Seller's affidavit, if any, differ materially from Seller's representations and lease(s) provided pursuant to Paragraph
419  6, or if tenant(s)/occupant(s) fail or refuse to confirm Seller's affidavit, Buyer may deliver written notice to Seller
420  within 5 days after receipt of such information, but no later than 5 days prior to Closing Date, terminating this
421  Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under
422  this Contract. Seller shall, at Closing, deliver and assign all leases to Buyer who shall assume Seller's obligations
423  thereunder.
424  **E. LIENS:** Seller shall furnish to Buyer at Closing an affidavit attesting (i) to the absence of any financing
425  statement, claims of lien or potential lienors known to Seller and (ii) that there have been no improvements or
426  repairs to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been
427  improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all
428  general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth
429  names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all charges
430  for improvements or repairs which could serve as a basis for a construction lien or a claim for damages have been
431  paid or will be paid at Closing.
432  **F. TIME: Time is of the essence** in this Contract. Calendar days, based on where the Property is located, shall
433  be used in computing time periods. Other than time for acceptance and Effective Date as set forth in Paragraph 3,
434  any time periods provided for or dates specified in this Contract, whether preprinted, handwritten, typewritten or
435  inserted herein, which shall end or occur on a Saturday, Sunday, national legal public holiday (as defined in 5
436  U.S.C. Sec. 6103(a)), or a day on which a national legal public holiday is observed because it fell on a Saturday or
437  Sunday, shall extend to the next calendar day which is not a Saturday, Sunday, national legal public holiday, or a
438  day on which a national legal public holiday is observed.
439  **G. FORCE MAJEURE:** Buyer or Seller shall not be required to exercise or perform any right or obligation under
440  this Contract or be liable to each other for damages so long as performance or non-performance of the right or
441  obligation, or the availability of services, insurance, or required approvals essential to Closing, is disrupted, delayed,

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

caused or prevented by a Force Majeure event. "Force Majeure" means: hurricanes, floods, extreme weather, earthquakes, fires, or other acts of God, unusual transportation delays, wars, insurrections, civil unrest, or acts of terrorism, governmental actions and mandates, government shut downs, epidemics, or pandemics, which, by exercise of reasonable diligent effort, the non-performing party is unable in whole or in part to prevent or overcome. The Force Majeure event will be deemed to have begun on the first day the effect of the Force Majeure prevents performance, non-performance, or the availability of services, insurance or required approvals essential to Closing. All time periods affected by the Force Majeure event, including Closing Date, will be extended a reasonable time up to 7 days after the Force Majeure event no longer prevents performance under this Contract; provided, however, if such Force Majeure event continues to prevent performance under this Contract more than 30 days beyond Closing Date, then either party may terminate this Contract by delivering written notice to the other and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all further obligations under this Contract.

H. CONVEYANCE: Seller shall convey marketable title to the Real Property by statutory warranty, trustee's, personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters described in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be transferred by absolute bill of sale with warranty of title, subject only to such matters as may be provided for in this Contract.

I. CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:

(i) LOCATION: Closing will be conducted by the attorney or other closing agent ("Closing Agent") designated by the party paying for the owner's policy of title insurance and will take place in the county where the Real Property is located at the office of the Closing Agent, or at such other location agreed to by the parties. If there is no title insurance, Seller will designate Closing Agent. Closing may be conducted by mail, overnight courier, or electronic means.

(ii) CLOSING DOCUMENTS: Seller shall at or prior to Closing, execute and deliver, as applicable, deed, bill of sale, certificate(s) of title or other documents necessary to transfer title to the Property, construction lien affidavit(s), owner's possession and no lien affidavit(s), and assignment(s) of leases. Seller shall provide Buyer with paid receipts for all work done on the Property pursuant to this Contract. Buyer shall furnish and pay for, as applicable, the survey, flood elevation certification, and documents required by Buyer's lender.

(iii) FinCEN GTO REPORTING OBLIGATION. If Closing Agent is required to comply with a U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") Geographic Targeting Order ("GTO"), then Buyer shall provide Closing Agent with essential information and documentation related to Buyer and its Beneficial Owners, including photo identification, and related to the transaction contemplated by this Contract which are required to complete mandatory reporting, including the Currency Transaction Report; and Buyer consents to Closing Agent's collection and report of said information to IRS.

(iv) PROCEDURE: The deed shall be recorded upon Collection of all closing funds. If the Title Commitment provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow closing procedure required by STANDARD J shall be waived, and Closing Agent shall, subject to Collection of all closing funds, disburse at Closing the brokerage fees to Broker and the net sale proceeds to Seller.

J. ESCROW CLOSING PROCEDURE: If Title Commitment issued pursuant to Paragraph 9(c) does not provide for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following escrow and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent for a period of not more than 10 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault of Buyer, Buyer shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days from date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit and all Closing funds paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and, simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-convey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand for refund of the Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.

K. PRORATIONS; CREDITS: The following recurring items will be made current (if applicable) and prorated as of the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes (including special benefit tax assessments imposed by a CDD pursuant to Chapter 190, F.S., and assessments imposed by special district(s) pursuant to Chapter 189, F.S.), interest, bonds, association fees, insurance, rents and other expenses of Property. Buyer shall have option of taking over existing policies of insurance, if assumable, in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may be required by prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will be credited to Buyer. Escrow deposits held by Seller's mortgagee will be paid to Seller. Taxes shall be prorated based on current year's tax. If Closing occurs on a date when current year's millage is not fixed but current year's assessment

FloridaRealtors/FloridaBar-ASIS-6   Rev.10/21 © 2021 Florida Realtors® and The Florida Bar. All rights reserved.
Licensed to Alta Star Software and ID: 01548241566.K6T8.105212
Software and added formatting © 2022 Alta Star Software, all rights reserved. • www.altastar.com • (877) 279-8898

STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

499 is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's
500 assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements
501 on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st
502 of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be
503 agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an
504 informal assessment taking into account available exemptions. In all cases, due allowance shall be made for the
505 maximum allowable discounts and applicable homestead and other exemptions. A tax proration based on an
506 estimate shall, at either party's request, be readjusted upon receipt of current year's tax bill. This STANDARD K
507 shall survive Closing.
508 **L. ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH:** Seller
509 shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections,
510 including a walk-through (or follow-up walk-through if necessary) prior to Closing.
511 **M. RISK OF LOSS:** If, after Effective Date, but before Closing, Property is damaged by fire or other casualty
512 ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does not
513 exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed
514 pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated
515 cost to complete restoration (not to exceed 1.5% of Purchase Price) will be escrowed at Closing. If actual cost of
516 restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not in excess of 1.5% of Purchase
517 Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of
518 Purchase Price, Buyer shall elect to either take Property "as is" together with the 1.5% or receive a refund of the
519 Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation
520 with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.
521 **N. 1031 EXCHANGE:** If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneously with
522 Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate
523 in all reasonable respects to effectuate the Exchange, including execution of documents; provided, however,
524 cooperating party shall incur no liability or expense related to the Exchange, and Closing shall not be contingent
525 upon, nor extended or delayed by, such Exchange.
526 **O. CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; DELIVERY; COPIES; CONTRACT
527 EXECUTION:** Neither this Contract nor any notice of it shall be recorded in any public or official records. This
528 Contract shall be binding on, and inure to the benefit of, the parties and their respective heirs or successors in
529 interest. Whenever the context permits, singular shall include plural and one gender shall include all. Notice and
530 delivery given by or to the attorney or broker (including such broker's real estate licensee) representing any party
531 shall be as effective as if given by or to that party. All notices must be in writing and may only be made by mail,
532 facsimile transmission, personal delivery or email. A facsimile or electronic copy of this Contract and any signatures
533 hereon shall be considered for all purposes as an original. This Contract may be executed by use of electronic
534 signatures, as determined by Florida's Electronic Signature Act and other applicable laws.
535 **P. INTEGRATION; MODIFICATION:** This Contract contains the full and complete understanding and agreement
536 of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or
537 representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or change
538 in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties intended
539 to be bound by it.
540 **Q. WAIVER:** Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this
541 Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or
542 rights.
543 **R. RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS:** Riders, addenda, and typewritten
544 or handwritten provisions shall control all printed provisions of this Contract in conflict with them.
545 **S. COLLECTION or COLLECTED:** "Collection" or "Collected" means any checks tendered or received, including
546 Deposits, have become actually and finally collected and deposited in the account of Escrow Agent or Closing
547 Agent. Closing and disbursement of funds and delivery of closing documents may be delayed by Closing Agent
548 until such amounts have been Collected in Closing Agent's accounts.
549 **T. RESERVED.**
550 **U. APPLICABLE LAW AND VENUE:** This Contract shall be construed in accordance with the laws of the State
551 of Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the
552 county where the Real Property is located.
553 **V. FIRPTA TAX WITHHOLDING:** If a seller of U.S. real property is a "foreign person" as defined by FIRPTA,
554 Section 1445 of the Internal Revenue Code ("Code") requires the buyer of the real property to withhold up to 15%
555 of the amount realized by the seller on the transfer and remit the withheld amount to the Internal Revenue Service

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

556  (IRS) unless an exemption to the required withholding applies or the seller has obtained a Withholding Certificate
557  from the IRS authorizing a reduced amount of withholding.
558  (i)  No withholding is required under Section 1445 of the Code if the Seller is not a "foreign person". Seller can
559  provide proof of non-foreign status to Buyer by delivery of written certification signed under penalties of perjury,
560  stating that Seller is not a foreign person and containing Seller's name, U.S. taxpayer identification number and
561  home address (or office address, in the case of an entity), as provided for in 26 CFR 1.1445-2(b). Otherwise, Buyer
562  shall withhold the applicable percentage of the amount realized by Seller on the transfer and timely remit said funds
563  to the IRS.
564  (ii)  If Seller is a foreign person and has received a Withholding Certificate from the IRS which provides for reduced
565  or eliminated withholding in this transaction and provides same to Buyer by Closing, then Buyer shall withhold the
566  reduced sum required, if any, and timely remit said funds to the IRS.
567  (iii)  If prior to Closing Seller has submitted a completed application to the IRS for a Withholding Certificate and has
568  provided to Buyer the notice required by 26 CFR 1.1445-1(c) (2)(i)(B) but no Withholding Certificate has been
569  received as of Closing, Buyer shall, at Closing, withhold the applicable percentage of the amount realized by Seller
570  on the transfer and, at Buyer's option, either (a) timely remit the withheld funds to the IRS or (b) place the funds in
571  escrow, at Seller's expense, with an escrow agent selected by Buyer and pursuant to terms negotiated by the
572  parties, to be subsequently disbursed in accordance with the Withholding Certificate issued by the IRS or remitted
573  directly to the IRS if the Seller's application is rejected or upon terms set forth in the escrow agreement.
574  (iv)  In the event the net proceeds due Seller are not sufficient to meet the withholding requirement(s) in this
575  transaction, Seller shall deliver to Buyer, at Closing, the additional Collected funds necessary to satisfy the
576  applicable requirement and thereafter Buyer shall timely remit said funds to the IRS or escrow the funds for
577  disbursement in accordance with the final determination of the IRS, as applicable.
578  (v)  Upon remitting funds to the IRS pursuant to this STANDARD, Buyer shall provide Seller copies of IRS Forms
579  8288 and 8288-A, as filed.
580  **W.  RESERVED**
581  **X.  BUYER WAIVER OF CLAIMS: To the extent permitted by law, Buyer waives any claims against Seller**
582  **and against any real estate licensee involved in the negotiation of this Contract for any damage or defects**
583  **pertaining to the physical condition of the Property that may exist at Closing of this Contract and be**
584  **subsequently discovered by the Buyer or anyone claiming by, through, under or against the Buyer. This**
585  **provision does not relieve Seller's obligation to comply with Paragraph 10(j). This Standard X shall survive**
586  **Closing.**

587                                       ADDENDA AND ADDITIONAL TERMS

588  19. ADDENDA: The following additional terms are included in the attached addenda or riders and incorporated into this
590      Contract (Check if applicable):

| | | |
|---|---|---|
| ☐ A. Condominium Rider | ☐ M. Defective Drywall | ☐ X. Kick-out Clause |
| ☒ B. Homeowners' Assn. | ☐ N. Coastal Construction Control | ☐ Y. Seller's Attorney Approval |
| ☐ C. Seller Financing | Line | ☐ Z. Buyer's Attorney Approval |
| ☐ D. Mortgage Assumption | ☐ O. Insulation Disclosure | ☐ AA. Licensee Property Interest |
| ☐ E. FHA/VA Financing | ☐ P. Lead Paint Disclosure (Pre-1978) | ☐ BB. Binding Arbitration |
| ☐ F. Appraisal Contingency | ☐ Q. Housing for Older Persons | ☐ CC. Miami-Dade County |
| ☐ G. Short Sale | ☐ R. Rezoning | Special Taxing District |
| ☐ H. Homeowners/Flood Ins. | ☐ S. Lease Purchase/ Lease Option | Disclosure |
| ☐ I. RESERVED | ☐ T. Pre-Closing Occupancy | ☐ DD. Seasonal/Vacation Rentals |
| ☐ J. Interest-Bearing Acct | ☐ U. Post-Closing Occupancy | ☐ EE. PACE Disclosure |
| ☐ K. RESERVED | ☐ V. Sale of Buyer's Property | ☒ Other: _Addendum to "As Is"_ |
| ☐ L. RESERVED | ☐ W. Back-up Contract | _Residential Contract for Sale_ |
| | | _and Purchase_ |

FloridaRealtors/FloridaBar-ASIS-6   Rev.10/21 © 2021 Florida Realtors® and The Florida Bar.  All rights reserved.
Licensed to Alta Star Software and ID: D164241566.K678.105212
Software and added formatting © 2022 Alta Star Software, all rights reserved. • www.altastar.com • (877) 279-8898

591* **20. ADDITIONAL TERMS:** _____
592 _____
593 _____
594 _____
595 _____
596 _____
597 _____
598 _____
599 _____
600 _____
601 _____
602 _____
603 _____
604 _____
605 _____
606 _____
607 _____
608 _____

609                                    **COUNTER-OFFER**
610* ☐ Seller counters Buyer's offer.

611 **THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE**
612 **ADVICE OF AN ATTORNEY PRIOR TO SIGNING.**
613 **THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.**

614 *Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the*
615 *terms and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and*
616 *conditions should be negotiated based upon the respective interests, objectives and bargaining positions of all*
617 *interested persons.*

618 AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK
619* TO BE COMPLETED.

620 Buyer: _____   Date: _Mar 27, 2022_

621* Buyer: _____   Date: _Mar 26, 2022_

622* Seller: _____   Date: _March 29, 2022_
        James Feltman, solely in his capacity as the Court-appointed Receiver, not individually

623* Seller: _____   Date: _____

624 Buyer's address for purposes of notice          Seller's address for purposes of notice
625* _____                _c/o Berger Singerman, LLP_
626* _____                _1450 Brickell Avenue, Suite 1900, Miami, FL 33131_
627* _____                _Attn: Christopher Jarvinen, Esq.; 305-714-4363_

628 BROKER: Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers
629 entitled to compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct
630 Closing Agent to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage
631 agreements with the parties and cooperative agreements between the Brokers, except to the extent Broker has
632 retained such fees from the escrowed funds. This Contract shall not modify any MLS or other offer of compensation
633 made by Seller or Listing Broker to Cooperating Brokers.

634* ___Bill Sohl___                               ___Annette Amiralan Maggio___
635 **Cooperating Sales Associate, if any**        **Listing Sales Associate**

636* ___Re/Max Direct___                           ___Coldwell Banker Boynton Beach___
637 **Cooperating Broker, if any**                 **Listing Broker**

Page 12 of 12

FloridaRealtors/FloridaBar-ASIS-6  Rev.10/21 © 2021 Florida Realtors® and The Florida Bar. All rights reserved.
Licensed to Alta Star Software and ID: D1548241566.K6T8.105212
Software and added formatting © 2022 Alta Star Software, all rights reserved. • www.altastar.com • (877) 279-8898



DRAFT 1-14-22

**THIS FORM IS THE ADDENDUM TO "AS IS" RESIDENTIAL CONTRACT FOR SALE AND PURCHASE ("ADDENDUM").   NO CONTRACT OR CONTRACTUAL OBLIGATIONS BETWEEN THE PARTIES WILL EXIST UNLESS OR UNTIL THE PARTIES HAVE EACH EXECUTED A COMPLETE AND FINAL PURCHASE AND SALE AGREEMENT AND ADDENDUM AND THE SELLER'S LEGAL OBLIGATION TO PERFORM SHALL NOT ARISE UNTIL, AMONG OTHER CONDITIONS ARE SATISFIED BY THE BUYER, THE "AS IS" RESIDENTIAL CONTRACT FOR SALE AND PURCHASE, INCLUDING THIS ADDENDUM, HAVE BEEN APPROVED BY A FINAL ORDER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (CASE NO. 1:21-CV-02552-JPC) UPON A MOTION TO BE PREPARED BY THE SELLER AND FILED WITH THE COURT SEEKING TO APPROVE THE PROPOSED SALE. THESE PROPOSED TERMS ARE SUBJECT TO CHANGE.**

### ADDENDUM TO "AS IS" RESIDENTIAL CONTRACT FOR SALE AND PURCHASE

THIS ADDENDUM TO "AS IS" RESIDENTIAL CONTRACT FOR SALE AND PURCHASE ("Addendum") is made and entered into in conjunction with, and by this reference, incorporated into the "As Is" Residential Contract for Sale and Purchase dated as of ____03/29/2022____, 2022 (the "Effective Date") by and between Canes Fourteen, LLC, a Florida limited liability company ("Seller") and Michael and Danika Spinner ("Buyer"; each of Buyer and Seller is referred to herein as a "Party", and collectively, the "Parties") in connection with the real property located at 11353 Manatee Terrace, Lake Worth, FL 33449 (the "Property").

### RECITALS

A.     Simultaneously herewith, the Parties have entered into that certain "As Is" Residential Contract for Sale and Purchase (the "Base Agreement"), for the purchase and sale of the Property, as more particularly described in the Base Agreement.

B.     The Parties desire to amend the Base Agreement as set forth in this Addendum. The Base Agreement, as amended by this Addendum, shall be collectively referred to as the "Agreement."

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants and agreements set forth in this Addendum, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     Recitals. The foregoing Recitals are true and correct and are hereby incorporated into this Addendum by this reference.

2.     Defined Terms. All initially capitalized terms used but not otherwise defined in this Addendum shall have the same meanings given to such terms in the Base Agreement.

3.     Sale Authority. James Feltman (the "Receiver"), solely in his capacity as the Court-appointed Receiver for Canes Fourteen, LLC, and not in his individual capacity, has the legal authority to convey title of the Property on behalf of Canes Fourteen, LLC to Buyer subject to, and conditioned upon, the approval of the proposed sale by a final order of the United States District Court for the Southern District of New York which is the court overseeing the receivership (Case No. 1:21-cv-02552-JPC) (hereinafter referred to as the "Court") upon a motion to approve the proposed sale to be prepared and filed by the Seller.

4.     "As Is" Sale. The Property is to be accepted by Buyer at Closing in its present condition,

11005044-6

"as is, with all faults", including without limitation all patent or latent defects in the condition of the Property, whether or not known or discovered, and subject to all Permitted Exceptions (as defined in Section 6 below), and without any representations or warranty from Receiver, Seller, its members or any of their respective agents or representatives, whatsoever, express or implied. Section 10(j) of the Base Agreement is deleted in its entirety. Buyer understands and acknowledges that Receiver (i) is acting solely in his capacity as Court appointed Receiver pursuant to Court Order, not in his individual capacity, (ii) has never occupied the Property and (iii) has no actual knowledge of facts relating to the physical condition or history of the Property. Notwithstanding anything contained in the Agreement to the contrary, Buyer acknowledges that neither Receiver nor Seller, nor any of their respective agents or representatives, have made and are not making, and they specifically disclaim, any warranties, representations or agreements of any kind or character, express or implied, with respect to the Property, including, without limitation, the physical condition of the Property and any improvements located thereon, or its suitability for any particular purpose. Buyer is to conduct all of Buyer's own due diligence, at Buyer's sole cost and expense. Buyer acknowledges that Buyer will have the opportunity prior to the expiration of the Inspection Period to inspect the Property and shall be deemed to have accepted the Property in its condition as it exists at Closing. Buyer hereby agrees and acknowledges that Seller will not execute or provide a Seller Property Disclosure form and Buyer agrees to waive any requirement for the delivery of such document. Further, Buyer agrees and acknowledges that, except for the Title Commitment defined in Section 6 below, Seller will not provide any diligence documents or information in connection with the Property, including without limitation, prior title insurance coverage or survey. The foregoing provisions are a material part of the consideration for Seller entering into the Contract and shall survive Closing.

   5.    Sale Subject to Court Approval. Section 4 of the Base Agreement is amended to reflect that this transaction will close on ___April 29th, 2022___ (the "Closing Date"), subject to the provisions set forth in this Section 5, unless specifically extended by other provisions of the Agreement. Buyer agrees and acknowledges that the Agreement and Seller's obligations to perform thereunder and close on the sale of the Property are conditioned upon, and subject to approval by a final order of the Court upon a motion to approve the proposed sale to be prepared and filed by the Seller. Buyer agrees that the Agreement, and Buyer's obligations to perform thereunder and close on the acquisition of the Property will remain a binding obligation on Buyer until a final order is entered by the Court. Seller agrees to file a motion to seek a final order of the Court approving the sale of the Property and the Buyer acknowledges that the Seller has no control over when the Court may consider whether to approve such motion. If the final order of the Court approving the sale is not obtained by the Closing Date, the Parties agree that the Closing Date shall be automatically extended for a period of time not to exceed ninety (90) days in order to allow Seller the opportunity to seek Court approval (the "Extended Closing Date"). If Court approval is not obtained by the Extended Closing Date, Buyer shall have the option to extend the Extended Closing Date for an additional thirty (30) days to allow time for the Court to enter the final order approving the sale (the "Second Extended Closing Date"). If (i) the final order approving the sale of the Property to Buyer is not entered by the Court prior to the expiration of the Second Extended Closing Date, or (ii) the Court does not approve the sale of the Property to Buyer, then this Agreement shall terminate, the Parties shall be released for all obligations and liabilities under the Agreement, and the deposit(s) paid by Buyer shall be returned to Buyer.

   6.    Title. Notwithstanding anything to the contrary in the Agreement, Buyer agrees that the Property shall be sold and conveyed by Seller to Buyer, and Buyer shall accept and assume the Property subject to the title matters noted on Schedule B Section II (the "Permitted Exceptions") of the title commitment issued by Fidelity National Title Insurance Company ("Fidelity Title") with an effective date of December 4, 2021 at 8:00 am (the "Title Effective Date") attached hereto as Exhibit "A" (the "Title Commitment"). Buyer confirms that Buyer has reviewed the Title Commitment and the Permitted Exceptions and accepts the Permitted Exceptions. For purposes of this Agreement, the term Permitted Exceptions shall also include: (i) current city, state and county ad valorem taxes and similar impositions levied or imposed upon or assessed against the Property not yet due and payable; (ii) any and all matters

2

that may be found and identified on a survey; and (iii) code enforcement violations, expired or open permits. Buyer may, at Buyer's sole cost and expense, cause Fidelity Title to update the Title Commitment. If any update to the Title Commitment for the Property is issued after the Title Effective Date but prior to the Closing Date and such update shows any material and adverse new or modified exception from the title exceptions set forth in Schedule BII of the Title Commitment that renders title unmarketable or uninsurable (other than any Permitted Exceptions), then if such new exception was caused by any act of Buyer or Buyer's agents or representatives, such new exception shall constitute a Permitted Exception. Section 18(E) of the Base Agreement is amended to reflect that Seller's representative shall execute and deliver to Buyer at Closing an affidavit attesting (i) to the absence of liens or potential lienors in respect of any improvements made to the Property and (ii) that there have been no improvements to the Property within the last 90 days immediately preceding Closing for which the costs thereof remain unpaid. Seller's representative shall also execute and deliver to Buyer an affidavit stating that there are no parties in possession, and no other party has a claim or right to possession, of the Property other than Seller. Section 18(H) of the Base Agreement is amended to reflect that title to the Property shall be conveyed to Buyer by Special Warranty Deed.

7.     Title Defects. Notwithstanding anything to the contrary in the Agreement, including without limitation Section 18 of the Base Agreement, Seller shall have no obligation to cure any title defects or other matters which may affect the insurability or marketability of title to the Property (the "Title Matters") for which Buyer is requesting a cure by Seller (to the extent that any such Title Matters are not Permitted Exceptions, which Buyer has hereby agreed to take title subject to), except that Seller shall be obligated to discharge and remove any monetary judgement or other monetary liens of an ascertainable amount placed on the Property caused by Seller. Section 18 A (ii) and Section 18 B of the Base Agreement are each amended to reflect that if Seller elects not to cure any Title Matters requested by Buyer, Buyer will have seven (7) days after receipt of notice of Seller's election not to cure to terminate the Agreement or accept title subject to any existing Title Matters without reduction in the Purchase Price.

8.     Seller's Default. Section 15(b) of the Base Agreement is deleted in its entirety and replaced with the following: "If for any reason Seller fails to close after all of the closing conditions set forth in the Agreement have been satisfied, Buyer's sole and exclusive remedy is to receive the return of Buyer's Deposit plus any reasonable costs incurred by Buyer to conduct its investigation of the Property in an amount not to exceed two hundred and 00/100 dollars ($200.00). Buyer expressly waives any and all claims for damages resulting from Seller's default and the right to seek specific performance of the Agreement, or any right to pursue any other remedy at law or at equity for such default by Seller". The foregoing provisions are a material part of the consideration for Seller entering into the Contract and shall survive Closing or termination of this Agreement.

9.     Dispute Resolution. Section 16 of the Base Agreement is deleted in its entirety.

10.     Title Costs. Section 9 of the Base Agreement is amended to reflect that Buyer shall pay all title charges, including without limitation, title search fee, title exam fee, closing or escrow fee, title update fee, and the cost of the owner's title insurance policy (including any endorsements thereto). Buyer agrees that Fidelity Title shall act as the title underwriter and title insurer in this transaction.

11.     Applicable Law and Venue. Notwithstanding anything to the contrary in the Agreement, in the event of any dispute arising out of or in any way related to the Property or this Agreement, venue shall be exclusively in the United States District Court for the Southern District of New York (Case No. 1:21-cv-02552-JPC) which has oversight of the receivership. The foregoing provisions shall survive the Closing or termination of this Agreement.

12.     Brokers. Buyer represents and warrants to Seller that no person or entity is acting as real estate broker, finder or real estate agent other than ___Bill Sohl___, as agent for ___Re/Max Direct___ ("Buyer's Broker"). If a claim for fees or damages in connection with the transaction is made by a broker,

3

salesman, or finder other than Buyer's Broker claiming to have dealt through or on behalf of Buyer, Buyer shall indemnify, defend and hold harmless Seller and Seller's agents and representatives, from all liabilities, damages, claims, costs, fees and expenses whatsoever (including, but not limited to, reasonable attorneys' fees, paraprofessional fees and court costs at trial and all levels of proceedings, including appeals) with respect to such a claim for brokerage. The provisions of this Section shall survive Closing and any cancellation or termination of this Agreement.

13.     Legal Description. Section 1(c) of the Base Agreement is amended to reflect the legal description of the Property as follows: Lot 245, HOMELAND, according to the map or plat thereof, as recorded in Plat Book 33, at Page 111, of the Public Records of Palm Beach County, Florida.

14.     Broker Liability. Section 14 of the Base Agreement, Professional Advice; Broker Liability, shall be amended to delete all references to Seller.

15.     Miscellaneous. Except as amended and modified by this Addendum, the terms and provisions of the Base Agreement shall remain in full force and effect as originally set forth in the Base Agreement. **In the event of any conflict between the terms of the Base Agreement and the terms of this Addendum, the terms of this Addendum shall control.** This Addendum shall be binding upon and inure to the benefit of the Parties, and their respective successors and assigns. In the event any provision of this Addendum is determined by appropriate judicial authority to be illegal or otherwise invalid, such provision shall be given its nearest legal meaning or reconstrued as such authority determines, and the remainder of this Addendum shall be construed to be in full force and effect. Headings and similar structural elements set forth in this Addendum are intended for ease of reference only, and are not intended, and will not be construed, to reflect the intention of the Parties or to affect the substance of this Addendum. This Addendum may be executed in two or more counterparts each of which shall be considered an original and a complete set of which shall constitute one instrument. The parties agree and intend that a signature by facsimile or by electronic transmission (i.e. e-mail) of a ".pdf" data file shall bind the party so signing with the same effect as though the signature was an original.

[The remainder of this page is intentionally left blank]

[Signatures appear on the following page]

4

11005044-6

The Parties have executed this Addendum as of the Effective Date.

**SELLER:**

Canes Fourteen, LLC, a Florida limited liability company

By: _James Feltman, Receiver for Canes Fourteen LLC_

James Feltman, solely in his capacity as
the Court-appointed Receiver, and not in his
individual capacity

**BUYER:**

_____ Michael J. Spinner    MS

_____ Danika Spinner    DS

JSF

5

[1095944.5]

Exhibit "A"

Title Commitment

(see attached)

 *Fidelity National Title Insurance Company*

**Transaction Identification Data for reference only:**
Berger Singerman, LLP
201 East Las Olas Boulevard, Suite 1500,
Ft. Lauderdale, FL 33301
ALTA Universal ID:
LOAN ID Number:
Issuing Office File Number: 11353 Manatee Terrace
*(Use for AgentTRAX documents)*
Property Address: 11353 Manatee Terrace
Lake Worth, FL
Order No.: 9513870
Revision Number: Revision A: 12/03/2021; 1/5/2022; 1/11/2022; 1/12/2022 D

## Fidelity National Title Insurance Company

### SCHEDULE A
AMERICAN LAND TITLE ASSOCIATION COMMITMENT

1.   Commitment Date: 12/04/2021 at: 8:00 AM

2.   Policy or Policies to be issued:

   A.  ALTA Owners 2006 with Florida Modifications
       Proposed Insured:  Purchaser with contractual rights under a purchase agreement with the
       vested owner identified at item 4 below
       Proposed Amount of Insurance:  $1,000.00

3.   The estate or interest in the Land described or referred to in this Commitment is (Identify
     estate covered, i.e., fee, leasehold, etc.):

        Fee Simple

4.   Title to the Fee Simple estate or interest in the land is at the Commitment Date vested in:

        Canes Fourteen, LLC, a Florida limited liability company

5.   The Land is described as follows in Exhibit "A" attached hereto and made part hereof.


Countersigned:


BY: _____
Authorized Officer or Agent

This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the
Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I –
Requirements; and Schedule B, Part II – Exceptions
C166C09                                                              ALTA Commitment (8/1/2016) (with FL Modifications)

1 of 7

*Fidelity National Title Insurance Company*

Order Number: 9513970
11353 Manatee Terrace

### SCHEDULE B SECTION I
### REQUIREMENTS
### AMERICAN LAND TITLE ASSOCIATION COMMITMENT

The following requirements must be met:

1. The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2. Pay the agreed amount for the estate or interest to be insured.

3. Pay the premiums, fees, and charges for the Policy to the Company.

4. Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

   A. Duly executed Special Warranty Deed from James Feltman, as Receiver in Case No. 1:21-cv-02552-JPC, styled In Re Smerling Litigation, filed in the U.S. District Court for the Southern District of New York, on behalf of Canes Fourteen, LLC, a Florida limited liability company, Grantor, to. _____.

5. Proof of payment of any outstanding assessments in favor of Palm Beach County, Florida, any special taxing district and any municipality.  NOTE:  If this requirement is not satisfied the following exception will appear on Schedule B:

   Any outstanding assessments in favor of Palm Beach County, Florida, any special taxing district and any municipality.

6. Proof of payment of service charges for water, sewer, waste and gas, if any, through the date of closing.  NOTE:  If this requirement is not met the following exception will appear on Schedule B:

   Any lien provided for by Florida Statutes in favor of any city, town, village or port authority for unpaid service charges for service by any water, sewer, waste or gas system supplying the insured land or service facilities.

7. The Proposed Policy Amount(s) must be disclosed to the Company, and subject to approval by the Company, entered as the Proposed Policy Amount. An owner's policy should reflect the purchase price or full value of the Land. A loan policy should reflect the loan amount or value of the property as collateral. Proposed Policy Amount(s) will be revised and premiums charged consistent therewith when the final amounts are approved.

8. The Company and its policy issuing agents are required by Federal law to collect additional information about certain transactions in specified geographic areas in accordance with the Bank Secrecy Act.  If this transaction is required to be reported under a Geographic Targeting Order issued by FinCEN, the Company or its policy issuing agent must be supplied with a completed ALTA Information Collection Form ("ICF") prior to closing the transaction contemplated herein.

9. The search did not disclose any open mortgages of record, therefore the Company reserves the right to require further evidence to confirm that the Land is unencumbered, and further reserves the right to make additional requirements or add additional items or exceptions upon receipt of the requested evidence. To delete this requirement, the title agent must confirm with the owner that the Land is free and clear of mortgages and include such a recitation in the title affidavit.

*Fidelity National Title Insurance Company*

Order Number: 9513870
11353 Manatee Terrace

## SCHEDULE B SECTION I
### Requirements continued

10. Proof of payment of ALL OUTSTANDING TAXES, folio or parcel number 00-41-44-35-01-000-2450.
NOTE: PLEASE CALL THE PALM BEACH TAX COLLECTOR'S OFFICE AT (561) 355-2264 FOR ALL
CORRECT AMOUNTS THAT ARE NOW DUE AND PAYABLE.

11. Proof of payment, satisfactory to the Company, of taxes for the year(s) 2021 in the gross amount of
$24,375.48 under Tax Folio Number: 00-41-44-35-01-000-2450.

12. Filing of the Declaration of Paul Steven Singerman in support of motion to sell the Land to be insured
to be filed in the case captioned In Re Smerling under Case No. 21 Civ. 2552 (JPC) in the United
States District Court Southern District of New York.

13. Filing of, as well as recordation in the Public Records of Palm Beach County, the Order granting the
motion to sell the Land to be insured In Re Smerling Litigation under Case No. 21 Civ. 2552 (JPC)
In the United States District Court Southern District of New York.

14. Proof of proper notice to the fee title holder of the property described on Schedule A hereof, as to [i]
the Declaration of Paul Steven Singerman in support of the motion to sell the Land to
be insured, and [ii] the Order granting Motion to sell the Land to be insured In Re Smerling Litigation,
both under Case No. 21 Civ. 2552 (JPC) in the United States District Court Southern
District of New York.

NOTE: Because the contemplated transaction involves an all-cash closing, the Company has not
performed searches on the names of the purchasers/proposed insured. If the Company is asked to insure
a Mortgage from said purchasers, we will require notification of same and we reserve the right to make
additional requirements and/or exceptions which we may deem necessary after conducting name searches
on the purchasers.

The following note is for informational purposes only, is neither guaranteed nor insured, and is not part of
the coverage of this form or policy.
The last conveyance of title that has been of record for more than 24 months and all subsequently
recorded conveyances are: Official Records Book 29986, Page 1091.

## END OF SCHEDULE B   SECTION I

This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice;
the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and
Schedule B, Part II - Exceptions                                                                                    3 of 7
C165C09                                        ALTA Commitment (8/1/2016) (with FL Modifications)



*Fidelity National Title Insurance Company*

Order No.: 9513870
11353 Manatee Terrace

### SCHEDULE B SECTION II
### EXCEPTIONS
### AMERICAN LAND TITLE ASSOCIATION COMMITMENT

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1. Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this form.

2. Taxes and assessments for the year 2022 and subsequent years, which are not yet due and payable.

3. Standard Exceptions:

   A. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.

   B. Rights or claims of parties in possession not shown by the public records.

   C. Any lien, or right to a lien, for services, labor, or materials heretofore or hereafter furnished, imposed by law and not shown by the public records.

   D. Taxes or assessments which are not shown as existing liens in the public records.

4. Any claim that any portion of the insured land is sovereign lands of the State of Florida, including submerged, filled or artificially exposed lands accreted to such land.

5. Any lien provided by County Ordinance or by Chapter 159, Florida Statutes, in favor of any city, town, village or port authority for unpaid service charges for service by any water, sewer or gas system supplying the insured land.

6. Restrictions, covenants, conditions, easements and other matters as contained on the Plat of Homeland, recorded in Plat Book 33, Page 111, of the Public Records of Palm Beach County, Florida.

7. Restrictions, covenants, conditions and easements, which include provisions for A. an easement on the land; B. a lien for liquidated damages; C. a private charge or assessments, as contained in that certain Declaration of Covenants, Conditions and Restrictions recorded in Official Records Book 2759, Page 588; as amended in Official Records Book 2791, Page 371; Official Records Book 2819, Page 575; Official Records Book 6666, Page 4; Official Records Book 7483, Page 174; Official Records Book 8172, Page 1939; Official Records Book 8172, Page 1953, Official Records Book 10215, Page 1595; Official Records Book 10428, Page 1776, and Official Records Book 27932, Page 129, as affected by Partial Final Summary Judgment for Plaintiff as to Count IX of Second Amended Complaint filed April 27, 2016,

This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and Schedule B, Part II - Exceptions

4 of 7

C165C09                                                ALTA Commitment (8/1/2016) (with FL Modifications)



*Fidelity National Title Insurance Company*

### SCHEDULE B SECTION II
### EXCEPTIONS
### AMERICAN LAND TITLE ASSOCIATION COMMITMENT

recorded in Official Records Book 28256, Page 830, as re-recorded June 7, 2016, recorded in Official Records Book 28350, Page 1026; Resolution of the Board of Directors of Homeland Property Owner's Association, Inc., recorded in Official Records Book 28862, Page 314; Agreed Partial Final Judgment Official Records Book 29189, Page 752; and Resolution Official Records Book 29247, Page 1786, as may be subsequently amended.

8. Agreement regarding Homeland Road as recorded in Official Records Book 8534, Page 315 and Agreement of Forbearance recorded in Official Records Book 8534, Page 321, and Quit Claim Deed recorded in Official Records Book 8534, Page 350, of the Public Records of Palm Beach County, Florida.

9. Agreement regarding Ingress and Egress, Security and Maintenance recorded in Official Records Book 8534, Page 336 and Official Record Book 9014, Page 1571, of the Public Records of Palm Beach County, Florida.

10. Easement granted by instrument recorded in Official Record Book 3073, Page 1518, of the Public Records of Palm Beach County, Florida.

11. Resolution recorded in Official Record Book 3122, Page 1216, of the Public Records of Palm Beach County, Florida.

12. Right of Way Deed as recorded in Official Records Book 7993, Page 1369, of the Public Records of Palm Beach County, Florida.

13. Agreement recorded in Official Records Book 4000, Page 999, of the Public Records of Palm Beach County, Florida.

14. Easement granted in Official Record Book 5615, Page 1436, of the Public Records of Palm Beach County, Florida.

15. Easement recorded in Official Records Book 12043, Page 1473, of the Public Records of Palm Beach County, Florida.

16. Florida Power and Light Company easement recorded in Official Records Book 2776, Page 1697, of the Public Records of Palm Beach County, Florida.

17. Easement granted in Official Records Book 1982, Page 754.

NOTE: Exception 1 above shall be deemed deleted as of the time the settlement funds or proceeds of the loan to be secured by the insured mortgage, as applicable, are disbursed by the Company or its authorized agent. Neither the Company nor its agent shall, however, be under any duty to disburse any sum except upon a determination that no such adverse intervening matters have appeared of record or occurred.

NOTES ON STANDARD EXCEPTIONS:

Item 3A will be deleted from the policy(ies) upon receipt of an accurate survey of the Land acceptable to the Company. Exception will be made for any encroachment, setback line violation, overlap, boundary line dispute or other adverse matter disclosed by the survey.

 *Fidelity National Title Insurance Company*

Order No.: 9513870
11353 Manatee Terrace

### SCHEDULE B SECTION II
### EXCEPTIONS
AMERICAN LAND TITLE ASSOCIATION COMMITMENT

Items 3B, 3C, and 3D will be deleted from the policy(ies) upon receipt of an affidavit acceptable to the Company, affirming that, except as disclosed therein (i) no parties in possession of the Land exist other than the record owner(s); (ii) no improvements have been made to the Land within 90 days prior to closing which have not have been paid for in full; and (iii) no unpaid taxes or assessments are against the Land which are not shown as existing liens in the public records. Exception will be made for matters disclosed in the affidavit.

NOTE: All recording references in this form shall refer to the public records of Palm Beach County, Florida, unless otherwise noted.

NOTE: In accordance with Florida Statutes section 627.4131, please be advised that the insured hereunder may present inquiries, obtain information about coverage, or receive assistance in resolving complaints, by contacting Fidelity National Title Insurance Company, 13800 NW 14th Street Suite 190, Sunrise, FL 33323; Telephone 954-217-1744.

Searched By: Peter W. Keyes; PKeyes@fnf.com

### END OF SCHEDULE B SECTION II



*Fidelity National Title Insurance Company*

Order No.: 9513870
11353 Manatee Terrace

## EXHIBIT "A"

Lot 245, HOMELAND, according to the map or plat thereof, as recorded in Plat Book 33, Page(s) 111, of the Public Records of Palm Beach County, Florida.

This page is only a part of a 2016 ALTA Commitment for Title Insurance. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and Schedule B, Part II - Exceptions
C165C09                                    ALTA Commitment (8/1/2016) (with FL Modifications)

7 of 7



**Comprehensive Rider to the
Residential Contract For Sale And Purchase**
THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR

When initialed by all parties, the parties acknowledge that the disclosure set forth below was provided to Buyer prior to execution of the Florida Realtors/Florida Bar Residential Contract For Sale and Purchase between the parties and the clauses below will be incorporated therein.

Canoe Fourteen, LLC, _____ (SELLER)

*MS*
*JJS* and ~~Michael M. Spinner~~   Michael J. Spinner      Danika Spinner      (BUYER)

concerning the Property described as _____ 11353 Manatee Terrace Lake Worth Beach FL, 33449 _____

Buyer's Initials _____ *MS*   *SD* _____      Seller's Initials _____

## B. HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE

PART A. DISCLOSURE SUMMARY

IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BY DELIVERING TO SELLER OR SELLER'S AGENT OR REPRESENTATIVE WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING.

BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THIS DISCLOSURE.

Disclosure Summary For _____ Homeland _____
(Name of Community)

1. AS A BUYER OF PROPERTY IN THIS COMMUNITY, YOU WILL BE OBLIGATED TO BE A MEMBER OF A HOMEOWNERS' ASSOCIATION ("ASSOCIATION").
2. THERE HAVE BEEN OR WILL BE RECORDED RESTRICTIVE COVENANTS ("COVENANTS") GOVERNING THE USE AND OCCUPANCY OF PROPERTIES IN THIS COMMUNITY.
3. YOU WILL BE OBLIGATED TO PAY ASSESSMENTS TO THE ASSOCIATION. ASSESSMENTS MAY BE SUBJECT TO PERIODIC CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS $_____ 209 PER _____ Month _____ YOU WILL ALSO BE OBLIGATED TO PAY ANY SPECIAL ASSESSMENTS IMPOSED BY THE ASSOCIATION. SUCH SPECIAL ASSESSMENTS MAY BE SUBJECT TO CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS $_____ 0 PER _____
4. YOU MAY BE OBLIGATED TO PAY SPECIAL ASSESSMENTS TO THE RESPECTIVE MUNICIPALITY, COUNTY, OR SPECIAL DISTRICT. ALL ASSESSMENTS ARE SUBJECT TO PERIODIC CHANGE.
5. YOUR FAILURE TO PAY SPECIAL ASSESSMENTS OR ASSESSMENTS LEVIED BY A MANDATORY HOMEOWNERS' ASSOCIATION COULD RESULT IN A LIEN ON YOUR PROPERTY.
6. THERE MAY BE AN OBLIGATION TO PAY RENT OR LAND USE FEES FOR RECREATIONAL OR OTHER COMMONLY USED FACILITIES AS AN OBLIGATION OF MEMBERSHIP IN THE HOMEOWNERS' ASSOCIATION. IF APPLICABLE, THE CURRENT AMOUNT IS $_____ 0 PER _____
7. THE DEVELOPER MAY HAVE THE RIGHT TO AMEND THE RESTRICTIVE COVENANTS WITHOUT THE APPROVAL OF THE ASSOCIATION MEMBERSHIP OR THE APPROVAL OF THE PARCEL OWNERS.
8. THE STATEMENTS CONTAINED IN THIS DISCLOSURE FORM ARE ONLY SUMMARY IN NATURE, AND, AS A PROSPECTIVE PURCHASER, YOU SHOULD REFER TO THE COVENANTS AND THE ASSOCIATION GOVERNING DOCUMENTS BEFORE PURCHASING PROPERTY.
9. THESE DOCUMENTS ARE EITHER MATTERS OF PUBLIC RECORD AND CAN BE OBTAINED FROM THE RECORD OFFICE IN THE COUNTY WHERE THE PROPERTY IS LOCATED, OR ARE NOT RECORDED AND CAN BE OBTAINED FROM THE DEVELOPER.

Mar 17, 2022 _____   BUYER _____
DATE

Mar 17, 2022 _____   BUYER _____
DATE

Page 1 of 2   B. HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE      (SEE CONTINUATION)
CR-6 Rev. 10/21 © 2021 Florida Realtors® and The Florida Bar. All rights reserved.

## B. HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE (CONTINUED)

**PART B.**

The Property is located in a community with a mandatory homeowners' association or an association that may require the payment of assessments, charges, or impose restrictions on the Property ("Association").

1. **APPROVAL:** The Association's approval of Buyer (CHECK ONE): ___ is  ☒ is not required. If Association approval of this transaction or the Buyer is required, this Contract is contingent upon Association approval no later than _____ (if left blank, then 5) days prior to Closing. Within _____ (if left blank, then 5) days after Effective Date, the Seller shall initiate the approval process with Association. Buyer shall pay application and related fees, as applicable, unless otherwise provided for in Association governing documents or agreed to by the parties. Buyer and Seller shall sign and deliver any documents required by the Association, provide for interviews or personal appearances, if required, and use diligent effort to timely obtain Association approval. If approval is not granted within the stated time period above, Buyer may terminate this Contract, and shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract.

2. **PAYMENT OF FEES, ASSESSMENTS, AND OTHER ASSOCIATION CHARGES:**
   (a) Buyer shall pay any application, initial contribution, and/or membership or other fees charged by Association pursuant to its governing documents or applicable Florida Statutes. If applicable, the current amount(s) is:

   $ _209.00_ per _Month_ for _HOA Fee_ to _HOA Management_
   $ _250.00_ per _Once_ for _Application Fee_ to _HOA Management_
   $ _____ per _____ for _____ to _____
   $ _____ per _____ for _____ to _____

   (b) If special or other assessments levied by the Association exist as of the Effective Date, or any assessment(s) are levied after the Effective Date and prior to the Closing Date, and are due and payable in full prior to Closing Date, then Seller shall pay all such assessment(s) prior to or at Closing; or, if any such assessment(s) may be paid in installments, then Seller shall pay all installments which are due before Closing Date, prior to or at Closing, and (CHECK ONE):  ☐ Buyer  ☐ Seller (if left blank, then Buyer) shall pay installments due after Closing Date. If Seller is checked, Seller shall pay the assessment in full prior to or at the time of Closing.

   (c) Seller shall pay, prior to or at Closing, all fines imposed against the Seller or the Property by the Association which exist as of the Closing Date and any fees the Association charges to provide information about the Property, assessment(s) and fees.

The Association or Management Company to which assessments, special assessments or rent/land use fees are due and payable, is/are:

_____     _____

Contact Person_____:     Contact person_____

Phone _____     Phone _____

Email _____     Email _____

Additional contact information can be found on the Association's website, which is:

_____

www. _____